IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
TINA M. CHANDLER,                       )
            Plaintiff,                   )        Civil Action No. 1:06-2082 (EGS)
v.                                       )
                                        )
BEN S. BERNANKE,                        )
CHAIRMAN OF THE BOARD                   )
OF GOVERNORS OF THE                     )
FEDERAL RESERVE SYSTEM,                 )
            Defendant.                   )
_____)

**DEFENDANT'S MOTION TO DISMISS AND FOR SUMMARY JUDGMENT**

Pursuant to Rules 12(b) and 56 of the Federal Rules of Civil Procedure, defendant, the

Board of Governors of the Federal Reserve System (the "Board"), hereby moves to dismiss for

lack of subject matter jurisdiction or for failure to state a claim as to portions of the complaint

and for summary judgment as to the entire complaint.

Plaintiff's four-count complaint alleges retaliation for engaging in a protected activity

under Title VII on the basis of a number of alleged adverse actions, including denial of a

promotion (Count I); race discrimination in violation of Title VII, when she was denied a

promotion and subjected to a hostile work environment (Count II); and age discrimination in

violation of the Age Discrimination in Employment Act ("ADEA"), when she was denied a

promotion (Count III).  Plaintiff also claims interference with the right to take leave under the

Family and Medical Leave Act ("FMLA") (Count IV).  The complaint follows an administrative

process that culminated in a Final Agency Decision dated September 8, 2006, finding that the

Board had not discriminated against plaintiff on the basis of her age, race, or color, or retaliated

against her for having previously filed a complaint of discrimination. Ex. A, Final Agency Decision.

Many of the allegations in plaintiff's complaint are subject to dismissal because they either are barred by the express terms of a prior settlement agreement or are time barred. Plaintiff previously filed an administrative complaint in December 2000, which was settled in April 2001.  Exhibit B, Agreement and General Release ("Settlement Agreement"), TC-ROI-00065-69.[1]  As part of the Settlement Agreement, plaintiff agreed to waive the claims that she had up until the date she signed the agreement.  Id. at ¶ 6.  Thus all of the allegations of discrimination or retaliation in plaintiff's complaint up to and including paragraph 34 are barred by the Settlement Agreement.

Likewise, many of plaintiff's claims of discrete acts of discrimination must be dismissed because plaintiff did not timely exhaust her administrative remedies in regard to those claims. Plaintiff first sought administrative EEO counseling on October 17, 2005.  Complaint ¶ 61.  Any claim alleging a discrete act of discrimination occurring more than 45 days before that date is time barred.  National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002); 12 C.F.R. § 268.104(a)(1) (requiring an aggrieved person to initiate EEO counseling within 45 days of the alleged discriminatory act).  Thus, allegations relating to discrete acts that occurred before September 2, 2005, such as the failure to promote or performance evaluations, are time barred.

For those claims that are not time-barred, plaintiff cannot make a prima facie case of discrimination based on race, age, or retaliation.  Specifically, plaintiff cannot make a prima facie showing that she did not receive a promotion for which she was qualified.  Similarly, plaintiff cannot make a prima facie case of hostile work environment harassment because she has

---

[1]   References to "TC-ROI" are to the report of investigation created during the administrative phase of this case. Plaintiff received a copy of the report of investigation.

not alleged conduct that is sufficiently severe or pervasive to be actionable harassment, nor can she connect any of the allegedly hostile conduct to a prohibited basis.  Finally, plaintiff's FMLA claim must be dismissed because the FMLA does not provide a private cause of action for federal government employees with more than 12 months of service.

## STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

### FACTUAL BACKGROUND

Plaintiff is a 49 year old African-American female who was employed at the Board as a Staff Assistant, grade FR-35, in the Division of Reserve Bank Operations and Payment Systems ("RBOPS") from 1998 until her resignation on November 6, 2006.  Compl. ¶ 1.  From 1998 to August 2004, plaintiff reported to an RBOPS Assistant Director, initially Jack Dennis, and then from 2001 to August 2004, Bud Martindale.  Id. at ¶¶ 10 and 40.

2001 Settlement Agreement

In December 2000 plaintiff filed an administrative complaint of discrimination that was resolved by the Settlement Agreement in April 2001.   Id. at ¶¶ 29 and 35.  The Settlement Agreement provided that (i) plaintiff's official 2000 performance evaluation rating would be changed to "Outstanding" from "Commendable";[2] (ii) plaintiff would receive a pay raise of 5.3%, the same percentage raise that all Board employees who were rated "Outstanding" received that year; (iii) plaintiff would receive a cash award of $500 that her former supervisor had recommended; and (iv) the Board would pay Ms. Chandler's attorney's fees of $1,000.  Ex. B at ¶¶ 1-5.  Plaintiff, in turn, agreed to waive any claims that she had or could have raised up until the date she signed the agreement.  Id. at ¶ 6.

---

[2] Under the Board's performance rating system, an "Outstanding" rating is the second highest rating.  A rating of "Commendable" is the third highest of five rating categories.  Ex. C at TC-ROI-00257.

<u>Facts related to plaintiff's January 2006 administrative EEO complaint</u>

After Bud Martindale resigned in August 2004, the Assistant Director's position remained vacant until June 2006 and plaintiff reported to Paul Bettge, who was then an Associate Director in RBOPS.  Compl. ¶¶ 44-46.  During this time, plaintiff assisted the Oversight Coordination Section, managed by Jeannine Szostek, and the Audit Review Section, managed by Jo Chang.  <u>Id.</u> at ¶¶ 47, 49-50.  Paul Bettge was responsible for preparing plaintiff's annual performance evaluation, although he sought input from Ms. Szostek and Ms. Chang.  <u>Id.</u> at ¶ 51.

In 2004, plaintiff received a performance rating of "Commendable."  Ex. C, 2004 Performance Evaluation, at TC-ROI-00257.  A rating of "Commendable" is defined as "performance that consistently meets the Board's high standards and expectations."  <u>Id.</u>  In her 2004 performance evaluation, plaintiff was told that she should "pay greater attention to details and be accurate in the completion of assignments," <u>id.</u> at TC-ROI-00255, and should "focus on following through on completing assignments and also arranging for backup when she will be out of the office," noting that "her lack of accessibility hinders [the staff's] ability to provide her with assignments that would help her demonstrate her ability to handle more complex and varied projects."  <u>Id.</u> at TC-ROI-00256.

On August 18, 2005, plaintiff e-mailed Mr. Bettge a memorandum requesting a promotion to Senior Staff Assistant.  Ex. D, E-mail dated August 18, 2005 re "Tina Chandler," TC-ROI-00275-278.  Senior Staff Assistant is a position that is "above full performance for the relevant job family."  Ex. E, RBOPS Memorandum re Career Ladder Progressions, at TC-ROI-00287.  RBOPS policy states that for an employee to be considered for a position that is above full performance for the relevant job family, the employee must be "consistently performing at a level that exceeds the expectations for full performance for [the employee's] job family."  <u>Id.</u>

Mr. Bettge does not recall receiving Ms. Chandler's August 18 e-mail.  Ex. F, Aff. of Paul Bettge, at TC-ROI-00226.  However, he recalls having talked with her at some point about the need for her to work on more projects and assignments that could demonstrate that she could perform at the "next level."  Id.  Plaintiff was not promoted to the FR-36 grade.  Compl. ¶ 56.

In October 2005, plaintiff received an annual performance rating of "Commendable."  Ex. G, 2005 Performance Evaluation, at TC-ROI-00248.  Plaintiff again was told that she should "focus on attention to details in the completion of her assignments," id. at TC-ROI-00246, and "make certain staff knows where or how to reach her when she is working on projects away from her desk."  Id. at TC-ROI-00247.  The 2005 performance evaluation also addressed plaintiff's need to gain experience working on more complex projects, noting that plaintiff should be "more accessible to management and analysts" and that "[g]reater accessibility would facilitate management's ability to provide her with assignments that would help her demonstrate her ability to handle more complex and varied projects."  Id.

On or about October 17, 2005, plaintiff contacted the Board's EEO Programs office alleging that the Board had discriminated against her on the basis of race and age and had retaliated against her for filing a previous complaint of discrimination.  Compl. ¶ 61.  Plaintiff subsequently filed a formal complaint of discrimination alleging retaliation and discrimination on the basis of race, color, and age in January 2006.  Ex. A at 2.  The specific allegations accepted for investigation were (1) because of plaintiff's age, she was evaluated at a lower level than her actual level of performance, preventing her from obtaining promotion to the FR-36 grade level, although younger women had been promoted; (2) because of plaintiff's race and color, she was denied awards for work performed and has received lesser awards than employees of other races and denied a promotion for the past five years; and (3) she was subjected to

harassment, abuse, and hostility in the workplace and denied promotion in retaliation for having previously filed a complaint with the Board's EEO programs office.  Id.

An investigation was conducted, and upon plaintiff's election, the Board issued a final decision, dated September 8, 2006.  Id.  The Board found that the plaintiff had not been discriminated against on the basis of her age, race or color, or retaliated against for having previously filed a complaint of discrimination.  Id. at 1.  Specifically, the Board determined that (1) the denial of cash awards, even if the claim were not time-barred, did not give rise to an inference of discrimination because plaintiff could not show that she was treated differently from similarly situated employees; (2) the failure to promote did not give rise to an inference of discrimination because plaintiff could not establish she was qualified for the promotion or that others similarly situated were promoted, and even if there were an inference of discrimination, plaintiff could not establish that the Board's proffered reason for the non-promotion was a pretext for age or race discrimination; and (3) plaintiff could not establish a prima facie case of retaliatory hostile work environment because plaintiff's allegations did not rise to the level of actionable harassment, and the temporal proximity between plaintiff's protected activity and the alleged conduct (almost 5 years) was insufficient to establish a causal connection.  Id. at 5-10.

Events after plaintiff's January 2006 administrative complaint

On June 7, 2006, plaintiff submitted a request for leave under the FMLA.  Compl. ¶ 87. The FMLA certification form filled out by plaintiff's doctor indicated that plaintiff had symptoms of fibromyalgia and post-traumatic stress disorder and was requesting leave for treatment of a "chronic condition."  Compl. ¶ 84; Ex. H, FMLA Certification of Health Care Provider, at 1, 4.  A chronic condition is defined on the FMLA certification as a condition which "(1) requires *periodic visits* for treatment by a health care provider . . . .; (2) continues over an

*extended period of time* . . .; and (3) may cause *episodic* rather than a continuing period of incapacity . . . ." Ex. H at 4 (emphasis in original). The FMLA certification indicated that plaintiff would have to work "intermittently" because of her condition. Id. at 1. The Board granted plaintiff's request on June 27, 2006, giving plaintiff twelve weeks of leave to be used on an intermittent basis between June 7, 2006 and June 6, 2007. Compl. at ¶ 89.

On July 24, 2006, Ms. Chang approached plaintiff and offered plaintiff some "gummy bear" candy that Ms. Chang had in her hand. Plaintiff alleges that she perceived Ms. Chang's offer of candy as hostile and an invasion of her "personal space" and that she felt like she needed to protect herself. Id. at ¶¶ 91-92. According to plaintiff, the same day she reported Ms. Chang's offer of candy to the Board's Equal Employment Opportunity office and the Board's Employee Relations office. Id. at ¶¶ 93-94. On July 26, plaintiff reported Ms. Chang's offer of candy to plaintiff's supervisor, Greg Evans. Id. at ¶ 95.

By letter dated August 18, 2006, plaintiff was placed on administrative leave because of concerns about plaintiff's ability to perform the functions of her job without endangering her safety or that of others, based on events described in a memorandum from Mr. Evans to plaintiff. Ex. I, August 18 letter from Chris Fields, at 1. Mr. Evans's memorandum described, among other things, plaintiff's reaction to the candy incident with Ms. Chang, including statements plaintiff made about wanting to hit Ms. Chang and going home and hitting her husband instead. Ex. J, August 18 memo from Greg Evans, at 1. Ms. Fields's letter indicated that plaintiff would need to receive a medical evaluation from a psychiatrist that explained whether she was mentally fit to perform her job. Ex. I at 1.

Plaintiff agreed to undergo psychiatric evaluation by a psychiatrist designated by the Board, who determined she was fit for duty. Compl. at ¶¶ 100-101. Plaintiff received a letter

from the Board on October 18, 2006 informing her of the psychiatrist's evaluation and informing

her that her administrative leave would end on October 18, 2006.  Id. at ¶ 101.

On November 6, 2006, plaintiff resigned effective immediately.  Ex. K, Aff. of Lisa

Hoskins, Att. 3, Memorandum from Tina Chandler dated November 6, 2006 re "Resignation as

of November 6, 2006."

## LEGAL FRAMEWORK

### Statutory and Regulatory Framework

1.      Title VII and the ADEA

Section 717 of the Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16,

provides that all personnel actions affecting federal employees shall be made free from

discrimination based on race, color, religion, sex, or national origin.  The Age Discrimination in

Employment Act of 1967 (ADEA), 29 U.S.C. § 633a, proscribes discrimination based on age

against federal employees aged 40 and over.

Board regulations set out procedures for administrative processing of individual

complaints of discrimination under Title VII and the ADEA.  12 C.F.R. § 268.103-268.109.[3]

These regulations require any person who believes he or she has been discriminated against in

violation of either Title VII or the ADEA to contact an EEO counselor within 45 days of the date

of the alleged discriminatory event in order to try to resolve the matter informally.  12 C.F.R.

§ 268.104(a).[4]  If counseling fails to resolve the issue, the aggrieved person may file a formal

---

[3] The Board's regulations essentially duplicate regulations issued by the Equal Employment Opportunity Commission ("EEOC"), 29 C.F.R. Part 1614.

[4] Under the ADEA, an individual may choose to bypass the administrative process by giving 30 days' notice to the EEOC of his intention to file a civil action.  Such notice must be filed within 180 days of the allegedly discriminatory event.  29 U.S.C. § 633a(d).  In this case, plaintiff chose to pursue administrative remedies for the alleged violation of the ADEA rather than pursuing a claim directly in federal court.  Because she has not complied with the notice requirements of § 633a(d), she cannot claim this court's jurisdiction based on the ADEA's bypass provisions.  Rann v. Chao, 396 F.3d 192, 196 (D.C. Cir. 2003).

administrative complaint within 15 days of receiving notice from the EEO counselor of the end

of the counseling period.  12 C.F.R. § 268.105(b).  The administrative complaint must be

dismissed if the plaintiff fails to adhere to these time limits, or if the complaint raises a matter

that has not been brought to the attention of an EEO counselor and that is not "like or related to a

matter" that has been raised in EEO counseling.  12 C.F.R. § 106(a)(2).

A civil complaint is subject to dismissal if it raises claims beyond those raised in the

administrative process, Park v. Howard University, 71 F.3d 904, 907 (D.C. Cir. 1995), or if

discrete acts of alleged discrimination were not brought to an EEO counselor within the

applicable time period.  Stewart v. Ashcroft, 352 F.3d 422, 426 (D.C. Cir. 2003).  With respect to

allegations of harassment under Title VII or the ADEA, because their very nature involves a

series of incidents linked by a pattern of repeated conduct, incidents raised outside of the time

period are not time-barred if connected to timely raised incidents.  Morgan, 536 U.S. at 115.  In

contrast, "discrete" employment decisions (such as performance appraisals or denied

promotions) "occur" on the day they happen, and a party must file a charge within the statutory

period or will lose the ability to recover for it.  Discrete discriminatory acts that occur outside the

filing period are not actionable, even when they relate in some contextual way to timely filed

charges.  Id. at 113.

2.      FMLA

The FMLA, Pub. L. No. 103-3, 107 Stat. 6, grants private and federal employees an

entitlement to periods of leave for certain enumerated circumstances, including a serious medical

condition.  See, e.g., 29 U.S.C. § 2612(a)(1); 5 U.S.C § 6382(a)(1).  Title II of the FMLA

governs actions relating to federal employees with more than 12 months of service.  5 U.S.C. §§

6381 et seq.  Title I of the FMLA governs leave for private employees and federal employees not

covered by Title II.  29 U.S.C. §§ 2601 et seq.  Title I expressly creates a private right of action

for damages and equitable relief to redress violations of the FMLA.  29 U.S.C. § 2617(a)(2).

Title II, however, does not.  See 5 U.S.C. §§ 6381-6387.  Accordingly, both this Court and other

courts have dismissed FMLA claims brought by federal employees with more than 12 months of

service for lack of subject matter jurisdiction and for failure to state a claim on which relief can

be granted.  See, e.g., Sullivan-Obst v. Powell, 300 F. Supp. 2d 85, 99 (D.D.C. 2004); Russell v.

U.S. Dept. of the Army, 191 F.3d 1016, 1018-19 (9th Cir. 1999); Mann v. Haigh, 120 F.3d 34, 37

(4th Cir. 1997).

### Legal Standards for Dismissal and Summary Judgment

A defendant may move pursuant to Rule 12(b)(1) to dismiss a claim for which the United

States government has not waived its sovereign immunity.  See Webman v. Fed. Bureau of

Prisons, 441 F.3d 1022, 1025-26 (D.C. Cir. 2006).  In deciding whether subject matter

jurisdiction exists, the court must "accept as true all of the plaintiff's well-pled factual

allegations and draw all reasonable inferences in favor of the plaintiff; however, the court does

not need to accept as true the plaintiff's legal conclusions."  Cronauer v. United States, 394 F.

Supp. 2d 93, 96 (D.D.C. 2005).

Dismissal under Rule 12(b)(6) is proper when, accepting as true the factual allegations of

the complaint, "it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in

support of his claim that would entitle him to relief."  Beebe v. Washington Metro Area Transit

Auth., 129 F.3d 1283, 1286 (D.C. Cir. 1997) (quoting Conley v. Gibson, 355 U.S. 41, 45-46

(1957)).

Summary judgment generally is appropriate when "the pleadings, depositions, answers to

interrogatories, and admissions on file together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In order to determine which facts are "material," the court looks to the substantive law on which plaintiff's claim is based. Dobbs v. Roche, 329 F. Supp. 2d 33, 39 (D.D.C. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A "genuine issue" is one "whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action." Id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Anderson, 477 U.S. at 248).

The court is required to draw all justifiable inferences in favor of the nonmoving party and also accept the admissible evidence presented by the nonmoving party as true. Sullivan-Obst, 300 F. Supp. 2d at 90 (D.D.C. 2004) (citing Anderson, 477 U.S. at 255). The moving party prevails by showing that the nonmoving party fails to establish an element essential to the nonmoving party's case. Celotex, 477 U.S. at 322.

Moreover, plaintiff cannot rely solely on allegations or conclusionary statements. Dobbs, 329 F. Supp. 2d at 39 (citing Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999); Harding v. Gray, 9 F.3d 150, 154 (D.C. Cir. 1993)). In order to avoid summary judgment, plaintiff must produce admissible factual evidence demonstrating the existence of a genuine issue of material fact still in dispute. Celotex, 477 U.S. at 322-24; Anderson, 477 U.S. at 247-50.

**Applicable substantive law**

1.      Discrimination

In the absence of direct evidence of discrimination, the allocation of burdens and order of presentation of proof is the three-step process enunciated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-803 (1973). Barnette v. Chertoff, 453 F.3d 513, 515 (D.C. Cir. 2006). Plaintiff has the initial burden of establishing a prima facie case of

discrimination.  <u>Id.</u>  If the plaintiff succeeds in proving the prima facie case, the burden shifts to

the defendant to articulate some legitimate, nondiscriminatory reason for its action, and if it

carries this burden, the plaintiff must then prove by a preponderance of the evidence that the

legitimate reasons offered by the defendant were not its true reasons, but were a pretext for

discrimination.  <u>George</u>, 407 F.3d at 411 (D.C. Cir. 2005).

In <u>Czekalski v. Peters</u>, 475 F.3d 360 (2007) and <u>George</u>, the D.C. Circuit held that if the

defendant provides a legitimate, non-discriminatory explanation for its actions, the court should

not address a defendant's contention that plaintiff cannot establish a prima facie case but instead

should proceed to the ultimate question of discrimination <u>vel</u> <u>non</u>.  <u>Czekalski</u>, 475 F.3d at 364;

<u>George</u>, 407 F.3d at 411-12.  The Board believes in this instance that plaintiff cannot establish a

prima facie case of discrimination, retaliation, or hostile work environment.  In order to obtain a

ruling on that issue and to preserve it for appeal, if necessary, in this motion the Board does not

articulate a legitimate, non-discriminatory reason for its actions.[5]

In order to establish a prima facie case of discrimination, plaintiff must show that (1) she

is a member of a protected group; (2) she suffered an adverse employment action; and (3) the

unfavorable action gave rise to an inference of discrimination.  <u>George</u>, 407 F.3d at 412.  For

discrimination cases regarding a failure to promote, a plaintiff makes a prima facie case by

showing that (1) she is a member of a protected class; (2) she sought a promotion for which she

was qualified; (3) she was denied that promotion; and (4) "other employees of similar

qualifications . . . were indeed promoted at the time the plaintiff's request for promotion was

denied."  <u>Taylor v. Small</u>, 350 F.3d 1286, 1294 (D.C. Cir. 2003).

---

[5] Should this Court determine that plaintiff can establish a prima facie case of discrimination or retaliation, the
Board intends to present in a subsequent pleading the legitimate, nondiscriminatory reasons for its actions.

2.    Retaliation

Retaliation cases also follow the three-step burden of proof process enunciated in
McDonnell Douglas.  McKenna v. Weinberger, 729 F.2d 783, 790 (D.C. Cir. 1984).  More
specifically, to establish a prima facie case of retaliation, plaintiff must demonstrate (1) that she
engaged in a statutorily protected activity; (2) that the employer took an adverse personnel
action; and (3) that a causal connection existed between the two.[6]  Id.

3.    Hostile Work Environment

To make a prima facie Title VII hostile environment claim, the plaintiff employee must
show that (1) the employee is a member of a protected class;  (2) the employee was subjected to
unwelcome harassment; (3) the harassment complained of was based upon plaintiff's protected
class;  (4) the charged harassment had the effect of unreasonably interfering with the plaintiff's
work performance and creating an intimidating, hostile, or offensive working environment;   and
(5) the existence of respondeat superior liability.  Davis v. Coastal Intern. Sec., Inc., 275 F.3d
1119, 1122-23 (D.C. Cir. 2002) (citing Yeary v. Goodwill Industries-Knoxville, Inc., 107 F.3d
443, 445 (6th Cir.1997)). The plaintiff must show that the harassment was severe enough to
violate Title VII or the ADEA, meaning that it must be "sufficiently severe or pervasive to alter
the conditions of the victim's employment." Harris v. Forklift Systems, 510 U.S. 17, 21 (1993).
The conduct must be severe enough to create an objectively hostile environment, one that a
reasonable person would find hostile or abusive.  Id.  This, in turn, is determined by evaluating
such things as the frequency of the harassing conduct, its severity, whether the conduct was
physically threatening, humiliating or a mere offensive utterance, and whether the harassing

---

[6] For the same reasons stated above, because the Board demonstrates in Part III below that plaintiff cannot establish
a prima facie case of retaliation, the Board has chosen not to articulate a legitimate, nondiscriminatory reason for its
actions in this filing.

conduct unreasonably interferes with an employee's work performance.  <u>George</u>, 407 F.3d at

416.

**ARGUMENT**

I.    **CLAIMS OF DISCRIMINATION OR RETALIATION BASED ON ALLEGED ACTIONS OCCURRING BEFORE APRIL 2001 ARE BARRED BY THE EXPRESS TERMS OF THE SETTLEMENT AGREEMENT.**

Plaintiff alleges that she was denied a promotion "repeatedly each year since 2000."

Compl.¶ 119.  Plaintiff's claim of non-promotion in 2000 through April 2001, however, is barred

by the express terms of the Settlement Agreement settling an administrative complaint of

discrimination she brought in December 2000.  The Settlement Agreement provides that plaintiff

waived her right to any claims she had or issues that she could have raised both at the time she

filed her administrative complaint in December 2000, as well as any issues that arose before she

signed the Settlement Agreement in April 2001.  Ex. B ¶ 6.  Therefore, plaintiff's claim of failure

to promote in 2000 and through April 2001 is barred by the express terms of the Settlement

Agreement because she waived her right to bring this claim.  <u>See</u> <u>Johnson v. Ashcroft</u>, 445 F.

Supp. 2d 45, 50 (D.D.C. 2006) (holding that a claim regarding events preceding a settlement

agreement was barred by the settlement agreement where the agreement explicitly stated that the

plaintiff agreed "to release and forever discharge" the defendant from liability for any claims

"which were or could have been raised on or before the effective date.").  In her statement of

facts, plaintiff also refers to events that occurred in January 2001 and "early" 2001, such as being

told that she was not wanted in her division and having specific assignments taken away from

her.  Compl. ¶¶ 31-34.  Any claim of discrimination or retaliation based on these allegations is

also barred by the express terms of the Settlement Agreement.

## II.  CLAIMS OF DISCRIMINATION OR RETALIATION BASED ON ALLEGED DISCRETE EMPLOYMENT ACTIONS OCCURRING BEFORE SEPTEMBER 2005 MUST BE DISMISSED AS UNTIMELY.

Plaintiff alleges several discrete acts of discrimination based on age, race, and retaliation for prior EEO activity.  Specifically, plaintiff alleges that she (1) did not receive a cash award that others received in 2004, id. at ¶ 53,[7] and (2) was denied a promotion every year since 2000 based on an under-evaluation of plaintiff's performance.  Id. at ¶ 119.  With the exception of plaintiff's allegations of failure to promote in 2005, all of these claims must be dismissed as untimely.  In Morgan, the Supreme Court held that "discrete" employment decisions (such as performance appraisals or denied promotions) "occur" on the day that they happen, and a party must file a charge within the statutory period or lose the ability to recover for it.  536 U.S. at 110.  The Board's regulations require that complaints of discrimination be brought to the EEO Counselor within 45 days of the alleged discriminatory act.  12 C.F.R. § 268.104(a)(1).

According to plaintiff, she first sought counseling for her EEO claim on October 17, 2005, Compl. ¶ 61; therefore, any alleged discrete acts of discrimination that occurred more than 45 days before that date (that is, September 2, 2005) are time-barred.[8]  This is the case for plaintiff's claim that she did not receive a cash award in 2004 and for her claims that she was denied promotion in 2000, 2001, 2002, 2003, and 2004, as well as any performance evaluations

---

[7] Plaintiff's complaint contains two paragraphs numbered 53.  The paragraph to which this citation refers is the last paragraph on page 8 of plaintiff's complaint, beginning with the phrase, "In about 2004 . . ."

[8] The 45-day time limit is subject to waiver, estoppel, and equitable tolling.  Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982).  Plaintiff bears the burden of pleading and proving equitable reasons for his failure to comply with the 45-day period.  Bayer v. Department of the Treasury, 956 F.2d 330 (D.C. Cir. 1992).  And the court's power to toll "will be exercised only in extraordinary and carefully circumscribed instances."  Smith-Haynie v. District of Columbia, 155 F.3d 575, 579-80 (D.C. Cir. 1998) (holding that equitable tolling applies only where plaintiff, despite all due diligence, is unable to obtain vital information bearing on the existence of his claim; equitable estoppel applies where affirmative misconduct on the part of the defendant lulled the plaintiff into inaction.  Here the complaint lacks any averment as to plaintiff's failure to timely complain of any discrete act before the failure to promote in late 2005, and her prior EEO activity demonstrates she was familiar with the EEO process.

plaintiff received in those years that plaintiff believed contributed to the failure to promote.

Plaintiff cannot bypass administrative exhaustion simply because a failure to promote allegedly

occurred each year.  Each alleged failure to promote was a discrete act.  Morgan, 536 U.S. at

114.  Discrete discriminatory acts that occur outside the filing period are not actionable, even

when they relate in some contextual way to timely filed charges.  Id. at 113.

### III.    PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CASE THAT HER NON-PROMOTION IN 2005 WAS CAUSED BY DISCRIMINATION BASED ON RACE, AGE, OR RETALIATION.[9]

Plaintiff claims that she has sought, and has not received, a promotion to Senior Staff

Assistant, FR-36, each year since 2000.  Compl. ¶ 124.  Plaintiff alleges that the failure to

promote was a result of discrimination based on age, race, and retaliation for prior EEO activity

in 2000.  Id. at ¶¶ 114-15, 119-121, 126-134.  As we explained in Part II above, any discrete

action that occurred before September 2, 2005 (45 days before plaintiff first contacted an EEO

counselor) – including the alleged non-promotions in 2000, 2001, 2002, 2003, and 2004 – should

be dismissed as untimely.  Therefore, we will focus on plaintiff's allegation of non-promotion in

2005.[10]

Plaintiff cannot make a prima facie case that her failure to be promoted in 2005 was

based on discrimination of any kind.  Specifically, plaintiff cannot establish that she was

qualified.  Plaintiff also cannot not establish that "other employees of similar qualifications . . .

---

[9] As stated above, pursuant to the D.C. Circuit's opinions in Czekalski, 475 F.3d 360 (2007) and George, 407 F.3d 405 (2005), we have not provided the Board's legitimate, nondiscriminatory reasons for its actions because the Board does not believe that plaintiff can establish a prima facie case of discrimination, retaliation, or hostile work environment.  If the Court decides that plaintiff can establish a prima facie case of discrimination, retaliation, or hostile work environment, the Board will file a supplemental pleading providing the legitimate, nondiscriminatory reasons for its actions.

[10] While plaintiff's request for a promotion occurred before September 2, 2005, the Board accepted in its final agency decision that this claim was timely raised.  Plaintiff received no written response to her request, and while plaintiff's supervisor has stated that he talked to plaintiff about issues related to her request, it is not clear that this discussion occurred before September 2, 2005.  Ex. A at 7 n.9.

were indeed promoted at the time the plaintiff's request for promotion was denied," Taylor, 350

F.3d at 1294, or provide any other evidence that gives rise to an inference of discrimination or

retaliation.

Plaintiff cannot show that she was qualified for a position of Senior Staff Assistant (FR-

36). RBOPS considers the Senior Staff Assistant position to be "above full performance for the

relevant job family." Ex. E, RBOPS Career Ladder Progressions Memo, at TC-ROI-00287.

This means that the Division will consider an individual for a grade increase only when he or she

is "consistently performing at a level that exceeds the expectations for full performance for his or

her job family." Id. (emphasis added). RBOPS policy also states that job knowledge,

communication and interpersonal skills, and the ability to work independently are "important

factors" in considering a promotion to above full performance levels for non-exempt positions

such as Senior Staff Assistant. Id. at TC-ROI-00286 n.1 (identifying grades FR 31 to FR 36 as

non-exempt positions), TC-ROI-00288.

Additionally, while the Staff Assistant (FR-35) and Senior Staff Assistant (FR-36)

positions are part of the same "job family," a Senior Staff Assistant is required to perform more

complex work. A comparison of the job descriptions for each position shows that Senior Staff

Assistants are expected to take on more responsibility and work with more autonomy than Staff

Assistants. For example, under "Principal duties and responsibilities," Senior Staff Assistants

have enhanced responsibilities that are not included in the job description for Staff Assistant,

including (i) writing briefing memoranda to RBOPS officers and Board members, (ii) contacting

senior Reserve Bank management, arranging interviews, and collecting information in

preparation for examinations and reviews, and (iii) preparing periodic section status reports for

use by RBOPS management and staff. Compare Ex. L, Staff Assistant Job Description, TC-

ROI-00237 <u>with</u> Ex. M, Senior Staff Assistant Job Description, TC-ROI-00239, ¶¶ 2, 3, and 5.
Under "Knowledge/Skill Requirements," Senior Staff Assistants, unlike Staff Assistants, are
required to have "an understanding of basic accounting and the ability to research information
from a variety of sources," and additional college coursework is "highly preferred."  Ex. M at
TC-ROI-00240.  Regarding supervision, the Staff Assistant job description states that unusual
problems or situations are referred to the appropriate supervisor or staff for guidance, Ex. L at
TC-ROI-00238, while Senior Staff Assistants are expected to use their "initiative to handle any
problems or unusual situations that may occur."  Ex. M at TC-ROI-00240.

Plaintiff's performance record shows that she did not meet the high standards required for
the enhanced responsibilities of a Senior Staff Assistant.  In both 2004 and 2005, plaintiff
received an overall performance rating of "Commendable" in her position as Staff Assistant.  Ex.
C, 2004 Performance Evaluation at TC-ROI-00257; Ex. G, 2005 Performance Evaluation at TC-
ROI-00248.  "Commendable" is the rating given to Board employees whose performance meets
(but does not exceed) the Board's expectations for its employees.  Ex. C at TC-ROI-00257.
Comments from plaintiff's performance evaluations demonstrate that plaintiff was not
"consistently performing at a level that exceeds the expectations for full performance" of a Staff
Assistant.  Ex. E at TC-ROI-00287.  For example, both her 2004 and 2005 performance
evaluations note that plaintiff should concentrate on attention to details when completing
assignments.  Ex. C at TC-ROI-00255; Ex. G at TC-ROI-00246.  Both evaluations also reflect
the fact that plaintiff was not getting the experience necessary to qualify her for the Senior Staff
Assistant position because she was not making herself accessible to receive more challenging
assignments.  Her 2004 performance evaluation states that "a consistent theme that was raised by
a number of individuals . . . is that she is frequently away from her desk and, when she is there, is

on the phone." Ex. C at TC-ROI-00256. This performance evaluation also remarked that plaintiff's lack of accessibility hindered her ability to work on assignments that could demonstrate her ability to handle more complex projects. Id. Plaintiff's 2005 performance evaluation – issued after her request for promotion in August 2005 – reiterates these comments. Ex. G at TC-ROI-00247 ("[Plaintiff] should continue to try and make certain staff knows where or how to reach her when she is working on projects away from her desk. Greater accessibility would facilitate management's ability to provide her with assignments that would help her demonstrate her ability to handle more complex and varied projects.").

The performance evaluations also show that plaintiff had shortcomings in the areas that are "important factors" in considering a promotion to Senior Staff Assistant – job knowledge, communication and interpersonal skills, and ability to work independently. Ex. E at TC-ROI-00288. Under "Job Knowledge," both the 2004 and the 2005 evaluations noted that plaintiff should "continue to strive to have a better understanding of the role of internal audit and audit committees at the Reserve Banks, as well as increase her knowledge of Reserve Bank operations." Ex. C at TC-ROI-00255; Ex. G at TC-ROI-00246. Under "Communication Skills" and "Interpersonal Skills," both evaluations commented on plaintiff's need to initiate communications with staff and "seek out assignments from others with whom she does not naturally work as well." Ex. C at TC-ROI-00256; Ex. G at TC-ROI-00246-00247. Finally, plaintiff's 2004 evaluation states that while plaintiff was willing to act independently "when necessary," Ex. C at TC-ROI-00256, plaintiff needed to improve certain skills that are important to the ability to work independently, such as her time management in completing projects. Id. (stating that plaintiff needed to focus on "following through on completing assignments" and

"communicating proactively with analysts when she is unable to accomplish tasks in a timely manner").

Ms. Chang, a manager who worked with plaintiff, echoed the critiques in plaintiff's performance evaluations. She stated that plaintiff was often on the phone with personal calls while at work and often left her desk without letting anyone know where to find her. Ex. N, Aff. of Jo Chang, at TC-ROI-00216-0017. Ms. Chang also noted that she had asked her staff to give assignments to plaintiff, but that they did not want to do so because plaintiff's work was "never quite right" and they did not want to have to "redo" any work that they gave to plaintiff. Id. These employees' impressions of plaintiff's performance on assignments show that plaintiff often could not even meet the expectations of the sections she supported in the position she had, much less exceed them on the consistent basis necessary to qualify for an "above full performance" promotion to Senior Staff Assistant. Ex. E at TC-ROI-00287.

Plaintiff cannot make any showing to support her assertion that she was qualified for the Senior Staff Assistant position beyond her own subjective assessment of her qualifications, which in this context simply "does not carry much weight." Nurriddin v. Goldin, 382 F. Supp. 2d 79, 96 (D.D.C. 2005) (holding that plaintiff's own assessment of his qualifications is insufficient to raise a genuine issue of material fact as to whether he was qualified for a promotion); Tolson v. James, 315 F. Supp. 2d 110, 116 (D.D.C. 2004) (plaintiff cannot rely on her "own subjective assessment of her performance, for plaintiff's perception of herself, and of her work performance is not relevant. It is the perception of the decision maker that is relevant.")

Plaintiff attempts to show that younger employees who were otherwise "similarly situated" to her were promoted to Senior Staff Assistant (FR-36) by naming two women – Nicole

Addison-Waters and Lakisha Tapscott.[11]  Compl. ¶¶ 127-133.  Plaintiff tries to claim that she

was similarly situated to Ms. Addison-Waters and Ms. Tapscott simply because they had been

Staff Assistants and that she had once "trained" them.  Id. at ¶ 72.  For these employees to be

similarly situated, however, plaintiff must establish that all of the relevant aspects of her

employment situation were nearly identical to theirs.   Holbrook v. Reno, 196 F.3d 255, 261

(D.C. Cir. 1999).  Plaintiff cannot meet this burden.  First, while Ms. Addison-Waters and Ms.

Tapscott were in the same division as plaintiff, they worked for a different supervisor.  Ex. K,

Atts. 1 and 2, Decl. of Lisa Hoskins attaching promotion recommendation memoranda for Nicole

Addison-Waters and Lakisha Tapscott, respectively (showing their supervisor recommending

promotion to be Jeff Stehm); see Nurriddin, 382 F. Supp. 2d at 98 (citing different supervisors as

one reason that plaintiff was not similarly situated to the employees referenced in his complaint).

Additionally, the memoranda recommending Ms. Addison-Waters and Ms. Tapscott for

their promotions contain striking differences from the performance record of plaintiff.  Ms.

Addison-Waters, who was promoted in March 2003, had received an "Extraordinary" rating on

her prior annual performance evaluation.  Ex. K, Att. 1.  "Extraordinary" is the Board's highest

possible rating and indicates that "performance substantially and consistently exceeds the

Board's high standards and expectations."  Ex. C at TC-ROI-00257.  Her supervisor noted that

Ms. Addison-Waters possessed the very qualities that plaintiff's evaluations showed she lacked.

Ms. Addison-Waters, for example, was praised for having "outstanding initiative" and being

"very proactive in . . . taking on greater responsibilities," which led to her being "well respected

by the staff."  Ex. K, Att. 1.  She also showed initiative in increasing her job knowledge,

---

[11] Plaintiff does not – and cannot – assert that these women were of a different race than plaintiff.  Plaintiff does not assert that any employees of a different race who were otherwise similarly situated to her were promoted to Senior Staff Assistant, nor does she make any other showing that would support an inference of race discrimination with regard to her non-promotion claim.

developing more advanced skills and gaining a better understanding of data systems to enable

her to support data requests.  According to her supervisor, she was "continually seeking

opportunities to expand her skills and contribute."  Id.  Similarly, Ms. Tapscott had received an

"Extraordinary" rating before her October 2005 promotion.  Ex. K, Att. 2.  Her supervisor stated

that her attention to detail was "excellent," and she had "effectively managed a broad scope of

responsibilities."  Id.  His recommendation included his observation that Ms. Tapscott has

"strong technical and administrative skills, seeks to enhance her skills and experience at every

opportunity, and is always willing to take on additional, more complex responsibilities."  Id.

Rather than showing that Ms. Addison-Waters and Ms. Tapscott were similarly situated to

plaintiff, their performance records underscore the reasons that plaintiff was not qualified for the

Senior Staff Assistant position.

Likewise, plaintiff cannot make a prima facie case that her failure to promote was

retaliatory.  In order to make a prima facie case of retaliation, plaintiff has to show a causal

connection between her protected activity – the EEO claim that she settled in 2001 – and the

failure to promote in 2005.  Given that over four years had passed between settlement of her

EEO claim and the failed promotion in 2005, plaintiff cannot rely on temporal proximity to show

a causal connection.  See Clark County School Dist. v. Breeden, 532 U.S. 268, 273 (2001)

(noting that a three- or four-month period between an adverse action and protected activity is

insufficient to show a causal connection, and that a 20-month period by itself suggests "no

causality at all").  Plaintiff cannot make any other showing that her failure to promote was in any

way related to her prior EEO claim.  Because plaintiff cannot show a causal connection between

the failure to promote and her prior EEO activity, she cannot establish a prima facie case of

retaliation.

**IV.    PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CASE OF HOSTILE WORK ENVIRONMENT.**

In her complaint, plaintiff alleges that she was subjected to a hostile work environment on the basis of race.  Compl. ¶ 120.  Plaintiff does not specify what events contributed to the alleged hostile work environment.  However, even assuming every alleged discriminatory event plaintiff describes in her statement of facts is relevant to the hostile work environment claim, and viewing these facts in the light most favorable to the plaintiff, plaintiff still cannot make a prima facie case of hostile work environment because she cannot link any of the allegedly hostile conduct to her race (or any other impermissible factor).  Further, the incidents that plaintiff describes, taken together, do not describe a "workplace [that] is permeated with discriminatory intimidation, ridicule, and insult," as required to establish an actionable hostile work environment.  Harris, 510 U.S. at 21.

In her complaint, plaintiff alleges the following incidents:[12]

- The head of the division did not replace plaintiff's 2000 performance evaluation in plaintiff's personnel file, contrary to the terms of the Settlement Agreement (Compl. ¶ 39);

- Work assignments were taken from plaintiff in 2001 (Id. at ¶¶ 32);

- A former supervisor "yelled from his office at plaintiff" during his tenure from 2001 to 2004 (Id. at ¶ 43);

- She was denied a cash award in 2004 and denied promotions from 2000 to 2005 (Id. at ¶¶ 53 (second); 119);

---

[12] Complainant's statement of facts includes some allegations from early 2001.  See generally, Complaint ¶¶ 30-34.  As we have shown, plaintiff waived her right to make a claim based on these incidents in the Settlement Agreement, so we have not enumerated them here.  In any event, even with these older incidents plaintiff cannot establish that she was subjected to a hostile work environment.

- A manager for one of the sections plaintiff assisted in 2004 and 2005 assigned plaintiff to projects indirectly through other personnel (Id. at ¶ 52 (second)), and she was ignored by managers for a period in 2006 (Id. at ¶ 74);

- Another manager with whom plaintiff worked, Ms. Chang, asked plaintiff, "Why don't you apply for other jobs?" and "What do you want to do with your life?" and once "yelled at" and "scolded" plaintiff in September 2005 (Id. at ¶¶ 54 (second), 55, 57);

- Plaintiff was "prohibited" from attending a Division climate survey meeting in October 2005 (Id. at ¶ 60);

- The Board did not grant plaintiff sufficient medical leave in 2006 (Id. at ¶¶ 83, 86-90);

- Ms. Chang invaded plaintiff's personal space by "thrusting" candy in front of plaintiff's face in July 2006 (Id. at ¶¶ 91-92), and management did not adequately address plaintiff's concerns about this incident (Id. at ¶¶ 96-97, 99); and

- Following the candy incident, management placed plaintiff on administrative leave until she was evaluated by a psychiatrist to determine that she was fit for duty (Id. at ¶¶ 98-101).[13]

Title VII does not prohibit all forms of workplace harassment, only those directed at discrimination because of a prohibited basis. Stewart v. Evans, 275 F.3d 1126, 1133 (D.C. Cir.

---

[13]Allegations regarding medical leave, the candy incident, and administrative leave were not included in plaintiff's formal administrative complaint of discrimination, which was filed on January 3, 2006 and accepted for investigation by letter dated March 23, 2006.  Ex. A, Final Agency Decision, at 2.  Per this Court's opinions in Evans v. Chao, 2006 U.S. Dist. LEXIS 7229, and Graham v. Gonzales, 2005 U.S. Dist. LEXIS 36014, we recognize that events occurring after plaintiff filed her administrative complaint of a hostile work environment can be considered when evaluating plaintiff's hostile work environment claim without plaintiff having to exhaust administrative remedies for each separate incident.

2002).  In this case, plaintiff asserts that she was subjected to a hostile work environment on account of her race, but there is no connection between any of the acts that plaintiff describes in her complaint and her race.[14]  None of plaintiff's allegations indicate that during the alleged incidents there was any reference to her race.  See Sullivan-Obst, 300 F. Supp. 2d at 97-98 (finding that plaintiff failed to establish hostile work environment discrimination based on race where plaintiff's complaint contained two specific instances where she was allegedly treated differently than a person of a different race).  Absent from the complaint is any allegation that any of the alleged acts in any way referenced plaintiff's race or any other evidence demonstrating that race was the reason for the alleged conduct.  Likewise, plaintiff has made no assertion that there was abusive conduct directed toward African-Americans as a group.  Even viewing facts in the light most favorable to the plaintiff, no reasonable person could find that any of the activity that plaintiff describes in her complaint was motivated by race.

Even if plaintiff could connect the alleged conduct to a prohibited basis, plaintiff cannot show that it created an atmosphere "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998) (quoting Harris, 510 U.S. at 21).  First, many of

---

[14]Count II of plaintiff's complaint explicitly alleges a hostile work environment only on the basis of race.  In her 2005 administrative complaint that led to the present complaint, plaintiff also alleged a hostile work environment on the basis of retaliation for her EEO activity that was settled in 2001.  See Ex. A, Final Agency Decision, at 2.  As we argued in Part III infra, plaintiff cannot establish a prima facie case of retaliation based on the 2000-2001 EEO activity because it occurred too long ago to support an inference of causation, and plaintiff cannot make any other showing to support an inference of retaliation.  This argument also applies to any allegation of a retaliatory hostile work environment.  Plaintiff's complaint focuses almost exclusively on events that occurred (i) in mid-2001 or earlier, and are therefore barred by the Settlement Agreement, or (ii) in mid-2004 or later, three years after the Settlement Agreement.  A three year time gap is too great to establish causation based on a temporal connection.  Breeden, 532 U.S. at 273 (noting that a three- or four-month period between an adverse action and protected activity is insufficient to show a causal connection, and that a 20-month period by itself suggests "no causality at all").  Plaintiff does not specifically allege in this complaint a hostile work environment based on retaliation for her 2005 administrative complaint that is the basis of the present complaint.  To the extent she is raising this claim, the incidents she alleges that occurred after she filed the 2005 administrative complaint are not sufficiently "severe and pervasive" to support a retaliatory hostile work environment claim, as we argue in this Part.

the incidents that plaintiff describes – occasional yelling, exclusion from a meeting or a project,

being ignored by a co-worker, and an invasion of "personal space" – are the types of "isolated

incidents" and "ordinary tribulations of the workplace" that Supreme Court has stated are not

actionable harassment.  Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).  They are

precisely the types of conduct that this Court has considered insufficient to support a prima facie

case of a hostile work environment.   See, e.g., Davis v. Ashcroft, 355 F. Supp. 2d 330, 346-348

(D.D.C. 2005) (plaintiff's claims of yelling by a supervisor, exclusion from certain management

decisions and meetings, and removal of certain responsibilities were "simply attacking the

ordinary tribulations of the workplace");  Raymond v. U.S. Capitol Police Bd., 157 F. Supp. 2d

50, 58 (D.D.C 2001) (plaintiff's receiving the "cold shoulder" from colleagues did not constitute

harassment); Carter v. Greenspan, 304 F. Supp. 2d 13, 24-27 (D.D.C. 2004) (plaintiff's

subjective discomfort from a colleague's physical contact with him did not warrant Title VII

relief).

        Certainly, plaintiff describes some events that do not often occur in the normal course of

one's work life and in that regard are not "ordinary tribulations" of the workplace, such as an

allegedly insufficient response to a request for FMLA leave and being sent for an independent

psychiatric evaluation.  While not ordinary occurrences, these incidents do not constitute a

hostile work environment.  First, they are isolated events that – even taken together with

plaintiff's other allegations – do not demonstrate an atmosphere of severe or pervasive

harassment, nor can they be connected to plaintiff's race.  Furthermore, the actions the Board

took, even viewing them in the light most favorable to the plaintiff based on her own allegations,

were not actions that a reasonable person would consider "hostile or abusive."  See Harris, 510

U.S. at 21.  Regarding plaintiff's request for medical leave, plaintiff's submission from her

doctor indicated that she had a condition that required *periodic* visits with a health care provider and might result in *episodic* periods of incapacity and necessitate her to take work "intermittently." Ex. H at 1, 4. In response to this request, the Board granted plaintiff twelve weeks of medical leave to use on an intermittent basis. Id. at ¶ 89. Plaintiff's subjective belief that she "needed time off from work continuously," id. at ¶ 90, does not change the fact that the Board granted plaintiff leave that was consistent with her doctor's diagnosis. Plaintiff's allegations also demonstrate that no reasonable person could consider the Board's decision to place plaintiff on administrative leave until she received a psychiatric evaluation as hostile or harassing. The letter giving her notice of this decision indicated that this measure was taken in response to concerns about her ability to perform her job "without endangering [her] safety or that of others," Ex, I at 1 – concerns based on, among other things, statements she had made to her supervisor about wanting to hit a colleague. Ex. J at 1.

   In sum, plaintiff cannot establish a prima facie case of hostile work environment. She cannot link the incidents she describes to her race or any other prohibited basis. Furthermore, most of plaintiff's allegations in her complaint are "unconnected incidents" occurring over a considerable period that do not describe a "united course of severe and pervasive discriminatory intimidation." Chaple v. Johnson, 453 F. Supp. 2d 63, 74-75 (D.D.C. 2006) (internal quotations omitted). While plaintiff alleges that she subjectively feels she has suffered physical and emotional injury, Compl. at ¶¶ 105-106, the events she describes, taken together, do not show an atmosphere that a reasonable person would have considered hostile or abusive. Harris, 510 U.S. at 21.

## V.    PLAINTIFF'S FMLA CLAIM MUST BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION OR, IN THE ALTERNATIVE, FAILURE TO STATE A CLAIM.

Plaintiff claims relief for alleged interference with leave granted under the FMLA. However, as both this Court and other courts have held, federal employees with more than a year of service do not have a private right of action under the FMLA for damages or equitable relief. See, e.g., Sullivan-Obst, 300 F. Supp. 2d at 99; Russell, 191 F.3d at 1018-19; Mann, 120 F.3d at 37. Plaintiff is a federal employee with more than 12 months of service, Compl. ¶ 7, and is therefore covered under Title II of the FMLA. 5 U.S.C. § 6381 et seq. Suits against the federal government are barred by sovereign immunity absent an unequivocal waiver by the federal government, and Title II contains no waiver. Mann, 120 F.3d at 37. Therefore, plaintiff's FMLA claim must be dismissed for lack of subject matter jurisdiction on the basis of sovereign immunity, see Russell, 191 F.3d at 1018-1019, or, in the alternative, for failure to state a claim. See Sullivan-Obst, 300 F. Supp. 2d at 99.

## CONCLUSION

Plaintiff's claims in Counts I, II, and III that she was subject to adverse actions, including being denied a deserved promotion, should be dismissed. Plaintiff's claims regarding any events occurring before April 2001 are barred by the Settlement Agreement, and any claims regarding discrete adverse acts occurring before September 2, 2005, should be dismissed for failure to timely exhaust administrative remedies. The remaining discrete adverse act – the 2005 failure to promote – should be dismissed because complainant cannot make a prima facie case of discrimination or retaliation. Plaintiff's claim in Count III that she was subjected to a hostile work environment likewise should be dismissed because she cannot make a prima facie case of hostile work environment harassment. Count IV, interference with right to take leave under the

FMLA, must be dismissed for lack of subject matter jurisdiction or, in the alternative, for failure

to state a claim.

DATED: May 8, 2007.

<u>s/ Katherine H. Wheatley</u>
Katherine H. Wheatley
(Bar No. 359037)
Associate General Counsel

John L. Kuray
Senior Counsel

Sara L. Stainback
Senior Attorney

Board of Governors of
the Federal Reserve System
20th & C Streets, N.W.
Washington, D.C.  20551
(202) 452-3779

Counsel for Defendant
Ben S. Bernanke, Chairman of the Board
of Governors of the Federal Reserve System

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

TINA M. CHANDLER,                )
       Plaintiff,                )
v.                               )
                                )
BEN S. BERNANKE,                 )
CHAIRMAN OF THE BOARD            )
OF GOVERNORS OF THE              )
FEDERAL RESERVE SYSTEM,          )
       Defendant.                )
_____)

Civil Action No. 1:06-2082 (EGS)

**DEFENDANT'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

1. Plaintiff is a 49 year old African-American female who was employed at the Board as a Staff Assistant, grade FR-35, in the Division of Reserve Bank Operations and Payment Systems ("RBOPS") from 1998 until November 6, 2006. Compl. ¶ 1.

2. From 1998 to August 2004, plaintiff reported to an RBOPS Assistant Director, initially Jack Dennis, id. at ¶ 10, and then from 2001 to August 2004, Bud Martindale.  Id. at ¶ 40.

3. In December 2000, Plaintiff filed an administrative complaint of discrimination. Id. at ¶ 29.  That complaint was resolved by Settlement Agreement in April 2001. Ex. B, Settlement Agreement.

4. The Settlement Agreement provided that (i) plaintiff's official 2000 performance evaluation rating would be changed to "Outstanding" from "Commendable"; (ii) plaintiff would receive a pay raise of 5.3%, the same percentage raise that all Board employees who were rated "Outstanding" received that year; (iii) plaintiff

would receive a cash award of $500 that her former supervisor had recommended; and (iv) the Board would pay Ms. Chandler's attorney's fees of $1,000.  Id. at ¶¶ 1-5.  Plaintiff, in turn, agreed to waive any claims that she had or could have raised up until the date she signed the agreement.  Id. at ¶ 6.

5. Under the Board's performance rating system, an "Outstanding" rating is the second highest rating.  A rating of "Commendable" is the third highest of five rating categories.  Ex. C at TC-ROI-00257.

6. After Bud Martindale resigned in August 2004, the Assistant Director's position remained vacant.  Compl. ¶¶ 44-45.  Plaintiff reported to Paul Bettge, who was then an Associate Director of RBOPS.  Id. at ¶ 46.

7. After Mr. Martindale resigned, plaintiff assisted the Oversight Coordination and Audit Review sections as a whole, rather than any particular individual.  Id. at ¶47.  Those sections were managed by Jeannine Szostek and Jo Chang, respectively.  Id. at ¶¶ 49-50.

8. In 2004 and 2005, Mr. Bettge was responsible for plaintiff's annual performance evaluation, although he sought input from Ms. Szostek and Ms. Chang.  Id. at ¶ 51.

9. In October 2004, plaintiff received an annual performance rating of "Commendable."  Ex. C, 2004 Performance Evaluation, at TC-ROI-00257.

10. A rating of "Commendable" is defined as "performance that consistently meets the Board's high standards and expectations."  Id.

11. In her 2004 performance evaluation under "Job Knowledge," plaintiff was told that she should "continue to strive to have a better understanding of the role of

internal audit and audit committees at the Reserve Banks, as well as increase her

knowledge of Reserve Bank operations." <u>Id.</u> at TC-ROI-00255.

12. Under "Analytical Ability," the 2004 performance evaluation states that plaintiff

should "pay greater attention to details and be accurate in the completion of

assignments." <u>Id.</u>

13. Under "Interpersonal Skills," plaintiff was told that she should "seek out

assignments with others with whom she does not naturally work as well." <u>Id.</u> at

TC-ROI-00256.

14. Under "Management of Job Responsibilities," the 2004 performance evaluation

states that plaintiff was willing to work "independently when necessary," but she

should "focus on following through on completing assignments and also

arranging for backup when she will be out of the office" and "communicat[e]

proactively with analysts when she is unable to accomplish tasks in a timely

manner." <u>Id.</u> at TC-ROI-00256.  It also noted that "a consistent theme that was

raised by a number of individuals . . . is that she is frequently away from her desk

and, when she is there, is on the phone," and that "her lack of accessibility hinders

[the staff's] ability to provide her with assignments that would help her

demonstrate her ability to handle more complex and varied projects." <u>Id.</u>

15.  On August 18, 2005, plaintiff e-mailed Mr. Bettge a memorandum requesting a

promotion to Senior Staff Assistant.  Ex. D, E-mail dated August 18, 2005 re

"Tina Chandler," TC-ROI-00275-278.

16. Mr. Bettge does not recall receiving Ms. Chandler's August 18 e-mail. Ex. F, Aff.

of Paul Bettge, at TC-ROI-00226.

3

17. Mr. Bettge recalls having talked with plaintiff at some point about the need for her to work on more projects and assignments that could demonstrate that she could perform at the "next level."  Id.

18. Plaintiff was not promoted to Senior Staff Assistant.  Compl. ¶ 56.

19. Senior Staff Assistant was the next level in plaintiff's career ladder and is at the FR-36 grade level.  Exhibit E, RBOPS Memorandum re Career Ladder Progressions, at TC-ROI-00287.

20. RBOPS policy states that Senior Staff Assistant is a position that is "above full performance for the relevant job family."  Id.

21. RBOPS policy states that for an employee to be considered for a position that is "above full performance for the relevant job family," the employee must be "consistently performing at a level that exceeds the expectations for full performance for his or her job family."  Id.

22. RBOPS policy states that job knowledge, communication and interpersonal skills, and the ability to work independently are "important factors" in considering a promotion to above full performance levels for non-exempt positions such as Senior Staff Assistant.  Id. at TC-ROI-00286 n.1 (identifying grades FR-31 to FR-36 as non-exempt positions), TC-ROI-00288.

23. Senior Staff Assistant has enhanced responsibilities, such as (i) writing briefing memoranda to RBOPS officers and Board members, (ii) contacting senior Reserve Bank management, arranging interviews, and collecting information in preparation for examinations and reviews, and (iii) preparing periodic section status reports for use by RBOPS management and staff.  Compare Ex. L, Staff

Assistant Job Description, TC-ROI-00237 <u>with</u> Exhibit M, Senior Staff Assistant
Job Description, TC-ROI-00239, ¶¶ 2, 3, and 5.

24. Senior Staff assistants are required to have "an understanding of basic accounting
and the ability to research information from a variety of sources," and additional
college coursework is "highly preferred."  Ex. M at TC-ROI-00240.

25. Staff Assistants are expected to refer unusual problems or situations to the
appropriate supervisor or staff for guidance.  Ex. L at TC-ROI-00238.  Senior
Staff Assistants, however, are expected to use their "initiative to handle any
problems or unusual situations that may occur."  Ex. M at TC-ROI-00240.

26. Nichole-Addison Waters received a promotion from Staff Assistant to Senior
Staff Assistant in 2003, and LaKisha Tapscott received a promotion from Staff
Assistant to Senior Staff Assistant in 2005.  Ex. K, Decl. of Lisa Hoskins, ¶¶ 6, 9.

27. Jeff Stehm was the supervisor who recommended both Ms. Addison-Waters and
Ms. Tapscott for promotion.  Ex. K, Atts. 1 and 2.

28. Both Ms. Addison-Waters and Ms. Tapscott had received performance ratings of
"Extraordinary" on their annual performance evaluations immediately preceding
their promotion.  <u>Id.</u>

29. "Extraordinary" is the Board's highest possible rating and indicates that
"performance substantially and consistently exceeds the Board's high standards
and expectations."  Ex. C at TC-ROI-00257.

30. In his memorandum recommending Ms. Addison-Waters for the promotion, Mr.
Stehm said that Ms. Addison-Waters had "outstanding initiative" and was "very
proactive in developing advanced skills and taking on greater responsibilities,"

and that she was "well respected by the staff." She also was "continually seeking opportunities to expand her skills and contribute." Ex. K, Att. 1.

31. In his memorandum recommending Ms. Tapscott for the promotion, Mr. Stehm said that Ms. Tapscott's "attention to detail has been excellent" and that she "effectively managed a broad scope of responsibilities." Mr. Stehm also noted that Ms. Tapscott had "strong technical and administrative skills, seeks to enhance her skills and experience at every opportunity, and is always willing to take on additional, more complex responsibilities." Ex. K, Att. 2.

32. In October 2005, plaintiff received an annual performance rating of "Commendable." Ex. G, 2005 Performance Evaluation, at TC-ROI-00248.

33. In her 2005 annual performance evaluation under "Job Knowledge," plaintiff again was told that she should "continue to strive to have a better understanding of the role of internal audit and audit committees at the Reserve Banks, as well as increase her knowledge of Reserve Bank operations." Ex. G at TC-ROI-00246.

34. Under "Analytical Ability," plaintiff was told that she should "continue to focus on attention to details in the completion of her assignments." Id. at TC-ROI-00246.

35. Under "Communication Skills," plaintiff's 2005 performance evaluation stated that she should "initiate communications with Audit Review and Oversight management and staff to ensure everyone in the programs knows that she is approachable and willing to provide assistance, particularly for tasks that will provide some 'stretch' to her ongoing responsibilities." Id.

36. Under "Interpersonal skills, plaintiff was told that she should "seek out assignments from others with whom she does not naturally work as well." Id. at TC-ROI-00247.

37. Under Management of Job Responsibilities, plaintiff was told that she should "make certain staff knows where or how to reach her when she is working on projects away from her desk." The 2005 performance evaluations also noted that plaintiff should be "more accessible to management and analysts" and that "greater accessibility would facilitate management's ability to provide her with assignments that would help her demonstrate her ability to handle more complex and varied projects." Id.

38. A manager who worked with plaintiff, Jo Chang, observed that plaintiff was often on the phone with personal calls while at work and often left her desk without letting anyone know where to find her. Ex. N, Aff. of Jo Chang, at TC-ROI-00216.

39. Ms. Chang had asked her staff to give assignments to plaintiff, but they did not want to do so because plaintiff's work was "never quite right" and they did not want to have to "redo" any work that they gave to plaintiff. Id.

40. On or about October 17, 2005, plaintiff contacted the Board's EEO Programs Office alleging that the Board discriminated against her in various employment actions on the basis of race and age and retaliated against her for filing a previous complaint of discrimination. Compl. at ¶ 61.

41. Plaintiff subsequently filed a formal complaint of discrimination alleging retaliation and discrimination on the basis of race, color, and age in January 2006. Ex. A at 2.

42. The specific allegations in plaintiff's administrative complaint accepted for investigation were (1) because of plaintiff's age, she was evaluated at a lower level than her actual level of performance, preventing her from obtaining promotion to the FR-36 grade level although younger women had been promoted; (2) because of plaintiff's race and color, she was denied awards for work performed and has received lesser awards than employees of other races and denied a promotion for the past five years; and (3) she was subjected to harassment, abuse, and hostility in the workplace and denied promotion in retaliation for having previously filed a complaint with the Board's EEO programs office. Id.

43. An investigation was conducted of plaintiff's allegations, and upon plaintiff's election, the Board issued a final decision, dated September 8, 2006. Id.

44. The Board found that the plaintiff had not been discriminated against on the basis of her age, race or color, or retaliated against for having previously filed a complaint of discrimination. Id. at 1. Specifically, the Board determined that (1) the denial of cash awards, even if the claim were not time-barred, did not give rise to an inference of discrimination because plaintiff could not show that she was treated differently from similarly situated employees; (2) the failure to promote did not give rise to an inference of discrimination because plaintiff could not establish she was qualified for the promotion or that others similarly situated were

8

promoted, and even if there were an inference of discrimination, plaintiff could not establish that the Board's proffered reason for the non-promotion was a pretext for age or race discrimination; and (3) plaintiff could not establish a prima facie case of retaliatory hostile work environment because plaintiff's allegations did not rise to the level of actionable harassment, and the temporal proximity between plaintiff's protected activity and the alleged conduct (almost 5 years) was insufficient to establish a causal connection.  Id. at 5-10.

45. On June 7, 2006, plaintiff submitted a request for leave under the Family Medical Leave Act. Compl. ¶ 87.

46. The FMLA certification form filled out by plaintiff's doctor indicated that plaintiff had symptoms of fibromyalgia and post-traumatic stress disorder and was requesting leave for treatment of a "chronic condition."  Id. at ¶ 84; Ex. H, FMLA Certification of Health Care Provider, at 1, 4.  A chronic condition is defined on the FMLA certification as a condition which "(1) requires *periodic visits* for treatment by a health care provider . . . .; (2) continues over an *extended period of time* . . .; and (3) may cause *episodic* rather than a continuing period of incapacity . . . ."  Ex. H at 4 (emphasis in original).

47. The FMLA certification indicated that plaintiff would have to take work "intermittently" because of her condition.  Id. at 1.

48. On June 27, 2006, the Board granted plaintiff's FMLA request, giving plaintiff 12 weeks of leave to be used intermittently from June 7, 2006 to June 6, 2007. Compl at ¶ 89.

49. On July 24, 2006, Ms. Chang offered plaintiff some "gummy bear" candy Ms. Chang had in her hand. Plaintiff alleges that she perceived the act as hostile and an invasion of her personal space, and that she felt she needed to protect herself from Ms. Chang. Compl. at ¶¶ 91-92.

50. On or about July 24, 2006, plaintiff reported Ms. Chang's offer of candy to the Board's Equal Employment Opportunity office. Id. at ¶ 93.

51. On or about July 24, 2006, plaintiff reported Ms. Chang's offer of candy to the Board's Employee Relations office, according to plaintiff. Id. at ¶ 94.

52. On or about July 26, plaintiff reported Ms. Chang's offer of candy to her supervisor, Greg Evans. Id. at ¶ 95.

53. By letter dated August 18, 2006, plaintiff was placed on administrative leave because of concerns about plaintiff's ability to perform the functions of her job without endangering her safety or that of others, based on events described in an August 18, 2006 memorandum from Mr. Evans to plaintiff. Ex. I, August 18 letter from Chris Fields, at 1.

54. The memorandum from Mr. Evans included, among other things, a description of plaintiff's reaction to the candy incident with Ms. Chang, including statements plaintiff made about wanting to hit Ms. Chang and going home and hitting her husband instead. Ex. J, August 18 letter from Greg Evans, at 1.

55. Ms. Fields's letter indicated that plaintiff would need to receive a medical evaluation from a psychiatrist that explained whether she was mentally fit to perform her job. Ex. I at 1.

56. Plaintiff agreed to undergo a psychiatric evaluation by a psychiatrist designated

by the Board, who determined she was fit for duty.  Compl. at ¶¶ 100-101.

Plaintiff received a letter from the Board on October 18, 2006 informing her of

the psychiatrist's evaluation and informing her that her administrative leave

would end on October 18, 2006.  Id. at ¶ 101.

57. On November 6, 2006, plaintiff resigned effectively immediately. Ex. K, Att. 3,

Memorandum from Tina Chandler dated November 6, 2006 re "Resignation as of

November 6, 2006."

DATED:  May 8, 2007

> s/ Katherine H. Wheatley
> Katherine H. Wheatley
> (Bar No. 359037)
> Associate General Counsel
>
> John L. Kuray
> Senior Counsel
>
> Sara L. Stainback
> Senior Attorney
>
> Board of Governors of
> the Federal Reserve System
> 20th & C Streets, N.W.
> Washington, D.C.  20551
> (202) 452-3779
>
> Counsel for Defendant
> Ben S. Bernanke, Chairman of the Board
> of Governors of the Federal Reserve System

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                        )
TINA M. CHANDLER,                        )
       Plaintiff,                             )          Civil Action No. 1:06-2082 (EGS)
v.                                                       )
                                                        )
BEN S. BERNANKE,                           )
CHAIRMAN OF THE BOARD          )
OF GOVERNORS OF THE              )
FEDERAL RESERVE SYSTEM,      )
       Defendant.                          )
_____)


**[PROPOSED] ORDER**


      For the reasons stated in the accompanying Memorandum Opinion, it is hereby

      ORDERED that defendant's Motion To Dismiss And For Summary Judgment is

GRANTED; and it is

      FURTHER ORDERED that the complaint is DISMISSED with prejudice.

Date:


                              _____
                              EMMET G. SULLIVAN
                              United States District Judge

DEFENDANT'S MOTION TO DISMISS AND FOR
SUMMARY JUDGMENT

EXHIBIT A



BOARD OF GOVERNORS
OF THE
**FEDERAL RESERVE SYSTEM**
WASHINGTON, D. C. 20551

STEPHEN R. MALPHRUS
STAFF DIRECTOR FOR MANAGEMENT

September 8, 2006

CERTIFIED MAIL/RETURNED RECEIPT REQUESTED

B.G. Stephenson
B.G. Stephenson, LTD.
Attorneys and Counselors at Law
Inns of Court
4157 Chain Bridge Road
Fairfax, VA 22030

**Notice of Final Agency Decision**
**EEO Complaint of Tina Chandler**
**Case No. FRB-EEO-06-01-001**

Dear Mr. Stephenson:

This constitutes the Board of Governors of the Federal Reserve System's (the Board's) final decision regarding the EEO complaint filed by your client, Tina M. Chandler (Complainant), in which she alleges age and race discrimination and retaliation in violation of the Age Discrimination in Employment Act, 29 U.S.C. 633a, et seq., and Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, et seq. For the reasons discussed below, the Board finds that the Complainant was not discriminated against on the basis of her age, race, or color, or retaliated against for having previously filed a complaint of discrimination.

**Procedural Background**

Complainant is employed by the Board as a Staff Assistant (FR-35) in the Division of Reserve Bank Operations and Payment Systems (RBOPS). In October 2005[1] Complainant contacted the Board's EEO Programs Office, alleging that the Board discriminated against her on the basis of race and age and retaliated against her for filing a previous complaint of discrimination. On December 19, 2005, the EEO counselor completed his final interview and issued notice to the Complainant of her right to file a

---

[1]  The Counselor's Report identifies October 25, 2005, as the date of initial counseling contact, but an attachment to that report authored by Complainant is dated October 17, 2005. For purposes of this Decision, the Board will consider the date of initial counselor contact to be October 17, 2005.

discrimination complaint with the Board.[2]  On January 3, 2006, Complainant filed a formal complaint of discrimination alleging retaliation and discrimination on the basis of race, color, and age.

By letter dated March 23, 2006, the Board's EEO Programs Director advised Complainant that her complaint had been accepted for investigation.  Specifically, the issues that were accepted were as follows: (1) because of Complainant's age (48 years), she has been evaluated at a level lower than her actual level of performance, thereby preventing her from obtaining promotion to the FR-36 grade level although younger women whom she trained have been promoted; (2) because of Complainant's race (African-American) and color (Black), she has been denied awards for work performed and has received lesser awards than employees of other races and denied a promotion for the past five years; and (3) she has been subjected to harassment, abuse and hostility in the workplace and denied promotion in retaliation for having previously filed a complaint with the Board's EEO Programs Office.  The Board referred these issues to a contract investigator, Greaux & Associates.  On March 30, 2006, Complainant, through counsel, filed a First Amended EEO Complaint of Discrimination, which largely repeated her earlier allegations but added an alleged failure to comply with an earlier settlement agreement as an additional fact supporting the alleged pattern of harassment, abuse and hostility.  The First Amended Complaint also alleged that two supervisors "conspired to place Complainant in a situation of anticipated failure" by failing to coordinate work assignments and requiring her to work on several high-intensity projects simultaneously.

After receipt of notice of the completion of the investigation, the Complainant notified the Board on July 13, 2006, that she elected to receive a final Board decision, bypassing her opportunity for a hearing before an EEOC administrative judge.

**Factual Allegations**

Complainant, a Staff Assistant, FR-35, was hired by the Board in 1998 and presently provides administrative support to the Oversight Coordination and Audit Review sections in the Division of Reserve Bank Operations and Payment Systems.  She initiated an earlier complaint of discrimination in December 2000, which was resolved by a settlement agreement signed on April 2, 2001.  The settlement agreement provided that Complainant's 1999-2000 performance evaluation ("PMP"), rating her "commendable," would be replaced with one rating her "outstanding" for that performance period.  The agreement further provided that if Complainant believes the terms of the agreement have been violated, she must notify the Board's EEO Programs Director within 30 days of the alleged violation.  Complainant alleges that Louise Roseman, Division Director, failed to replace her "commendable" PMP for that period with the "outstanding" PMP.

When Complainant was hired in 1998, she originally reported to the Assistant Director for RBOPS over the Oversight Coordination Section and the Audit Review Section.  That position has been vacant since the summer of 2004, and she presently

---

[2]  Pursuant to 12 C.F.R. 268.104 governing the Board's processing of informal complaints, the counseling period for her pre-complaint was extended by 30 days.

reports to Paul W. Bettge, Associate Director for RBOPS. Complainant assists the Oversight Coordination and Audit Review sections, rather than any particular individual, with various projects, including the Bank Evaluation Project for the Oversight Section and the Joint Meeting of Audit Committee Chairs and General Auditors Conference for the Audit Review Section.

Mr. Bettge is responsible for evaluating Complainant's performance through the Board's Performance Management Program (PMP), but seeks the input of Jeannine Szostek, Manager of Oversight Coordination, and Jo Chang, Manager of Audit Review. Under the Board's Performance Management Program, an employee's performance is evaluated against five possible levels of performance – Extraordinary, Outstanding, Commendable, Marginal, and Unsatisfactory. Complainant's PMP dated October 2003 rated her as "Outstanding," though it included several comments indicating areas for improvement in accuracy, timeliness, and communication skills. In October 2004 and October 2005, Complainant received a PMP evaluation of "Commendable." A rating of "Commendable" is defined as "[p]erformance that consistently meets the Board's high standards and expectations." Both later reviews noted that while Complainant "manages a number of her duties and responsibilities well," she could strengthen her performance by demonstrating greater initiative in seeking out more complex assignments and making herself more accessible to all members in the sections she supports, and by improving her attention to detail and accuracy. Complainant contends that the 2004 and 2005 performance appraisals are unfair and have prevented her from obtaining a promotion to a Senior Staff Assistant (FR-36), while other younger staff members (specifically, Lakisha Tabscott, Robin Jones-Foote, and Addison Waters) have been promoted.

In August 2005, Complainant requested that Ms. Chang recommend her for promotion. Ms. Chang advised Complainant to prepare a memorandum advocating for her promotion, which Ms. Chang would review. After showing the memorandum to Ms. Chang, Complainant emailed the memorandum to Mr. Bettge on August 18, 2005. Mr. Bettge did not respond formally to the request, and Complainant has remained at the Grade 35 level.

In September 2005, Ms. Chang raised her voice when speaking with Complainant about an assignment. Complainant reported to Mr. Bettge that she was very upset about Ms. Chang yelling at her. Complainant also alleged that her prior supervisor, Bud Martindale, who left the Board in the summer of 2004, yelled at her to come into his office when he needed her, and that Ms. Szostek refuses to communicate with her directly.

In October 2005, all RBOPS Division employees were asked to complete a climate survey conducted by Morehead Associates. Each section manager was given composite results for his or her section and asked to distribute and discuss the results in a section meeting. The Complainant's results were included with Mr. Bettge's, rather than with either of the sections that she serves. Complainant was not included in the section meetings of either of the sections she supports, which she claimed was evidence of retaliation or discrimination.

Complainant also contends that she has received lower cash awards (or no cash awards) than other employees working on the same project, on the basis of her race and color.

## Discussion

### I. Timeliness of Claims

The Board's EEO Rules require that complaints of discrimination be brought to the attention of the EEO Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of a personnel action, within 45 days of the effective date of the action. 12 C.F.R. § 268.104(a)(1). Here, Complainant first sought counseling for her EEO claims on October 17, 2005. However, many of her claims relate to actions occurring significantly earlier than 45 days before her initial counselor contact (that is, September 2, 2005). For instance, Complainant raises complaints regarding denied promotions dating back to at least 2003, an unfairly low performance appraisal in 2004, and lower cash awards received in 2004.

There is no evidence that Complainant was unaware of the time limits for raising these claims or that she was prevented from contacting an EEO counselor such that the time limits should be waived for those incidents that occurred outside of the 45 day time period.[3] In *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), the Court adopted separate doctrines in order to determine the timeliness of claims of allegations of harassment as opposed to claims of "discrete" employment decisions. With respect to allegations of harassment, because their very nature involves a series of incidents linked by a pattern of repeated conduct, incidents raised outside of the time limitations period are not time-barred if connected to timely raised incidents. *Id*. Therefore, all alleged incidents linked to Complainant's timely raised allegations of retaliatory harassment, such as Ms. Chang "yelling" at Complainant in September 2005, are not time-barred.

In contrast, the Court notes in *Morgan* that "discrete" employment decisions (such as performance appraisals or denied promotions) "occur" on the day that they happen, and a party must file a charge within the statutory period or will lose the ability to recover for it. Discrete discriminatory acts that occur outside the filing period are not actionable, even when they relate in some contextual way to timely filed charges. *Id.* at 110. Therefore, the Board finds that Complainant's claims relating to discrete employment actions (specifically, denied promotions, unfairly low performance appraisals, and unfairly low cash awards) pre-dating September 2, 2005, are time-barred. *See, e.g., Lowery v. Dept. of Agriculture*, 2006 EEOPUB LEXIS 393, *8 (upholding agency's dismissal of claims involving denial of promotions from 1983 to 1988, non-selection for a position in 1988, and an unfairly low performance appraisal, where such conduct

---

[3] Moreover, the fact that Complainant has filed a prior complaint with the Board's EEO Programs Office suggests that she has some degree of familiarity with the Board's EEO procedures.

occurred outside the limitations period, as "[t]hese are the types of clearly defined, discrete acts, which must each satisfy the limitations period or they are time-barred").

Similarly, Complainant's allegation regarding the failure to replace her 1999-2000 PMP with a more favorable one pursuant to the settlement agreement is time-barred. The settlement agreement provided that Complainant had 30 days from the time of any failure to comply with the agreement to notify the EEO Programs Director about the breach. Under the express terms of the 2001 settlement agreement, this claim is untimely.

## II.    Discrimination Claims

### A.    Cash Awards

Complainant contends that she was denied awards (or given smaller awards) than other employees on the basis of her race (African-American) and color (Black). Specifically, the Complainant states that in 2003 she received a $1000 award for her work on the Joint Meeting of Audit Committee Chairs, but in 2004 she only received $500 for the same project.[4] She also contends that in 2004, others working on the Bank Evaluation project, including John Gibbons, received an award, but that Complainant did not. Complainant has not alleged that she was denied any cash award to which she was entitled in 2005.[5]

As noted above, her complaint regarding her cash award in 2004 is time-barred. Even if it were not, the Board would dismiss this claim for failure to establish a *prima facie* case of discrimination.

To establish a *prima facie* case under Title VII, a complainant must demonstrate that: (1) she is a member of a protected class; (2) she has suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination. *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005); *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002).[6] While Complainant can meet the first and second prongs of this test,[7] she has failed to establish the third prong – that the unfavorable action gives rise to an inference of discrimination.

---

[4] The record is inconsistent on whether Complainant received any cash award in 2004.

[5] Indeed, the investigative record demonstrates that Complainant, in fact, received awards totaling $1500, equal to or exceeding all other Division Staff Assistants in 2005.

[6] Next, if the complainant successfully establishes a *prima facie* case of discrimination, the burden shifts to the employer to assert a "legitimate, non-discriminatory reason" for the adverse action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The complainant must then demonstrate that the employer's asserted explanation is in reality "a pretext for discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).

[7] The denial of a cash award can constitute an adverse employment action. *Russell v. Principi*, 257 F.3d 815, 819 (D.C. Cir. 2001).

6

One way a complainant can show that an adverse action gives rise to an inference of discrimination is by demonstrating that she was treated differently from similarly situated employees who are not part of the protected class. *See George,* 407 F.3d at 412. A complainant who attempts to demonstrate a *prima facie* case on this basis must show that proffered comparators are in fact similarly situated to the complainant. *See Holbrook v. Reno,* 196 F.3d 255, 261 (D.C. Cir. 1999) (noting that "[a] plaintiff must also demonstrate that 'all of the relevant aspects of her employment situation were 'nearly identical' to those' [of the comparator].") The record in this case does not support such a finding.

The RBOPS Award Program states that RBOPS distributes awards to staff for varying amounts, "depending on the level of contribution and taking into account an employee's grade level and normal job responsibilities." While Complainant notes that in 2004, John Gibbons, a Senior Oversight Analyst, and unspecified others received an award for working on the Bank Evaluation Project (and Complainant did not), the investigative record contains no evidence that she and Mr. Gibbons (or any other employee who received a cash award for his or her performance on the Bank Evaluation Project in 2004) are in any way similarly situated or performed a similar role to Complainant on this project. Moreover, the investigative record does reflect that in 2004, the RBOPS Staff Assistant receiving the highest award amount ($3500) was an African-American employee, and that a number of other African American employees also received cash awards that year. Thus, Complainant's allegations regarding denied cash awards simply do not give rise to an inference of discrimination.

For these reasons, the Board concludes that Complainant's claims relating to discriminatory cash awards must be denied.

### B. Failure to Promote to FR-36 Based on Allegedly Unfair Performance Appraisals and Retaliation[8]

Complainant contends that she received unfairly low PMP evaluations based on her age and/or race in October 2004 and October 2005, thereby resulting in the Board denying her the promotion she requested in August 2005. Separately, she claims the failure to promote was done in retaliation for her prior EEO activity.[9]

---

[8] Disparate treatment suits brought under the Age Discrimination in Employment Act (ADEA) are analyzed under the same framework used in cases of race discrimination arising under Title VII of the Civil Rights Act of 1964. In addition, retaliation claims are subject to the same general framework for analysis; the Board assumes, in this regard, that retaliatory failure to promote would be considered a "materially adverse action" under *Burlington Northern & Santa Fe Rwy Co. v. White,* 2006 U.S. LEXIS 4895 (June 22, 2006), in that it would dissuade a reasonable employee from making a charge of discrimination. Thus, Complainant's promotion claims, alleging race, color, and age discrimination and retaliation, will be analyzed together.

In order to establish a *prima facie* case for a failure to promote claim, a complainant must establish that: (1) she is a member of a protected class; (2) she sought a promotion for which she was qualified; (3) she was denied that promotion; and (4) "other employees of similar qualifications ... were indeed promoted at the time the plaintiff's request for promotion was denied." *Taylor v. Small*, 350 F.3d 1286, 1294 (D.C. Cir. 2003). Complainant cannot establish a *prima facie* case, as she fails on both the second and the fourth prong of this test.

First, Complainant cannot establish that she was qualified for a promotion to a Senior Staff Assistant (FR-36). According to an RBOPS memorandum regarding "Career Ladder Progressions, Competitive Career Ladder Progressions, and Promotions for Non-Official Staff,"[10] the position of Senior Staff Assistant (FR-36) is one that is categorized as "above full performance for the relevant job family." This means that the Division will consider an individual for a grade increase only when he or she is "consistently performing at a level that exceeds the expectations for full performance for his or her job family." In 2004 and 2005, Complainant received a performance rating of "Commendable," which reflected that she met, but did not exceed, the expectations of her position. While Complainant contends that these ratings were unfair,[11] both the 2004 and 2005 PMPs and the statements of the managers of the sections she supports reflect significant deficits in Complainant's performance.[12] Therefore, given that Complainant's performance has not exceeded the expectations for her position, Complainant cannot establish that she is qualified for a promotion to a Senior Staff Assistant (FR-36).

Second, Complainant has not established that other employees of similar qualifications were promoted at the time her request for promotion was denied.

---

[9] While Complainant's request for a promotion occurred prior to the claim-filing period that started September 2, 2005, the Board does not consider the denial of a promotion requested in August 2005 to be untimely raised. Complainant's memorandum has not been responded to in writing, and while Mr. Bettge testified that he talked to Complainant about her request (with the implication that he denied it orally), it is not clear that this discussion occurred prior to September 2, 2005. To the extent that Complainant challenges the Board's failure to promote her at any time prior to August 2005, as discussed in Section I, above, these claims are plainly time-barred, as discrete acts of alleged discrimination occurring well outside the 45 day period prior to Complainant's EEO counselor contact in October 2005. Moreover, the record does not indicate that she sought a promotion any time prior to August 2005.

[10] *See* Investigative Record, Exhibit 17B.

[11] Complainant did not, however, make use of the appeal procedures set forth in the Board's PMP Policy for employees who want to contest their PMPs.

[12] For example, the PMPs state that Complainant could strengthen her performance by demonstrating greater initiative in seeking out complex assignments and making herself more accessible to all members in the sections she supports. In a sworn statement, one manager noted that while she has told her staff to give Complainant administrative assignments, "her work was never quite right and the staff got tired of giving her work . . . because they don't want to have to redo" it. In their statements to the EEO Counselor, both managers indicated that Complainant needed to improve her attention to detail and spend less time on the phone or away from her desk.

8

Complainant contends that other younger staff have been promoted more quickly within her Division. However, of the comparators noted by Complainant, only Ms. Tabscott (age 26) has been promoted to a Senior Staff Assistant (FR-36). Moreover, while Ms. Tabscott has been in her position for a shorter period of time than Complainant, the investigative record is insufficient to demonstrate that Complainant and Ms. Tabscott are "similarly qualified" in terms of performance, and Complainant made no allegations in that regard.

Even assuming arguendo that Complainant could establish a *prima facie* case, Complainant cannot establish that the Board's proffered reason for her non-promotion (that her performance in her present position was insufficient to justify a promotion) is a pretext for age[13] (or race) discrimination. As shown above, the managers of the sections Complainant supports had significant concerns about her performance. Her supervisor indicated that she would need to get more experience for the next level and demonstrate that she could perform at that level before being promoted.[14] Nothing in the record suggests that these statements are a pretext for discrimination. "A plaintiff cannot establish pretext simply based on her own subjective assessment of her own performance, for plaintiff's perception of herself, and of her work performance, is not relevant. It is the perception of the decision maker which is relevant." *Tolson v. James*, 315 F. Supp.2d 110, 116 (D.D.C. 2004). Moreover, even if the appropriateness of the Board's actions was not clear, the issue to be determined is not whether the Board made the "right" decision in denying Complainant a promotion, but whether the Board's decision was motivated by unlawful discrimination. *See Fischbach v. District of Columbia Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (noting that courts do not "second-guess" an employer in personnel decisions unless there is a demonstrably discriminatory motive). The investigative record is insufficient to support a finding of unlawful discrimination.

Based on the above, the Board concludes that Complainant's failure to promote claim must be denied.

### III.   Retaliation Claims

Complainant alleges that in retaliation for having previously filed a 2000 complaint of discrimination against Louise Roseman, RBOPS Division Director, she has been subjected to a pattern of harassment, abuse, and hostility that took the form of alleged verbal abuse, humiliation, and withdrawal of assignments.

---

[13] Notably, of the Staff Assistants currently in RBOPS, four of the five FR-36 Staff Assistants are over the age of 40 and two are the same age or older than Complainant.

[14] The record shows that Ms. Chang has also encouraged the Complainant to sign up for the Division mentoring program in order to assist in Complainant's career development. To date, Complainant has not done so. The Division's formal mentoring program is available to all RBOPS employees who wish to enhance their personal or professional development.

To establish a *prima facie* case of retaliation, a complainant must show that: (1) she engaged in a statutorily protected activity, (2) she suffered an adverse action that a reasonable employee would have found to be materially adverse, in that it would have "dissuaded a reasonable worker from making or supporting a charge of discrimination," and (3) there existed a causal connection between the protected activity and the materially adverse action. *Burlington Northern & Santa Fe Railway Co. v. White*, 2006 U.S. LEXIS 4895 (June 22, 2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). If a complainant can establish a *prima facie* case, the Board must then articulate a legitimate, nondiscriminatory reason for its action. *Holbrook v. Reno*, 196 F.3d 255, 263 (D.C. Cir. 1999). If the Board does so, the complainant must prove by a preponderance of the evidence that the asserted reason is a pretext for retaliation. *Id.* Thus, Complainant bears the actual burden of proof that she was intentionally retaliated against.

Here, the Complainant can meet the first element of her *prima facie* case. The Complainant's previous filing of an EEO complaint in 2000 is an activity protected under Title VII. *See, e.g., Holbrook*, 196 F.3d at 263.

With respect to the second element of her *prima facie* case, however, Complainant's allegations of harassment do not rise to the level of an action that could dissuade a reasonable employee from making a charge of discrimination. Rather, taken separately or together, they are the type of "normally petty slights, minor annoyances, and simple lack of good manners" that are a normal part of the working environment. *Burlington Northern* at *27. To be sure, a hostile work environment can give rise to a retaliation claim. *See Nichols v. Truscott*, 424 F. Supp. 2d 124, 141 (D.D.C. 2006) (citing *Singletary v. District of Columbia*, 351 F.3d 519, 526 (D.C. Cir. 2003)). However, to prevail on such a claim, a complainant must show that her employer, in retaliation for complainant's protected activity, subjected her to "discriminatory intimidation, ridicule, and insult of such severity or pervasiveness [as] to alter the conditions of [her] employment and create an abusive working environment." *Hussain v. Nicholson*, 435 F.3d 359, 366 (D.C. Cir. 2006).

In support of her harassment claim, Complainant raises primarily the following occurrences: (1) Ms. Szostek avoids personal communication with her; (2) Ms. Chang "yelled" at her on one occasion in September 2005 when accusing her of making errors on an assigned project; (3) Mr. Martindale (who left the Board in 2004) "hollered" for her when he needed her to come to his office; (4) in October 2005, Complainant was excluded from both the Oversight section meeting and the Audit section meeting, in which results of an employee opinion survey were discussed; and (5) Complainant was given three major projects simultaneously.[15] These allegations are insufficient to demonstrate a hostile work environment for several reasons. First, the alleged harassing

[15] Complainant raises other allegations related to actions allegedly taken in 1999 and 2000 by Louise Roseman. However, these allegations were waived pursuant to the settlement agreement signed by Ms. Chandler in March 2001, in resolution of her EEO complaint filed in 2000. *See* Investigative Record, Exhibit 1B, p. 12.

10

conduct was infrequent, only occurring on several occasions over an extended period of time, and there is no evidence that it interfered with the Complainant's ability to perform her job.[16] In fact, Complainant's most recent performance appraisal, in October 2005, resulted in an evaluation of "Commendable."

In addition, the allegations raised by Complainant are simply not sufficiently severe to constitute a hostile environment[17] or to constitute an adverse action that would reasonably deter an employee from filing a claim of discrimination. In that regard, the Supreme Court noted in *Burlington Northern* that "[t]he anti-retaliation provision seeks to . . . prohibit[] employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers. And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Burlington Northern*, 2006 U.S. LEXIS 4895 at *27.

Finally, the Complainant has also failed to establish that any of the alleged harassing conduct had any causal connection to Complainant's prior EEO activity, as is required for the third prong of her *prima facie* case. A complainant may establish a causal connection "by showing that the employer had knowledge of the employee's protected activity, and that the [retaliatory] personnel action took place shortly after that activity." There is no evidence in the investigatory record indicating that Ms. Szostek, one of Complainant's alleged harassers, had any knowledge of Complainant's prior EEO activity until she met with the EEO counselor in early 2006, so there can be no causal connection between Ms. Szostek's conduct and the prior activity. With respect to the other alleged conduct, the temporal proximity between Complainant's protected activity and the alleged retaliatory conduct (almost 5 years) is wholly insufficient to establish a causal connection. *See Clark County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (noting that a three- or four-month period between an adverse action and protected activity is insufficient to show a causal connection, and that a 20-month period suggests "no causality at all"); *Glenn v. Williams*, 2006 U.S. Dist. LEXIS 8687, *80 (D.D.C. Feb. 21, 2006) (stating that "the greater the time that has elapsed between the protected activity and the alleged acts of discrimination, the more difficult it is for a complainant to justify an inference of causal connection between the two"). For these reasons, the Board concludes that Complainant has failed to establish a *prima facie* case of retaliation.

In light of the above, the Board has determined that Complainant's retaliation claims must be denied.

---

[16] *See Baloch v. Norton*, 355 F. Supp. 2d 246, 260 (D.D.C. 2005) ("isolated incidents of what one might call a 'nasty' supervisor and a claim of a hostile work environment where almost one-third of the alleged time-span of that hostile environment lacks actionable activity" is insufficient to support a Title VII claim); *Burton v. Batista*, 339 F. Supp. 2d 97, 108 (D.D.C. 2004) (finding that three allegedly hostile encounters were insufficient to demonstrate a hostile work environment).

[17] *See, e.g., Colbert v. Chao*, 2001 U.S. Dist. LEXIS 8266 (D.D.C. June 19, 2001) (concluding that the plaintiff's allegations that her current supervisor had become "openly hostile towards her by banging his fists and shouting at her on several occasions" did not demonstrate an adverse action); *Russ v. Van Scoyoc Assocs., Inc.*, 122 F. Supp. 2d 29, 32 (D.D.C. 2000) (holding that "it is clear that merely being yelled at by your supervisor does not rise to the level of an adverse employment action").

11

**Appeal Rights**

### Equal Employment Opportunity Commission Review

You have the right to request review of this decision by the Equal Employment Opportunity Commission. Attached is a copy of EEOC Form 573, the Notice of Appeal/Petition which must be mailed within thirty (30) days of your receipt of this notice to:

> Equal Employment Opportunity Commission
> Office of Federal Operations
> P.O. Box 19848
> Washington, D.C. 20036

or hand-delivered to:

> Equal Employment Opportunity Commission
> Office of Federal Operations
> 1801 L Street, N.W.
> Washington, D.C. 20507

or sent facsimile to:
> (202) 663-7022

### Right to File a Civil Action

You also have the right to file a civil action in an appropriate United States District Court. If you choose to file a civil action, you may do so:

- within 90 days of receipt of this final agency decision if no appeal has been filed, or

- within 90 days of receipt of an Equal Employment Opportunity Commission ("EEOC") final decision on review; or

- after 180 days from the date of filing a request for review with the EEOC if there has been no final decision by the EEOC.

If you choose to request review of this decision by the EEOC, you must furnish a copy of the request for review to Ms. Sheila Clark, the Board's EEO Programs Director, at the same time that you file the request for review with the EEOC. In or attached to the request for review, you must certify the date and method by which service was made on the Board.

12

You must name the person who is the official agency head or department head as the defendant. In this case, you must name Ben S. Bernanke, Chairman, as the defendant. Failure to provide the name or official title of the agency head may result in dismissal of your case.

If you decide to file a civil action, and you do not have or cannot afford the services of an attorney, you may request that the court appoint an attorney to represent you and that the court permit you to file the action without payment of fees, costs, or other security. The grant or denial of any such request is within the sole discretion of the court. Filing the request for an attorney does not extend the time in which to file a civil action. Both the request and the civil action MUST BE FILED WITHIN NINETY (90) CALENDAR DAYS of the date you receive the final action or final decision (as appropriate) from the Board or the EEOC.

Sincerely,

Enclosure

cc:    Ms. Tina Chandler

bcc:   Kit Wheatley - Mail Stop 12
       Sheila Clark - Mail Stop 156
       Amy Koontz - Mail Stop 13

P-038-550-222 - Mailed 9/8/06 by Sheila Clark

DEFENDANT'S MOTION TO DISMISS AND FOR
SUMMARY JUDGMENT

EXHIBIT B

BOARD OF GOVERNORS
OF THE
FEDERAL RESERVE SYSTEM
WASHINGTON, D.C. 20551

EQUAL EMPLOYMENT
OPPORTUNITY PROGRAMS
OFFICE

April 13, 2001

Ms. Tina M. Chandler
1720 East Bancroft Lane
Crofton, Maryland  21114

Dear Ms. Chandler:

This letter acknowledges that on April 2, 2001 Mr. Stephen R. Malphrus, Staff Director for Management as agent for the Board of Governors of the Federal Reserve System signed the Agreement and General Release in settlement of your EEO complaint.

Enclosed please find the signed copy which became effective on April 10, 2001.

Sincerely,

Sheila Clark
EEO Programs Director

c: Mr. Brian Lederer, Esq.
   3003 Van Ness St., N.W. Suite W228
   Washington, D.C.   20008

## Agreement and General Release

Tina M. Chandler and the Board of Governors of the Federal Reserve System (the "Board"), referred to as the Parties, voluntarily enter into this Agreement and General Release ("Agreement") which is the agreement the Parties reached to settle Ms. Chandler's EEO complaint which she filed on December 13, 2000.

Ms. Chandler agrees that she fully understands all of the terms of this Agreement and that it fully settles the claims in her formal EEO complaint and all claims which could have been raised up through the date on which she signs this agreement.

Ms. Chandler also agrees that she fully understands that she may seek advice from, and be represented by an attorney or other person of her choice in connection with her EEO complaint and at all stages throughout the processing of her EEO complaint, including in determining whether to sign this Agreement. Ms. Chandler is, in fact, represented by an attorney in regard to this Agreement.

Ms. Chandler has voluntarily decided to enter into this Agreement and has read and carefully considered this Agreement and all other alternatives available to her.

The Parties (Ms. Chandler and the Board) agree to the following:

1. The 1999-2000 Performance Management Program (PMP) review as written by Mr. Jack Dennis with an overall rating of "Outstanding," will be placed in Ms. Chandler's employee personnel performance file as Ms. Chandler's official PMP rating for the 1999-2000 rating year.

2. Ms. Chandler will receive a raise for 2001 of 5.3%, which is the same percentage raise given to all Board employees receiving a rating of Outstanding. The raise will be payable retroactive to December 17, 2000, the first pay period of 2001. The amount of the increase that is retroactive will be paid as a lump sum payment along with her regular pay in the first full pay period following the effective date of this Agreement.

3. Ms. Chandler will receive the cash award for 1999-2000 that Mr. Jack Dennis, her former supervisor, recommended in the amount of $500.00 (minus applicable taxes and withholding). No other action with respect to the cash award will be taken.

4. The PMP review for 1999-2000 which reflected an overall rating of "Commendable" will be removed from Ms. Chandler's Division of Reserve Bank Operations (RBOPS) employee file.

5. The Board will pay Ms. Chandler's attorney's fees and costs in the amount of $1,000, to be paid to Brian Lederer, Esq., within ten (10) days following the execution of this Agreement.

Page 2 of 4

6. Upon signing this Agreement, Ms. Chandler will withdraw, in writing, her formal EEO complaint which she filed on December 13, 2000. Ms. Chandler agrees that she will not pursue that complaint in any other way or any other issues which could have been raised in that complaint. This waiver does not prevent Ms. Chandler from filing a complaint about anything that occurs after the Agreement is signed. All outstanding issues that have arisen between the time the formal complaint was filed and the time Ms. Chandler signs this Agreement or that could have been raised are also hereby waived.

   This waiver does not include any claims that Ms. Chandler may have under the Federal Tort Claims Act or applicable Workers Compensation Acts.

7. The Board will issue, on the fifth (5th) business day following the final effective date of this Agreement, a memorandum correcting the announcements regarding Ms. Chandler made on January 4, 2001, to Reserve Bank Operations and Payments Systems (RBOPS) staff and, on January 5, 2001, to staff of the Division of Consumer and Community Affairs.

8. If Ms. Chandler believes the terms of this Agreement have not been complied with, within 30 days of the alleged violation of this Agreement, she shall notify the Board's EEO Programs Director in writing. Ms. Chandler may request that the terms of this Agreement be specifically complied with or that her claim be reinstated for further processing from the point processing ceased.

9. This Agreement sets forth the entire agreement between the Parties and may not be modified, altered, or changed without the express written consent of both parties.

10. This Agreement does not change either Party's rights or responsibilities under the Board's rules or policies except as provided in this Agreement.

11. The terms and conditions of this Agreement are confidential and shall not be released or disclosed by either party unless required by law, in order to effectuate the terms of this Agreement, or in the fulfillment of the Board's duties and responsibilities.

12. Neither the making of this Agreement, nor anything contained herein, shall in any way be considered to be an admission of wrongdoing by either party.

13. Notice of Rights under Age Discrimination in Employment Act. As described in paragraph 6 7 of this Agreement, Ms. Chandler agrees to withdrawn her EEO complaint and waive the claims raised in that complaint or which could have been raised in that complaint. Since Ms. Chandler alleged in that complaint that she was discriminated against on the basis of age as she is over 40 years of age (age claims are covered by the Age Discrimination in Employment Act (ADEA), as amended), in

Page 3 of 4

order for her to withdrawn that complaint, she must also waive the allegations of age discrimination raised in that complaint. For a waiver of age claims to be valid, the law provides that Ms. Chandler must be advised that she has twenty-one (21) days from the date she receives this Agreement to consider whether to sign the Agreement. After Ms. Chandler has signed this Agreement, she has seven (7) calendar days, up to and including the date the Agreement is executed in which to revoke the Agreement for any reason or no reason at all. To revoke this Agreement, Ms. Chandler must deliver notice in writing to: Sheila Clark, EEO Programs Director, Board of Governors of the Federal Reserve System, Washington, D.C. 20551.

Ms. Chandler understands that she has twenty-one (21) days from the date she receives this Agreement to consider whether to sign it and seven (7) days after it signed by both parties to revoke it.

The Agreement is executed upon signature of both parties. If the Agreement is not revoked on or before the 7th calendar day after it is executed, the Agreement will become fully effective and enforceable on the 8th calendar day after it is executed.

_____          3/23/01
Ms. Tina M. Chandler                                Date

        SWORN to before me this
        23 day of March, 2001.
        _____
        Sherry A. Felder           Sherry A. Felder
        Notary Public for          Notary Public, District of Columbia
        County of District         My Commission Expires 11-30-04
        State of Columbia
        My Commission Expires 11/30/2004


_____          3/22/01
Brian Lederer, Esq.                                Date
Counsel for Ms. Tina M. Chandler

        SWORN to before me this
        _____ day of _____, 2001.         BL
        _____
        Notary Public for
        County of                            3/22/01
        State of
        My Commission Expires

Page 4 of 4

_(signature)_                                    4.2.2001
Stephen R. Malphrus                              Date
Staff Director for Management
Board of Governors of the Federal Reserve System

SWORN to before me this
2ᵗ day of _April_ 2001.
_Cherry G. Felder_
Notary Public for
County of _District_
~~State~~ of _Columbia_
My Commission Expires _1/30/2004_

Amended Complaint
Page _15_ of _24_    13

TC - ROI -00069

DEFENDANT'S MOTION TO DISMISS AND FOR
SUMMARY JUDGMENT

EXHIBIT C

**Performance Management Program**

Division of Reserve Bank Operations and Payment Systems

Board of Governors of the Federal Reserve System

**Restricted FR**

---

| | |
|---|---|
| **Name** <br> Tina Chandler /007864 | **Supervisor** <br> Edgar A. Martindale(through 6/04) <br> Paul Bettge (7/04-10/04) |
| **Position Title/Grade** <br> Staff Assistant/FR 35 | **Performance Period** <br> October 2003 - October 2004 |
| **Section** <br> Program Direction | **Planning Period** <br> October 2004 - October 2005 |
| | **Next PMP Date** <br> October 2005 |

---

Managers and employees should consult the Board's Performance Management Program (PMP) Policy to guide them during the PMP process. The PMP session is a managerial activity with active employee participation, which includes:

- Reviewing and clarifying job responsibilities and work expectations
- Establishing future objectives and measurement criteria to be used in evaluating actual performance
- Describing and evaluating performance results based on performance evidence and the application of the measurement criteria to determine the extent and quality of performance
- Determining an overall performance rating based on performance results
- Identifying development activities that will improve job performance and future career development

---

(The initial step in the PMP session should be a review of relevant organization objectives, strategies, programs, activities, etc., and any internal and external factors that will have an impact on the employee's work.)

**JOB RESPONSIBILITIES**

(Unless otherwise noted below, the job responsibilities are as described in the position description. Managers and supervisors must be evaluated on their effectiveness in managing their human resources, including recruitment, compensation, performance evaluation, career development, day-to-day treatment, and affirmative action.)

TC - ROI -00252

## OBJECTIVES

(Describe the expected product and/or behavior results to be achieved or demonstrated during the PMP planning period, including the measurement criteria against which the performance results will be evaluated. Product objectives should include a description of specifically what is to be produced, how much (if appropriate), and when. Behavior objectives should describe the specific behaviors to be demonstrated. Measurement criteria should indicate the quantitative and qualitative standards by which performance will be evaluated and refer to the division's five performance criteria.)

1.  **Objective:** Provide high quality and timely assistance to all members of the Oversight Coordination and Audit Review programs.

    **Measurement Criteria:** Timeliness and accuracy of work products and initiative in seeking out additional or "stretch" assignments, especially when not busy with other requests. Possibly assist on-site at a Reserve Bank either or both programs during the course of a review.

2.  **Objective** Assist in planning the joint meeting of Reserve Bank audit committee chairs and general auditors and handle all necessary administrative arrangements for the meeting.

    **Measurement Criteria:** Effective coordination of administrative arrangements before, during, and after the meeting.

3.  **Objective:** Reorganize and inventory the Oversight and Audit Review files to accommodate planning and on-site review workpapers, sensitive correspondence, and proper maintenance of Bank exam/ Audit Review reports. Provide staff assistance to review of recordkeeping for on- and off-site review workpapers.

    **Measurement Criteria:** Oversight and Audit Review workpapers are maintained in an effective manner, including maintenance of complete workpapers in a systematic, organized fashion. Also, a thorough assessment of other programs' workpapers is conducted, with recommendations, as appropriate, made for organizing and maintaining the workpapers. This will require a significant degree of initiative and strong working relationships with the other staff assistants.

4.  **Objective:** Develop system for tracking required periodic reporting by general auditors.

    **Measurement Criteria:** Increased knowledge of Reserve Bank internal audit functions and reporting requirements. Tracking system developed and maintained for reports submitted by general auditors and notification of management of reports that have not been received or were not received timely.

**PERFORMANCE SUMMARY**

(Accomplishments achieved during past PMP period as they relate to the previously documented or emergent objectives and to other job responsibilities. Provide enough concrete performance evidence giving a reasonable indication of what was actually achieved, and an assessment of how well and to what extent objectives were achieved by applying the measurement criteria and taking into account other circumstances, such as complexity and difficulty.)

<u>Results against 2004 performance objectives:</u>

Objective 1: Continue to produce high quality work and assistance on a timely basis relating to Oversight Coordination, Audit Review and COGA.

<u>Results:</u> During this performance period, Tina did not have a lot of opportunities to provide assistance to Oversight Coordination and Audit Review in their Bank/Audit reviews. However, Tine continues to perform her responsibilities of maintaining updates to SOL for Oversight Coordination and Audit Review. This objective will continue to be restated during the upcoming performance planning period.

Objective 2: Organize strategic planning for meeting of AC chairs/GAs developing a work breakdown structure estimating the work effort and a time frame of activities determining the duration of the project in calendar days. This objective will continue to be restated during the upcoming performance planning period.

<u>Results:</u> Tina worked closely with Audit Review management in organizing the joint meeting of Reserve Bank audit committee chairs and general auditors. Tina took a key role in ensuring the effective organization of the meeting by preparing an action plan, which highlighted the major tasks, a target completion date for each task, and the responsible individual for completing each task. She then updated the action plan periodically and sent it to management to keep them informed of the status of the project. The meeting was generally considered to be well planned and smoothly coordinated. Tina received positive feedback from several audit committee chairs and general auditors expressing their gratitude for the great success of the overall Conference.

Objective 3: Reorganize and inventory the Oversight Coordination and Audit Review filing room to accommodate planning workpapers, sensitive correspondence and proper maintenance of exam/reports. Also assist Oversight and Audit Review team in inventory of workpapers throughout the division.

<u>Results:</u> At the beginning of this performance period, Tina worked on reorganizing and inventory of the AR and OC file room; however, more work still needs to be completed to make sure that the room is neat, files are put away and old records are shipped to off-site storage. This objective will continue to be restated during the upcoming performance planning period.

Objective 4: Continue working effectively with management and staff in support to special project requirements and assignments.

<u>Results:</u> During this performance period, Tina completed several projects for Audit Review and Oversight Coordination:

- Provided assistance during the 2003 Reserve Bank evaluation process.
- Provided administrative assistance in coordinating the SCAD Audit Management Conference. The conference was considered a great success.
- Coordinated the arrangements for an IIA training conference for Audit Review and Oversight Coordination. The project was completed in a timely manner.

Objective 5. Continue education by obtaining a bachelors degree in Business Administrative.

<u>Results:</u> Tina has also enrolled in a Bachelors of Arts in Communications program. Currently she is taking a College composition and Public Speaking Course.

Exhibit $14B$
Page $3$ of $6$

## MEASUREMENT CRITERIA

(Accomplishments will generally be judged against the following five performance criteria; the supervisor will note whether an employee's performance against each criterion is below expectations, meets expectations, or exceeds expectations for the employee's grade level. For each of these criteria, the supervisor will identify performance areas significantly above or below grade level, and describe problems encountered and their effect on the performance results.)

---

**1. Job Knowledge:**   ☐ Below   ☒ Meets   ☐ Exceeds

Extent to which employee demonstrates expertise in policies, procedures, standards, and developments as they relate to the area of responsibility, including matters originating in the area of principal concentration, coming from related areas, or affecting the Federal Reserve, banking or financial markets more generally; maintains and uses professional knowledge and tools effectively; recognizes issues of significance to the Federal Reserve as the central bank; demonstrates knowledge of organization's goals, objectives, business, and technology; learns rapidly and applies knowledge effectively. Effectively uses office automation and specialized programming tools, as appropriate.

Comments:

Tina has a good understanding of the Oversight and Audit Review Program, which she supports. She demonstrates a solid level of expertise using office automation tools. Going forward, additional knowledge and comfort with converting documents to PDF format would facilitate the Reserve Bank evaluation process. She has a very good understanding of the administrative procedures and process in RBOPS. Tina should continue to strive to have a better understanding of the role of internal audit and audit committees at the Reserve Banks, as well as increase her knowledge of Reserve Bank operations.

---

**2. Analytical Ability:**   ☐ Below   ☒ Meets   ☐ Exceeds

Extent to which employee exhibits thoroughness, precision, research skills, creativity, resourcefulness, attention to detail and accuracy; understands problem/issue context and demonstrates ability to identify and synthesize relevant information and data. Demonstrates logical thought processes, diagnostic skills, sound judgement, and interpretation. Uses sound decision-making processes and develops quality recommendations or alternative courses of action for complex problems. Is sensitive to the impact of decisions on organization and acts accordingly.

Comments:

Tina has demonstrated the skills to independently research and resolve issues. This is extremely beneficial in planning administrative aspects of the joint meeting of Reserve Bank audit committee chairs and general auditors. Tina has exhibited problem solving abilities, although continued efforts should be made to pay greater attention to details and be accurate in the completion of assignments.

---

**3. Communication Skills:**   ☐ Below   ☒ Meets   ☐ Exceeds

Extent to which employee organizes and presents ideas both orally and in writing in a clear, concise, accurate, and persuasive manner with an appropriate tone and/or demeanor. Extent to which employee communicates in open and constructive fashion, and selects appropriate styles of communication for audience. Exhibits good listening and comprehension skills; accepts input and feedback well. Demonstrates ability to articulate clearly the reasoning, conclusions, and implications to the audience.

Comments:

Tina has effective oral communication skills and has taken courses to enhance her written communication skills. During the performance period Tina aggressively pursued courses to further enhance her job skills and knowledge. She has completed a writing course that has advanced her English grammar and speaking techniques for overall personal development.

**4. Interpersonal Skills:**    ☐ Below    ☐ Meets    ☒ Exceeds

Extent to which employee works collaboratively with others either bilaterally or as part of a team; maintains integrity in all actions. Shares relevant information with others and is approachable by others. Able to interact effectively with others when dealing with individuals at a variety of levels and/or on different reporting lines. Builds positive working relationships to accomplish objectives; demonstrates effective conflict management and negotiation skills. Establishes and maintains credibility with peers and management; demonstrates maturity and professionalism in work.

Comments:

Tina has a very pleasant and low-key demeanor. When she is approached with a request for assistance, she is receptive to the request. Tina works well with a number of individuals in the Audit Review and Oversight Coordination programs, but should make an effort to seek out assignments from others with whom she does not naturally work as well. Tina worked effectively with the analyst responsible for the 2003 Reserve Bank evaluation process. In addition, feedback from Reserve Bank staff with whom Tina interacts is typically positive.

**5. Management of Job Responsibilities:**    ☐ Below    ☒ Meets    ☐ Exceeds

Extent to which employee effectively plans ahead, sets priorities, schedules work, and adjusts when necessary; demonstrates adaptability and resilience in approaching work assignments or unanticipated events; completes assignments in a timely fashion and follows through to communicate the implications of shifting priorities to those affected. Coordinates activities with all affected areas and fosters teamwork; demonstrates initiative and leadership; is willing and able to act independently, seek out new approaches or ideas, and take on added responsibilities. Keeps supervisor informed and consults with supervisor on issues, as appropriate.

Comments:

Tina manages a number of her duties and responsibilities well and is willing to act independently when necessary, such as when handling administrative tasks for arranging meetings. Tina also shows a willingness to take on new responsibilities. However, Tina should also focus on following through on completing assignments and also arranging for backup when she will be out of the office. Tina could also greatly enhance her performance by demonstrating greater initiative in seeking out additional assignments from all members of both programs she supports, by communicating proactively with analysts when she is unable to accomplish tasks in a timely manner, and by being more accessible to members of the programs. A consistent theme that was raised by a number of individuals in the two programs when providing feedback on Tina's performance, is that she is frequently away from her desk and, when she is there, is on the phone. When these individuals are able to speak with Tina, she is agreeable to taking on an assignment, but her lack of accessibility hinders their ability to provide her with assignments that would help her demonstrate her ability to handle more complex and varied projects.

**Additional Criteria for Supervisors:**    ☐ Below    ☐ Meets    ☐ Exceeds

Extent to which supervisor disseminates information to educate and inform employees about issues affecting their job responsibilities. Provides candid and frequent feedback to staff for their development and evaluative purposes. With the employee, identifies developmental needs to maintain or augment the knowledge, skills, and abilities required to perform the work of the Board. Manages operations to attain goals within allocated resources. Demonstrates and promotes equal employment opportunity in compliance with Federal laws and Board policies pertaining to recruitment, development, and promotion. Demonstrates program and division leadership, fosters teamwork, and responds to changing requirements.

Comments:

Exhibit 14B
Page 5 of 6

**SUGGESTED DEVELOPMENT ACTIVITIES**

(If additional knowledge, skills, and abilities are needed for development in current position or for future career development, please indicate the type of activities, such as formal training, rotational assignments, etc., that are proposed.)

Join Toastmasters or similar organization to continue to strengthen communications skills.

Take other work-related seminars and courses.

Continue to take courses toward Bachelors degree.

**OVERALL EVALUATION**

(Must be reasonably clear linkage to performance results.)

☐ EXTRAORDINARY PERFORMANCE: Performance that substantially and consistently exceeds the Board's high standards and expectations. This performance rating is reserved for a limited number of employees.

☐ OUTSTANDING PERFORMANCE: Performance that consistently meets and often exceeds the high standards of the job and the expectations of the position. This performance rating is reserved for a limited number of employees.

☒ COMMENDABLE PERFORMANCE. Performance that consistently meets the Board's high standards and expectations.

☐ MARGINAL PERFORMANCE: Performance that is marginally below the level of acceptability because it does not either fully or consistently satisfy the requirements and expectations of the position.

☐ UNSATISFACTORY PERFORMANCE: Performance that is below the level of acceptability because it substantially and consistently fails to satisfy the requirements and expectations of the position.

**SIGNATURES**

(A Performance Management Program interview has been conducted in which job objectives, performance results, and career development were discussed.)

Employee _____  Date  10/26/04

Supervisor _____  Date  10/26/04

Reviewing Manager _____  Date  10/27/04

**COMMENTS**

DEFENDANT'S MOTION TO DISMISS AND FOR
SUMMARY JUDGMENT

EXHIBIT D



Tina Chandler/Board/FRS
Sent by: Tina Chandler

08/18/2005 04:04 PM

To   Paul Bettge/BOARD/FRS@BOARD

cc

bcc  Tina Chandler/BOARD/FRS

Subject   Tina Chandler

Good Afternoon Paul,

Initially this recommendation was submitted to Jo Chang for her review upon our discussion. After speaking with her, she then instructed me to forward it to you directly. After reviewing, please inform me of your decision.   You response regarding this matter would be greatly appreciated.



Promotion for Tina Chandler.doc

Exhibit 15
Page 1 of 3

# BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
## DIVISION OF RESERVE BANK OPERATIONS AND PAYMENT SYSTEMS

| | |
|---|---|
| **Date:** | August 18, 2005 |
| **To:** | Paul Bettge |
| **From:** | Tina Chandler |
| **Subject:** | Request for Promotion for Tina Chandler to FR 36 |

## Recommendation

That Ms. Chandler is promoted from FR 35 Staff Assistant to Senior Staff Assistant at a Grade 36 level effective September ____, 2005, and that she receive a 9% increase in her annual salary.

## Discussion

Ms. Chandler has been a Staff Assistant, Grade 35, in the Oversight/Examination and Audit Review Section for eight years. Prior to that, she worked in the Surveillance section of BS&R for four years. During her tenure in the Oversight/Examination and Audit Review Section, she has greatly increased her skills and growth potential. She has demonstrated the ability to effectively coordinate and execute multiple tasks on a timely basis. She has accepted every challenge, and effectively completed each new work assignment with minimal supervision. Over the past several years she has organized and participated in a variety of projects, COGA Conference, Joint Meeting of Audit Committee Chairs and General Auditors Conference, Bank Evaluations, Internal Auditors Conference, review of Federal Reserve Bank of Boston and Dallas. Maintain and maintenance the Division's Task Manager for Oversight and Audit Review Section, and has assumed responsibility for posting Oversight and Audit Review reports and all other data to (SOL) System Oversight Library, and consolidates business profiles from each reserve bank into AutoAuto for Audit Review Section. Prepare and compile section status report for Oversight Section. Maintain a monthly calendar for the Oversight Section. On every assignment, her work product has been done very well. Over the past years, she has adapted well to her new responsibilities and her performance has been exemplary. She has received four consecutive "Outstanding", in her work performance (PMP).

Ms. Chandler has a wide range of responsibilities and has proven herself to be a valuable asset to Oversight and Audit Review Section. Her primary responsibility is: Timekeeping, making travel and lodging arrangements, type correspondence and statistical reports, assembling data, books, and preparations of exhibits for presentations to Board Committee and international banking groups. Retrieve internal and external request for data from Controllers Office, Research Library. Maintain the Review Reports for the Division, Oversight Coordination and Audit

**Exhibit** 15
**Page** 2 of 3

# BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
### DIVISION OF RESERVE BANK OPERATIONS AND PAYMENT SYSTEMS

| | |
|---|---|
| **Date:** | August 18, 2005 |
| **To:** | Paul Bettge |
| **From:** | Tina Chandler |
| **Subject:** | Request for Promotion for Tina Chandler to FR 36 |

## Recommendation

That Ms. Chandler is promoted from FR 35 Staff Assistant to Senior Staff Assistant at a Grade 36 level effective September ____, 2005, and that she receive a 9% increase in her annual salary.

## Discussion

Ms. Chandler has been a Staff Assistant, Grade 35, in the Oversight/Examination and Audit Review Section for eight years. Prior to that, she worked in the Surveillance section of BS&R for four years. During her tenure in the Oversight/Examination and Audit Review Section, she has greatly increased her skills and growth potential. She has demonstrated the ability to effectively coordinate and execute multiple tasks on a timely basis. She has accepted every challenge, and effectively completed each new work assignment with minimal supervision. Over the past several years she has organized and participated in a variety of projects, COGA Conference, Joint Meeting of Audit Committee Chairs and General Auditors Conference, Bank Evaluations, Internal Auditors Conference, review of Federal Reserve Bank of Boston and Dallas. Maintain and maintenance the Division's Task Manager for Oversight and Audit Review Section, and has assumed responsibility for posting Oversight and Audit Review reports and all other data to (SOL) System Oversight Library, and consolidates business profiles from each reserve bank into AutoAuto for Audit Review Section. Prepare and compile section status report for Oversight Section. Maintain a monthly calendar for the Oversight Section. On every assignment, her work product has been done very well. Over the past years, she has adapted well to her new responsibilities and her performance has been exemplary. She has received four consecutive "Outstanding", in her work performance (PMP).

Ms. Chandler has a wide range of responsibilities and has proven herself to be a valuable asset to Oversight and Audit Review Section. Her primary responsibility is: Timekeeping, making travel and lodging arrangements, type correspondence and statistical reports, assembling data, books, and preparations of exhibits for presentations to Board Committee and international banking groups. Retrieve internal and external request for data from Controllers Office, Research Library. Maintain the Review Reports for the Division, Oversight Coordination and Audit

**Exhibit** _15_
**Page** _2_ **of** _3_

Review Section in the Task manager application. Set up the Oversight review procedures in AutoAudit, send routine e-mail communications to the business areas, and collect and consolidate the business area information requests. Arrange conferences bridges and room locations at the Board for the review status meetings, and assist Division, Oversight and Audit review section staff as needed with adhoc assignments. She assumes full responsibility for the updating and distribution of these assignments. She has shown exceptional ability to develop, monitor, and maintain several of her major conferences. Ms. Chandler continues to assist other members of the staff in automated presentations whenever called upon. She has exhibited the ability to be a liaison and coordinator, as well as the primary contact for COGA Conference, Joint Meeting of Audit Committee Chairs, and Federal Reserve Bank General Auditors. All of the conferences have always run smoothly and the participants have expressed their satisfaction to the highest degree which is outstanding. Also, Ms. Chandler's coordination of these meetings has been presented with several cash awards for her performance.

When called upon Ms. Chandler has fulfilled her responsibilities to assist in administrative tasks. She has prepared correspondence in preparation for meetings and also prepared thank-you letters for senior executive staff members.    Ms. Chandler has proven her ability to adapt to all challenges placed before her. In recognition of this effort, and her job proficiency, she is deserving of a promotion and an appropriate increase in pay.

Ms. Chandler entered Trinity College located in Washington, DC in 2002. She has enhanced her aptitude to perform her daily duties by completing several writing courses, public speaking course, and is continuing her education in Communications seeking a Bachelors Degree.

Exhibit 15
Page 3 of 3

DEFENDANT'S MOTION TO DISMISS AND FOR
SUMMARY JUDGMENT

EXHIBIT E

**RBOPS**
**Career Ladder Progressions, Competitive Career Ladder Progressions, and**
**Promotions for Non-Official Staff**

This document clarifies and documents the division's practices and procedures regarding grade increases. There are three types of grade increases: career ladder progressions, competitive career ladder progressions, and promotions. A career ladder progression is a grade increase that reflects an employee's demonstrated ability to perform at the next higher grade level within a job family up to and including the full performance level. A competitive career ladder progression results from competitive selection, reflects an employee's demonstrated ability to perform above the full performance in his or her career ladder, and is supported by a business need for higher level work. A promotion is a grade increase that results from the competitive selection to fill a vacant position.

Board Policies

The division's approach to career ladder progressions and promotions falls under the framework provided by the Board's overall personnel policies. In particular, the following Board policy statements are relevant – Compensation Guidelines, Performance Management Program, Job Descriptions and Evaluation, and Vacancy Posting.

Division Objective and Framework

The division has a very challenging mission, which requires staff with certain skills, knowledge, and abilities. One of the division's objectives regarding grade increases is to acknowledge staff's development of skills and abilities that contribute to meeting the division's increasingly complex challenges. Grade increases reflect such growth on the part of division staff members.

The framework to meet this objective consists of job families and job descriptions that reflect the skills, knowledge, and experience that the division requires to accomplish its mission. Each job within the division has a job description, which is posted on the division's website. The job descriptions are written in general terms for two principal reasons. First, some of them cover positions in different sections that require similar skills but involve different areas of focus. Second, the job descriptions need to be sufficiently flexible to encompass the evolution of assignments that occurs in an analytically challenging work environment. Division managers and officers build on the job descriptions to set objectives for each individual within the division.

The division encourages both managers and staff to seek appropriate opportunities for staff to demonstrate the ability to perform at increasingly higher levels. Such efforts provide a more challenging and rewarding work environment for staff, and also help the division to develop the skills required to address the increasingly complex issues it faces. Each division staff member, however, has the primary responsibility for her or her own career growth, consistent with the expectation that individuals working in RBOPS will demonstrate an appropriately high level of initiative throughout all aspects of their work.

1

Exhibit _i 7 ß_
Page _/ of 5_

Division Performance Expectations and Considerations

An individual will be considered for a career ladder progression when he or she has met the minimum qualifications for the next grade in his or her job family and has demonstrated the ability to perform consistently at a level of commendable or better for the higher grade. Performance criteria are those in the division's performance management process.

For exempt positions and non-exempt staff assistant positions, the performance criteria are the following:[1]
- job knowledge
- analytical ability
- communication skills
- interpersonal skills
- management of job responsibilities
- additional criteria for supervisors[2]

The performance criteria for secretarial positions are those in the Board's secretarial/clerk typist PMP form:
- quality of work
- problem solving
- initiative
- communication
- interpersonal skills
- organizational skills

While the criteria are consistent across grades, the emphasis placed on each criterion and the specific expectations against which an individual's performance is measured relative to any particular criterion may vary to some degree by section because of the different requirements of the sections. The general expectations for each grade level, however, are consistent across the division.

With the lower- and mid-grades in the exempt job families, the division will look primarily for demonstrated improvement in the following:
- job knowledge
- analytical skills
- written and oral communications
- the ability to work effectively with others
- the ability to accomplish increasingly numerous and complex tasks satisfactorily and on time

---

[1] Exempt refers to a position that is exempt from coverage under the Fair Labor Standards Act (grades FR21 - FR29) Nonexempt refers to positions that are covered by the Act (grades FR31 - FR36).

[2] These additional criteria are designed to assess a manager's performance as a supervisor.

2

Exhibit 17 3
Page 2 of 5

As one advances towards the higher grades within an exempt job family, particularly to full performance and above, the division looks, among other things, for demonstrated improvement in the following:

- the ability to handle increasingly complex and ambiguous matters
- leadership abilities and interpersonal skills
- the ability to accomplish complex assignments independently
- the ability and willingness to accept increasing responsibility
- the ability to exercise sound judgment with respect to complex issues and work relationships
- the ability to communicate effectively (both in writing and orally) with a wide range of parties at increasingly senior levels
- the ability to synthesize a wide range of information, identify feasible alternatives, and develop positions and perspectives on complex issues

As an individual advances through the non-exempt job families the division looks for, among other things, demonstrated improvement in the following:

- job knowledge
- the ability and willingness to accept increasing responsibilities
- effective oral and written communication and interpersonal skills
- the ability to complete assigned tasks independently
- the ability to organize and manage multiple tasks and assignments effectively

The highest grade that an individual can reach without competition is the full performance level for his or her job family. All other grade increase decisions are made through one of two competitive processes. If the grade increase were to result from the need to fill a vacant position, such from analyst or project leader to manager, or from secretary to staff assistant, for example, the division follows the Board's Vacancy Posting Policy. Decisions to grant employees competitive career ladder progressions to an above full performance level within the same section and budgeted position are also made competitively, but as there is no vacant position to fill, they do not fall within the Vacancy Posting Policy. These increases are subject to competitive reviews of all eligible employees within the career ladder.

The division has five positions that are above full performance for the relevant job family:

- project leader (FR28)
- senior economist (FR28)
- senior information systems analyst (FR27)
- senior technical editor (FR25)
- senior staff assistant (FR36)

When an individual is consistently performing at a level that exceeds the expectations for full performance for his or her job family, the division will consider the individual for a grade increase to above full performance within the existing job family. In order to justify a grade increase to above full performance, the division must compare the

3

Exhibit 17 B
Page 5 of 5

candidate's performance to that of all other individuals at the full performance level in the relevant job family. The specific skills of those considered may differ, depending upon the skills required of the job family and the section. Within the exempt job families, job knowledge, strong analytical and communication skills, demonstrated leadership ability, and interpersonal skills are particularly important for success. For the above full performance non-exempt position, job knowledge, communication and interpersonal skills, and the ability to work independently are important factors. There is no pre-established minimum or maximum number of individuals that a section may have at a grade that is above full performance.

Process:

Initial grade assignment:
- The relevant first level officer, in conjunction with the hiring manager, the division director, and appropriate Management Division staff, assign new employees a grade.
- The initial grade is determined by the following:
    a. past work experience
    b. educational level
    c. salary alignment with other staff in the division and/or job family
- Individuals transferring from other Board divisions (or within RBOPS) will generally be placed in the same grade as their previous position. A grade increase is possible if the current grade is below the posted range for the position or if the individual meets the minimum qualifications for the higher grade and his or her performance and/or skill sets warrant an increase.

Career ladder progressions:
- A manager brings forward to his or her first-level officer grade increase nominations for direct reports whom he or she believes have demonstrated performance commensurate with the next grade level. It is incumbent upon the manager to have specific examples of the individual's performance that support a grade increase.
- The manager and officer will discuss the manager's recommendation, and if the officer concurs, he or she will schedule the matter for discussion at the next monthly officers' meeting. [3]
- The division's officer team discusses all proposed career-ladder progressions. A central reason for having such discussions among all division officers is to ensure that the division is handling career ladder progressions consistently across the division.
- The division director makes the decision.

Competitive Career Ladder Progressions:
- The section manager informs his or her first-level officer of an individual who is performing at a level that consistently exceeds that required at the full

_____
[3] The first-level officer would discuss the proposal with his or her associate director, if applicable.

4

Exhibit / 7 3
Page 4 of 5

performance level. As with career ladder progressions, the manager must have specific examples of the individual's performance to support the grade increase.

- The officer and the manager review the recent performance of all individuals in the particular job family who are at the full performance level, seeking input from other officers and managers within the job family, as appropriate.
- If the officer and manager believe that the nominated individual's performance clearly exceeds that of others at the same level, the officer will schedule the matter for discussion at the next monthly officers' meeting.
- The division's officer team discusses all proposed grade increases to above full performance. These discussions help to ensure that the division is handling competitive career ladder progressions consistently across the division.
- The division director makes the decision.

Because increases in grade indicate that an individual's job responsibilities have increased, such changes are generally accompanied by an increase in salary, consistent with the Compensation Guidelines Policy. The size of any increase may vary between individuals depending upon several factors, including the individual's relative position in the new salary range and the salaries of other employees with similar experience in the same job family and grade. (Please refer to the Board's Compensation Guidelines.)

For information concerning promotions or lateral postings to fill vacant positions, please refer to the Board's Vacancy Posting Policy.

If you have further questions, please contact your manager, officer, or Lisa Hoskins.

December 2004

5

Exhibit 17 B
Page 5 of 5

DEFENDANT'S MOTION TO DISMISS AND FOR
SUMMARY JUDGMENT

EXHIBIT F

**AFFIDAVIT**

**DISTRICT OF COLUMBIA**

**WASHINGTON**

I, Paul W. Bettge, (47 years of age, Caucasian, no prior EEO
activity), Senior Associate Director of the Division of Reserve
Bank Operations and Payment Systems (RBOPS), Board of Governors
of the Federal Reserve System (the Board), current business
address Constitution Ave between 20th & 21st Sts, N.W.,
Washington, D. C. 20551, do solemnly swear or affirm that:

I am submitting this affidavit to answer the complaint of
discrimination and retaliation filed by Tina M. Chandler against
the Board. For the record, I am a white male, over forty.  I
have never filed an EEO complaint.  I am responding to the
following allegations made by the complainant:

> Issue 1. Because of Tina Chandler's age (48 years of age),
> she has been evaluated at a level lower than her actual
> level of performance and thereby she was prevented from
> obtaining a promotion to the FR-36 grade level although
> younger women, who she trained, have been promoted.

Exhibit __11__
Page __1__ of __7__

Affiant's Initials_____

Issue 2. Because of Tina Chandler's race (African-American) and color (Black), she has been denied rewards for work performed and she has received lesser awards than employees of other races and she has been denied a promotion for the past five years.

Issue 3. Tina Chandler has been subjected to a pattern of harassment, abuse, and hostility in the workplace and denied promotion in retaliation for having previously filed an EEO complaint with the Board's EEO Program Office.


I, Paul W. Bettge, am employed by the Board as the Senior Associate Director for RBOPS.   I have been in my current position since February 2005. I have been with the Board for a little over 24 years. I report to Louise Roseman the Director of RBOPS.  I am responsible for Reserve Bank oversight, financial accounting, Human Resources, Audit Review, and planning and control.


I know Tina Chandler.  She provides administrative support to the Oversight Coordination and Audit Review programs and reports to me.

Affiant's Initials _PWB_

TC - ROI -00223

## Background

At one time many aspects of the oversight function were carried out by examiners traveling 100% of the time.  In 1999 or 2000 the Board decided to bring the function in-house throughout the division.  Jack Dennis was the Assistant Director and oversaw the Audit Review section.  Bud Martindale was the Assistant Director to whom the Oversight Coordination program reported. Upon Jack Dennis' retirement, the Audit review section was also assigned to Bud Martindale. Tina Chandler was hired by Jack. Staff assistants support sections not individuals.  Individual managers do not have staff assistants.

The Assistant Director's position, formerly filled by "Bud" Martindale, on the organizational chart is currently vacant.  No one is officially acting in the position. I would like to fill the position and have considered it.


There are approximately seven or eight staff assistants in the division.  Most staff assistants maintain databases and analyze data in addition to handling administrative responsibilities. The concept of a staff assistant was developed about ten years ago.  The role of the secretary had changed with most managers and analysts doing their own tasks on the computer.  But, there was still a need for administrative support.  A work group

Affiant's Initials _____

TC - ROI -00224

function was created to deal with the division.  Staff assistants do that and other fairly routine analyst-type work. They are a hybrid between a secretary and a junior analyst.  The FR-35 does routine types of support tasks.  The FR-36 is more complex. There are three staff assistants supporting the programs for which I have responsibility.  One staff assistant (FR-36) reports directly to me and is responsible for three sections.  Another staff assistant (FR-36) reports an Associate Director who then reports to me.

AGE DISCRIMINATION

Evaluations

   My general approach is to ask employees to provide a draft of proposed objectives for the coming year and to write up results for the past year.  I will then amend or modify the draft based upon my judgment and observations.

   I am responsible for Tina Chandler's performance evaluation (PMP).  I get feedback from the sections, which I consider and gauge by my own experience, i.e., my assessment of her job performance.

Affiant's Initials 

TC - ROI -00225

<u>Promotion</u>

In order for an individual to be considered for a career ladder progression they should demonstrate the ability to perform more complex tasks than are expected at their current grade.

I talked with the managers about giving Tina assignments to enable her to demonstrate that she could perform at a level expected at the FR-36 position.

If Tina Chandler says that she sent me an email on August 18,2005, I can't dispute that. I really don't recall. Tina did draft a career ladder progression memo for herself, if that is the point of the reference. I talked with her about it. I told her that we needed to identify some projects and assignments to give her some experience for the next level and also to demonstrate that she could perform at that level.


**RACE DISCRIMINATION**

<u>Denied Awards</u>

Employees can receive two types of recognition. There is a merit increase tied to the PMP performance rating. There is a Board-wide average determined by HR Management. There are also cash awards an employee can earn by strong performance on a project. The manager or officer can recommend an individual to

Affiant's Initials 

TC - ROI -00226

receive a cash award.  If someone did a really strong job in

support of an analyst on a project the analyst can also tell his

or her manager.

**RETALIATION**

I was vaguely aware that Tina Chandler had filed an EEO

complaint.  I picked up responsibility for the programs she

supports in October 2000.  I was not involved in the complaint

but I knew of it generally.

Climate Survey:

I would have liked for Tina Chandler to have been a participant

in the discussions.  It was just a mix-up.  Nobody received

individual survey results. We asked that each section with five

or more responses get their own results.  The Oversight and

Audit Sections each received results for their sections.  We

asked each section to meet and come up with action plans.  The

managers included the analysts and themselves.  It was just an

oversight.  I do not believe that it was intentional.  I would

have liked for them to have included Tina and make her feel a

part of the sections.  Of the other two staff assistants in my

area, one was definitely included in the HR section meeting,

Although I don't know if she was included with the other program

Affiant's Initials _____

she supports.  I also do not know definitely if the other staff

assistant for my areas was included in section discussions or

not.   Staff assistant's results were reported with the officers

to whom they report. Tina's result's were included with mine. *pwb*

### Harassment

I am aware of the yelling incident.   Jo Chang had asked Tina to
*Tina reported to me that* *pwb*

a draft letter to the Audit Committee Chairs.  Jo Chang blew up.

I told Tina that I would talk with Jo and I did.   Jo Chang said
*pwb*

that the letter goes out from the Governor and the Tina Chandler

had it going from a previous chair.


I am not aware of any treatment that would cause Tina Chandler

to feel that things are happening because of the previous

complaint.


*pwb*
*seven*

I have read the above statement consisting of ~~nine~~ (7) pages, and I declare
under a penalty of perjury that it is true and correct.   I understand that
the information I have given is not to be considered confidential and that
it may be shown to the interested parties.

*Paul W Bitty*   5/17/06
                                                Signature

Exhibit 11
Page 7 of 7

DEFENDANT'S MOTION TO DISMISS AND FOR
SUMMARY JUDGMENT

EXHIBIT G

| **Performance Management Program** | Board of Governors of the Federal Reserve System | **Restricted FR** |
|---|---|---|

Division of Reserve Bank
Operations and Payment Systems

| **Name** | **Supervisor** |
|---|---|
| Tina Chandler | Paul Bettge |
| **Position Title/Grade** | **Performance Period** |
| Staff Assistant/FR 35 | 10/2004 – 10/2005 |
| **Section** | **Planning Period** |
| Program Direction | 10/2005 – 09/2006 |
| | **Next PMP Date** |
| | 10/2006 |

Managers and employees should consult the Board's Performance Management Program (PMP) Policy to guide them during the PMP process. The PMP session is a managerial activity with active employee participation, which includes:

- Reviewing and clarifying job responsibilities and work expectations
- Establishing future objectives and measurement criteria to be used in evaluating actual performance
- Describing and evaluating performance results based on performance evidence and the application of the measurement criteria to determine the extent and quality of performance
- Determining an overall performance rating based on performance results
- Identifying development activities that will improve job performance and future career development

(The initial step in the PMP session should be a review of relevant organization objectives, strategies, programs, activities, etc., and any internal and external factors that will have an impact on the employee's work.)

## JOB RESPONSIBILITIES

(Unless otherwise noted below, the job responsibilities are as described in the position description. Managers and supervisors must be evaluated on their effectiveness in managing their human resources, including recruitment, compensation, performance evaluation, career development, day-to-day treatment, and affirmative action.)

See Job Description

Exhibit _14A_
Page _1_ of _9_

FR 931r (9/00)

TC - ROI -00243

## OBJECTIVES

(Describe the expected product and/or behavior results to be achieved or demonstrated during the PMP planning period, including the measurement criteria against which the performance results will be evaluated. Product objectives should include a description of specifically what is to be produced, how much (if appropriate), and when. Behavior objectives should describe the specific behaviors to be demonstrated. Measurement criteria should indicate the quantitative and qualitative standards by which performance will be evaluated and refer to the division's five performance criteria.)

1.  **Objective:** Continue to provide high quality and timely assistance to all members of the Oversight Coordination and Audit Review program, including providing administrative support to the Reserve Bank evaluation process.

    **Measurement Criteria:** Timeliness and accuracy of work products and initiative in seeking out additional or "stretch" assignments, especially when not busy with other requests. Continue to assist on-site at a Reserve Bank during the course of a review when appropriate.

2.  **Objective** Continue to assist in planning the joint meeting of Reserve Bank audit committee chairs and general auditors and handle all necessary administrative arrangements for the meeting.

    **Measurement Criteria:** Effective coordination of administrative arrangements before, during, and after the meeting.

3.  **Objective:** Reorganize and inventory the Oversight and Audit Review files to accommodate planning and on-site review workpapers, sensitive correspondence, and proper maintenance of Bank/Audit review reports and examination reports. Provide staff assistance to review of recordkeeping for on- and off-site review workpapers.

    **Measurement Criteria:** Workpapers and reports are maintained in an effective manner, including maintenance of files in a systematic, organized fashion. Also, a thorough assessment of other programs' workpapers is conducted, with appropriate recommendations made for organizing and maintaining the workpapers. This will require a significant degree of initiative and strong working relationships with the other staff assistants.

4.  **Objective:** Develop system for tracking required periodic reporting by general auditors. Post these and other Oversight and Audit Review documents into SOL on a timely basis. Continue to maintain and disseminate Review Tracking System.

    **Measurement Criteria:** Increased knowledge of Reserve Bank internal audit functions and reporting requirements. Tracking system developed and maintained for reports submitted by general auditors and notification of management of reports that have not been received or were not received timely.

Exhibit _14 A_
Page _2 of 9_

TC - ROI -00244

**PERFORMANCE SUMMARY**

(Accomplishments achieved during past PMP period as they relate to the previously documented or emergent objectives and to other job responsibilities. Provide enough concrete performance evidence giving a reasonable indication of what was actually achieved, and an assessment of how well and to what extent objectives were achieved by applying the measurement criteria and taking into account other circumstances, such as complexity and difficulty.)

<u>Results against 2005 performance objectives:</u>

Objective 1: Provide high quality and timely assistance to all members of the Oversight Coordination and Audit Review programs.

<u>Results</u>: During this performance period, Tina strongly supported the 2004 Reserve Bank evaluation process, for which she received a cash award. In addition, Tina had two opportunities to assist Audit Review in its review of the Dallas and Boston internal audit functions. Tine participated during the first three days of the Dallas and Boston AR on-site reviews. Tina compiled the audit staff and Bank management surveys. She also worked on attaching some information to audit workpapers in AutoAudit. Finally, Tina maintained updates to SOL for Audit Review and Oversight.

Objective 2: Assist in planning the joint meeting of Reserve Bank audit committee chairs and general auditors and handle all necessary administrative arrangements for the meeting.

<u>Results</u>: Tina received a cash award in recognition of her significant contributions in providing exceptional support, particularly in coordination and planning, to the 2005 Joint Meeting of Audit Committee Chairs and General Auditors. Most notably, Tina provided assistance in ensuring that transportation arrangements and hotel reservations were handled smoothly and that printed meeting materials were completed in a timely and professional manner. Tina also coordinated and supported the Conference of General Auditors meeting, which was held immediately before the Joint Meeting.

Objective 3: Reorganize and inventory the Oversight and Audit Review files to accommodate planning and on-site review workpapers, sensitive correspondence, and proper maintenance of Bank exam/ Audit Review reports. Provide staff assistance to review of recordkeeping for on- and off-site review workpapers.

<u>Results</u>: Tina started to work on reorganizing and inventory of the Oversight/Audit Review file room; however, more work still needs to be completed to make sure that the room is neat, files are put away and old records are shipped to off-site storage.

Objective 4: Develop system for tracking required periodic reporting by general auditors

<u>Results</u>: During this performance period, Tina did not have the opportunities to develop a system for tracking required periodic reporting by general auditors.

In addition to the accomplishments noted above, Tina retrieved from AutoAudit over 450 Reserve Bank business profiles, converted them into PDF files, and posted them into SOL. This project required a great deal of time and effort to accomplish. Tina also solicits the name of individual section on-site review leaders and incorporates that information into AutoAudit. Further, Tina strengthened her relationship with Reserve Bank audit support staff and provided effective support to Reserve Bank general auditors during their visits to the Board.

Exhibit 14 A
Page 2 of 7

TC - ROI -00245

**MEASUREMENT CRITERIA**

(Accomplishments will generally be judged against the following five performance criteria; the supervisor will note whether an employee's performance against each criterion is below expectations, meets expectations, or exceeds expectations for the employee's grade level. For each of these criteria, the supervisor will identify performance areas significantly above or below grade level, and describe problems encountered and their effect on the performance results.)

| 1. **Job Knowledge**: | ☐ Below | ☐ Meets | ☒ Exceeds |
|---|---|---|---|

Extent to which employee demonstrates expertise in policies, procedures, standards, and developments as they relate to the area of responsibility, including matters originating in the area of principal concentration, coming from related areas, or affecting the Federal Reserve, banking or financial markets more generally; maintains and uses professional knowledge and tools effectively; recognizes issues of significance to the Federal Reserve as the central bank; demonstrates knowledge of organization's goals, objectives, business, and technology; learns rapidly and applies knowledge effectively. Effectively uses office automation and specialized programming tools, as appropriate.

Comments:

Tina demonstrates a solid level of expertise using office automation tools. Tina shows a good understanding of the Audit Review and Oversight Coordination programs, which she supports. She also has a good understanding of the administrative procedures and process in RBOPS. Tina should continue to strive to have a better understanding of the role of internal audit and audit committees at the Reserve Banks, as well as increase her knowledge of Reserve Bank operations generally, in order to put into context her assignments and strengthen her overall performance.

| 2. **Analytical Ability**: | ☐ Below | ☒ Meets | ☐ Exceeds |
|---|---|---|---|

Extent to which employee exhibits thoroughness, precision, research skills, creativity, resourcefulness, attention to detail and accuracy; understands problem/issue context and demonstrates ability to identify and synthesize relevant information and data. Demonstrates logical thought processes, diagnostic skills, sound judgement, and interpretation. Uses sound decision-making processes and develops quality recommendations or alternative courses of action for complex problems. Is sensitive to the impact of decisions on organization and acts accordingly.

Comments:

Tina has demonstrated the ability to research and resolve administrative issues. This is particularly helpful in planning the annual joint meeting with Reserve Bank audit committee chairs and general auditors. Tina has also shown good analytical ability during her participation on on-site audit reviews. Tina should continue to focus on attention to details in the completion of her assignments.

| 3. **Communication Skills**: | ☐ Below | ☒ Meets | ☐ Exceeds |
|---|---|---|---|

Extent to which employee organizes and presents ideas both orally and in writing in a clear, concise, accurate, and persuasive manner with an appropriate tone and/or demeanor. Extent to which employee communicates in open and constructive fashion, and selects appropriate styles of communication for audience. Exhibits good listening and comprehension skills; accepts input and feedback well. Demonstrates ability to articulate clearly the reasoning, conclusions, and implications to the audience.

Comments:

Tina has effective oral communication skills, and has worked to develop further her writing skills. In addition, Tina should initiate communications with Audit Review and Oversight management and staff to ensure everyone in the programs knows that she is approachable and willing to provide assistance, particularly for tasks that will provide some "stretch" to her ongoing responsibilities.

Exhibit 14 A
Page 5 of 9

---

**4. Interpersonal Skills**:  ☐ Below  ☒ Meets  ☐ Exceeds

Extent to which employee works collaboratively with others either bilaterally or as part of a team; maintains integrity in all actions. Shares relevant information with others and is approachable by others. Able to interact effectively with others when dealing with individuals at a variety of levels and/or on different reporting lines. Builds positive working relationships to accomplish objectives; demonstrates effective conflict management and negotiation skills. Establishes and maintains credibility with peers and management; demonstrates maturity and professionalism in work.

Comments:

Tina has a very pleasant and low-key demeanor.  When she is approached with a request for assistance, she is receptive to the request.  Tina works well with a number of individuals in the programs, but, as noted above, should make an effort to seek out assignments from others with whom she does not naturally work as well.  Feedback from Reserve Bank staff with whom Tina interacts is typically positive.

---

**5. Management of Job Responsibilities**:  ☐ Below  ☒ Meets  ☐ Exceeds

Extent to which employee effectively plans ahead, sets priorities, schedules work, and adjusts when necessary; demonstrates adaptability and resilience in approaching work assignments or unanticipated events; completes assignments in a timely fashion and follows through to communicate the implications of shifting priorities to those affected. Coordinates activities with all affected areas and fosters teamwork; demonstrates initiative and leadership; is willing and able to act independently, seek out new approaches or ideas, and take on added responsibilities. Keeps supervisor informed and consults with supervisor on issues, as appropriate.

Comments:

Tina manages a number of her duties and responsibilities well.  Tina could strengthen her performance by continuing her willingness to take on new responsibilities and by demonstrating greater initiative in seeking out additional assignments from all members of the programs she supports.  Tina could also strengthen her performance by being more accessible to management and analysts in the programs.  In order to accomplish some of her assignments, Tina must be away from her desk to accomplish certain work responsibilities (e.g., to work on Bank evaluations or the file room).  Tina should continue to try and make certain staff knows where or how to reach her when she is working on projects away from her desk.  Greater accessibility would facilitate management's ability to provide her with assignments that would help her demonstrate her ability to handle more complex and varied projects.

---

**Additional Criteria for Supervisors**:  ☐ Below  ☐ Meets  ☐ Exceeds

Extent to which supervisor disseminates information to educate and inform employees about issues affecting their job responsibilities. Provides candid and frequent feedback to staff for their development and evaluative purposes.  With the employee, identifies developmental needs to maintain or augment the knowledge, skills, and abilities required to perform the work of the Board. Manages operations to attain goals within allocated resources. Demonstrates and promotes equal employment opportunity in compliance with Federal laws and Board policies pertaining to recruitment, development, and promotion. Demonstrates program and division leadership, fosters teamwork, and responds to changing requirements.

Comments:

Exhibit 14A
Page 6 of 7

**SUGGESTED DEVELOPMENT ACTIVITIES**

(If additional knowledge, skills, and abilities are needed for development in current position or for future career development, please indicate the type of activities, such as formal training, rotational assignments, etc., that are proposed.)

**OVERALL EVALUATION**

(Must be reasonably clear linkage to performance results.)

☐ EXTRAORDINARY PERFORMANCE: Performance that substantially and consistently exceeds the Board's high standards and expectations. This performance rating is reserved for a limited number of employees.

☐ OUTSTANDING PERFORMANCE: Performance that consistently meets and often exceeds the high standards of the job and the expectations of the position. This performance rating is reserved for a limited number of employees.

☒ COMMENDABLE PERFORMANCE: Performance that consistently meets the Board's high standards and expectations.

☐ MARGINAL PERFORMANCE: Performance that is marginally below the level of acceptability because it does not either fully or consistently satisfy the requirements and expectations of the position.

☐ UNSATISFACTORY PERFORMANCE: Performance that is below the level of acceptability because it substantially and consistently fails to satisfy the requirements and expectations of the position.

**SIGNATURES**

(A Performance Management Program interview has been conducted in which job objectives, performance results, and career development were discussed.)

Employee _____    Date 10/31/05

Supervisor _____    Date 10/31/05

Reviewing Manager _____    Date 10/31/05

**COMMENTS**

Exhibit 14A
Page 6 of 9

BOARD OF GOVERNORS
OF THE
**FEDERAL RESERVE SYSTEM**
WASHINGTON, D. C. 20551

DIVISION OF
RESERVE BANK OPERATIONS
AND PAYMENT SYSTEMS

November 14, 2005

To:        Paul Bettge

Fr:         Tina Chandler

Subject:    Rebuttal against My 2005 PMP

---

This rebuttal is for the record and should accompany my 2005 PMP. Because of Paul Bettge's time constraints in reviewing of my PMP, I signed it even though I did not agree with it. Paul Bettge requested that I send him a draft of objectives for my '05-'06 planning period, and to provide him with a list of accomplishments/projects worked on for the '04-'05 performance period. Also, he asked if I would put them on the standard PMP form. I submitted the information per Paul's request. However, Paul did not acknowledge some of my important task and accomplishments during this performance period. There are some derogatory statements and accusations made against my '04 – '05 performance review that are untrue. I sent Mr. Bettge a copy via-email of some of the negative verbiage that I wanted to be taken out of my PMP, and during our meeting on October 31, 2005, he slightly changed a few things.

In the results against 2005 performance objectives: Mr. Bettge did not indicate that I had taken on several addition assignments. I collected, consolidated, and distributed the Oversight Section's bi-monthly status reports via e-mail, and maintain the Review Report for the Oversight Coordination and Audit Review Sections in the Task Manager Application. The Task Manager was a new application that was developed for Examination Review Tracking Report. Also, I requested information for the Oversight Timeline schedule of reviews by sending routine e-mail communications to the business areas of the Division, and collected and consolidated the business area information requests, and updated the AutoAudit timeline schedule matrix, and set up conference bridge and room locations at the Board for the review status meetings. I took the initiative in taking on a huge project for the Audit Review Section which consisted of retrieving from AutoAudit application over 450 Reserve Bank business profiles, converted them into PDF files, created a new record in SOL, input all necessary data and posted it to the Division's System Oversight Library (SOL). To perform the business profiles project, it took my transferring data from several applications to another and the project was intensive. Mr. Bettge failed to acknowledge or make a notation of the fact that I initiatively took on these additional projects/tasks that were suggested in the 2004 objective criteria.

Though Mr. Bettge "did mention that I assisted in the coordination of the Bank Evaluation for the Division, he did not" mention the fact that is was not included in my objectives for the 2005

Exhibit 14 A
Page 2 of 9

TC - ROI -00249

performance objectives and measurement criteria and should have been considered as an initiative that I had taken on and that the project was extremely systematic and detailed.

The objective number one measurement criteria in my PMP, "taking initiative in seeking out additional or stretch assignments, especially when not busy with other requests." This measurement does not compliment the objective above. I explained to Paul Bettge that I am always busy with requests from all members of the Oversight and audit review sections. I have therefore taken on additional assignment and have and met the required objectives. However, the term stretch is unclear. I fulfilled my assignment and carried out the initiative set forth, I feel that Mr. Bettge should make clear of what he means by stretch.

Objective number three suggests that "I accommodate planning of on-site workpapers for Oversight and Audit Review." The workpapers for Oversight and Audit Review are stored in AutoAudit Application. I made clear to Paul that workpapers are now being stored electronically and the current operating system is automated. The measurement criteria states, "This will require a significant degree of initiative and strong working relationships with the other staff assistants. I tried to explain to Paul that I do not have any affiliation with workpapers as a daily assignment/task. He still insisted that I build a relationship with other staff assistants regarding workpapers assignments. I have talked with three other staff assistants and they told me that they do not handle workpapers in their area either. Therefore this objective is obsolete and the request is not in concurrence with the current operating system which is automated.

In the objective number four, I have explained to Paul Bettge that I had created the tracking template for Reserve Bank Audit Report in 1998. He still insists that I create this template. I asked him if he was referring to the fact that he wanted me to resume the responsibility of tracking the Audit Activity Reports. I told Paul that Ken Todd had sent me an e-mail discussing this matter and that I have not heard anything from Jo Chang, Manager regarding the fact that Ken is to give that responsibility back to me.

In the Measurement Criteria Analytical Ability, Mr. Bettge states that I should continue to focus on attention to details in the completion of my assignments. I expressed to Mr. Bettge that I have never left any assignment incomplete. I always follow through on all assignments given to me and that they are completed in a timely manner. Mr. Bettge stated that the review tracking reports which are sent to Louise Roseman and officers/managers were incomplete with missing data. I explained to Paul that I send out a request every week for updates to the tracking system. The time that the report did not reflect its information was due to the fact that no one responded to my request or there was a malfunction with the system. In fact, if I do not get the information required, the report will come up incomplete.

I also explained to Paul that he and Jeannine Szostek were cc'd on an update to the tracking report and they failed to forward that information to me. If I am to keep the tracking system up to date, then it is management's and staff's responsibility to provide me with the current data. I indicated in my PMP that I sent to Paul Bettge to remove the word **low-key demeanor** because it appears to be derogatory and conflicts with my understanding as far as what he really means by that.

TC - ROI -00250

In conclusion, this PMP is unwarranted. One thing I will conclude with and that is Jo Chang and Jeannine Szostek have not asked to meet with me to go over next year's objectives and measurement criteria as it is required per instruction on the PMP. Also, they did not go over any objectives and measurement criteria for last year's PMP. I do not work directly with Paul Bettge or indirectly with Paul Bettge. All of the input regarding my PMP was given to him by Jo Chang and Jeannine Szostek, and neither one of them has discussed any objectives or measurement criteria with me to establish clarity in my job performance.

Exhibit 14A
Page 9 of 9

DEFENDANT'S MOTION TO DISMISS AND FOR
SUMMARY JUDGMENT

EXHIBIT H

Certification of Health Care Provider
(Family and Medical Leave Act of 1993)

**U.S. Department of Labor**
Employment Standards Administration
Wage and Hour Division



| *(When completed, this form goes to the employee, **Not to the Department of Labor**.)* | OMB No.: 1215-0181<br>Expires: 08-31-2007 |
|---|---|

1. Employee's Name

lina M. Chandler

2. Patient's Name *(If different from employee)*

lina M. Chandler

3. Page 4 describes what is meant by a **"serious health condition"** under the Family and Medical Leave Act. Does the patient's condition[1] qualify under any of the categories described? If so, please check the applicable category.

    (1) _____ (2) _____ (3) _____ (4) ✗ _____ (5) _____ (6) _____ , or None of the above _____

4. Describe the **medical facts** which support your certification, including a brief statement as to how the medical facts meet the criteria of one of these categories:

GENERALIZED ACHES AND PAINS, FATIGUE
TRIGGER POINT CONSISTENT ⊂
TIBREMYnesin.
PATIENT ALSO ~~con~~ WITH PTSD,
    HAVING FLASHBACKs

5. a. State the approximate **date** the condition commenced, and the probable duration of the condition (and also the probable duration of the patient's present **incapacity**[2] if different):

CHRONIC CONDITION.
PATIENT WILL NEED PSYCHIATRIC AND
RHEUMATOLOGIC CARE

   b. Will it be necessary for the employee to take work only **intermittently or to work on a less than full schedule** as a result of the condition (including for treatment described in Item 6 below)?

PATIENT WILL HAVE TO TAKE WORK
ONLY INTERMITTENTLY

If yes, give the probable duration:

CHRONIC CONDITION.

   c. If the condition is a **chronic condition** (condition #4) or **pregnancy**, state whether the patient is presently incapacitated[2] and the likely duration and frequency of **episodes of incapacity**[2]:

PATIENT IS PRESENTLY INCAPACITATED.
WILL REQUIRE PSYchINTRIC CARE
BEFORE WORKING FULL TIME,

[1] Here and elsewhere on this form, the information sought relates only to the condition for which the employee is taking FMLA leave.

[2] "Incapacity," for purposes of FMLA, is defined to mean inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom.

Form WH-380
Revised December 1999

6.  a.  If additional **treatments** will be required for the condition, provide an estimate of the probable number of such treatments.

FREQUENT VISITS TO DOCTORS

If the patient will be absent from work or other daily activities because of **treatment** on an **intermittent** or **part-time** basis, also provide an estimate of the probable number of and interval between such treatments, actual or estimated dates of treatment if known, and period required for recovery if any:

HER CONDITION MAY FLARE AT TIMES

b.  If any of these treatments will be provided by **another provider of health services** (e.g., physical therapist), please state the nature of the treatments:

c.  **If a regimen of continuing treatment** by the patient is required under your supervision, provide a general description of such regimen (*e.g.*, prescription drugs, physical therapy requiring special equipment):

PRESCRIPTION DRUGS: FLETERIL + CLNVIL

7.  a.  If medical leave is required for the employee's **absence from work** because of the **employee's own condition** (including absences due to pregnancy or a chronic condition), is the employee **unable to perform work** of any kind?

PATIENT WILL HAVE TO TAKE TIME OFF FROM WORK UNTIL HER CONDITION IMPROVES

b.  If able to perform some work, is the employee **unable to perform any one or more of the essential functions of the employee's job** (the employee or the employer should supply you with information about the essential job functions)? If yes, please list the essential functions the employee is unable to perform:

PATIENT UNABLE TO PERFORM ANY OF HER DUTIES AT PRESENT TIME

c.  If neither a. nor b. applies, is it necessary for the employee to be **absent from work for treatment**?

8. a. If leave is required to **care for a family member** of the employee with a serious health condition, **does the patient require assistance** for basic medical or personal needs or safety, or for transportation?

b. If no, would the employee's presence to provide **psychological comfort** be beneficial to the patient or assist in the patient's recovery?

c. If the patient will need care only **intermittently** or on a part-time basis, please indicate the probable **duration** of this need:

| | |
|---|---|
| Signature of Health Care Provider | Type of Practice |
| 2150 PENNSYLVANIA AVE | 202 741 3333 |
| Address | Telephone Number |
| WASHINGTON, DC | 6/7/06 |
| | Date |

**To be completed by the employee needing family leave to care for a family member:**

State the care you will provide and an estimate of the period during which care will be provided, including a schedule if leave is to be taken intermittently or if it will be necessary for you to work less than a full schedule:

Employee Signature                                      Date

A **"Serious Health Condition"** means an illness, injury impairment, or physical or mental condition that involves one of the following:

1. Hospital Care

    **Inpatient care** (*i.e.*, an overnight stay) in a hospital, hospice, or residential medical care facility, including any period of incapacity[2] or subsequent treatment in connection with or consequent to such inpatient care.

2. Absence Plus Treatment

    (a) A period of incapacity[2] of **more than three consecutive calendar days** (including any subsequent treatment or period of incapacity[2] relating to the same condition), that also involves:

    (1) **Treatment[3] two or more times** by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (*e.g.*, physical therapist) under orders of, or on referral by, a health care provider; or

    (2) **Treatment** by a health care provider on **at least one occasion** which results in a **regimen of continuing treatment[4]** under the supervision of the health care provider.

3. Pregnancy

    Any period of incapacity due to **pregnancy**, or for **prenatal care**.

4. Chronic Conditions Requiring Treatments

    A **chronic condition** which:

    (1) Requires **periodic visits** for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider;

    (2) Continues over an **extended period of time** (including recurring episodes of a single underlying condition); and

    (3) May cause **episodic** rather than a continuing period of incapacity[2] (*e.g.*, asthma, diabetes, epilepsy, etc.).

5. Permanent/Long-term Conditions Requiring Supervision

    A period of **Incapacity[2]** which is **permanent or long-term** due to a condition for which treatment may not be effective. The employee or family member must be **under the continuing supervision of, but need not be receiving active treatment by, a health care provider.** Examples include Alzheimer's, a severe stroke, or the terminal stages of a disease.

6. Multiple Treatments (Non-Chronic Conditions)

    Any period of absence to receive **multiple treatments** (including any period of recovery therefrom) by a health care provider or by a provider of health care services under orders of, or on referral by, a health care provider, either for **restorative surgery** after an accident or other injury, **or** for a condition that **would likely result in a period of Incapacity[2] of more than three consecutive calendar days in the absence of medical intervention or treatment,** such as cancer (chemotherapy, radiation, etc.), severe arthritis (physical therapy), and kidney disease (dialysis).

This optional form may be used by employees to satisfy a mandatory requirement to furnish a medical certification (when requested) from a health care provider, including second or third opinions and recertification (29 CFR 825.306).

*Note:* Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number.

---

[3] Treatment includes examinations to determine if a serious health condition exists and evaluations of the condition. Treatment does not include routine physical examinations, eye examinations, or dental examinations.

[4] A regimen of continuing treatment includes, for example, a course of prescription medication (*e.g.*, an antibiotic) or therapy requiring special equipment to resolve or alleviate the health condition. A regimen of treatment does not include the taking of over-the-counter medications such as aspirin, antihistamines, or salves; or bed-rest, drinking fluids, exercise, and other similar activities that can be initiated without a visit to a health care provider.

---

**Public Burden Statement**

We estimate that it will take an average of 20 minutes to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, Department of Labor, Room S-3502, 200 Constitution Avenue, N.W., Washington, D.C. 20210.

*DO NOT SEND THE COMPLETED FORM TO THIS OFFICE; IT GOES TO THE EMPLOYEE.*

DEFENDANT'S MOTION TO DISMISS AND FOR
SUMMARY JUDGMENT

EXHIBIT I

RESTRICTED – FR

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
MANAGEMENT DIVISION

Christine M. Fields
Associate Director

August 18, 2006

Ms. Tina M. Chandler
1720 East Bancroft Lane
Crofton, Maryland 21114

Dear Ms. Chandler:

Information has come to my attention that creates a concern about your ability to perform the functions of your job without endangering your safety or that of others. Thus, I am requiring you to provide me with a written medical evaluation from your doctor that explains whether you are mentally fit to perform your job. Your division agrees with this recommendation.

My concerns with your ability to perform your job safely arise from two recent events that are outlined in the August 18, 2006 memo from your supervisor, Greg Evans. Concerns have also been expressed by Rena Carlton, Supervisor, Employee Relations, as a result of your conversation with her.

Based on the events detailed by Mr. Evans and the concerns expressed by Ms. Carlton, I am extremely concerned about your behavior. Your behavior toward your co-workers has becoming increasingly erratic and threatening and I am concerned that a medical problem may be underlying your actions. As you know, you gave permission for the Board's doctor, Dr. Horan, to speak to a rheumatologist that you were consulting regarding a medical concern you had. Dr. Horan states that the rheumatologist informed him that your problems were not rheumatological but rather stemmed from a mental health problem. Because we are concerned that your behavior could stem from mental health problems, employee relations staff discussed your recent behavior with Dr. Horan and he recommended that you be sent for an independent medical evaluation in order to determine whether you can safely perform your work. In addition, on August 8, 2006 you reported to the Board's Health Unit and were seen by Dr. Kanjarpane. You informed Dr. Kanjarpane that you felt you could not continue to perform your job. Dr. Kanjarpane also advised management that you should be examined by a doctor to determine whether you are able to perform your duties.

In light of your recent behavior and the recommendations from Dr. Horan and Dr. Kanjarpane, I am requesting that you provide me with a written medical evaluation from your psychiatrist that explains whether you are mentally fit to perform your job by September 8, 2006. As you know, you have been granted administrative leave to allow you time to obtain

this medical information and for the Board to reach a decision on this issue. In addition, in order for the Board to receive a full evaluation of your fitness for duty, you must inform me by August 25, 2006 of your psychiatrist's name and telephone number so that I can forward to him or her your job description as well as a copy of this letter so that your doctor understands the reasons why the Board has asked for you to be evaluated. Please be advised that if you do not submit the contact information for your psychiatrist and/or a written evaluation from your psychiatrist by the dates indicated above, you may be disciplined or, if appropriate, your employment may be terminated.

If you do not wish to be seen by your psychiatrist, you may choose to been seen by a Board doctor. If you choose this option, the Board will ask you to be evaluated by a doctor who is a board-certified psychiatrist in private practice. This examination will include psychological testing as well any additional examinations that are necessary to permit the psychiatrist to opine on your mental fitness to perform your job. The Board will pay for the examination and any additional examinations, if any are necessary, to reach a conclusion on this issue. If you prefer to be seen by a Board doctor you must inform me of this choice by August 25, 2006.

Should you wish, you may also submit any other medical documentation about your ability to perform your job from your personal physician, or other medical practitioner, and the Board will consider this documentation in reaching a decision on your fitness for duty.

Since you will be excused from work during the time it takes for the Board to evaluate your fitness for duty, you will not have access to the building until the matter of your ability to safely perform your job has been resolved. As noted above, if you do not comply with the deadlines for submitting the information I have requested above, your administrative leave will be terminated and, as noted above, you may be subject to disciplinary action or termination of your employment. However, if you find that you can not comply with these deadlines, or if you have any questions regarding this matter, please contact Keisha Hargo at 202-728-5877.

Sincerely,

Christine M. Fields
Associate Director

cc:    Keisha Hargo

DEFENDANT'S MOTION TO DISMISS AND FOR
SUMMARY JUDGMENT

EXHIBIT J

# BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

DIVISION OF RESERVE BANK OPERATIONS AND PAYMENT SYSTEMS

| | |
|---|---|
| **Date:** | August 18, 2006 |
| **To:** | Tina Chandler |
| **From:** | Greg Evans |
| **Subject:** | Recent Performance |

The purpose of this memorandum is to provide you with feedback on your recent job performance. This memorandum is designed to explain to you the concerns I have with your performance and to advise you that your performance must immediately improve.

A major concern I have about your current performance is your interactions with co-workers. In particular, I am concerned about some of your recent statements and interactions with Jo Chang and Bonnie Abbott.

I understand that, on July 24, 2006, while I was out of the office, Jo Chang offered you some gummy bears that she was holding in her hands, which you did not accept. On July 25, you left the office abruptly around 10:00 am because you were not feeling well. As you were leaving I indicated that I had wanted to discuss some things with you and hoped we could get to them on Thursday, July 27 (you had indicated previously that you would be out on Wednesday for a medical appointment). It was not practical to discuss issues with you at that time as I was engaged in a meeting with another staff member and it was clear that you needed to depart immediately.

The next day, July 26th, you left me a voice mail expressing your anger over Jo's method of offering you the gummy bears. You also indicated that you did not believe it was appropriate for Yao-Chin Chao to be giving you assignments related to the up-coming Joint Audit Committee Chair/ General Auditor meeting. In particular, your voice mail stated that you were angry that Jo tried to "force feed" you gummy bears. You stated that you were "totally irate" over this event, that you "wanted to hit her," that it "took everything I [you] did to not hit her," and that you went home and hit your husband instead of Jo. In addition, when I met with you to discuss this event on July 27, you stated that you believed you would have been "within your rights" to hit Jo. You also indicated that you believed Jo was engaged in "trickery" designed to goad you into physically assaulting her so that we could have you removed from the office in "handcuffs." When I indicated that Jo seemed genuinely unaware that she had offended you, you demonstrated how you had responded to her with a slow, low and drawn-out "no" through clenched teeth and tightly clenched fists. It appeared to me from our conversation that you were indicating that it was a personal struggle to resist taking physical action against Jo for "violating your personal space." Further, you indicated that you did not think it was possible for you to

- 2 -

remain in the division under such circumstances as the hostility you perceived would cause you to "become unbalanced."

First, you should be aware that no one observed Jo force feeding you or taking any other action that was out of the course of polite social behavior. Given that Jo's offer of food was a mundane, even friendly, social interaction, your response to it was completely inappropriate. Moreover, even if Jo's behavior had been different, it is never acceptable to threaten others with violence. As noted in the attached Board policy entitled Preventing Violence in the Workplace, the Board does not tolerate violence in the workplace. Thus, your interpretation of mundane events as personal assaults and your self-identified struggle to maintain composure and resist violent impulses concern me. Clearly, any violent actions or threatened violent actions toward an employee of the Board are completely unacceptable and could subject you to disciplinary action, up to and including termination of your employment with the Board.

Second, as we discussed on July 27, Yao-Chin's role in the planning of the Joint Audit Committee Chair/ General Auditor meeting includes many of the responsibilities handled by Jo in the past; it does not replace your responsibilities for the administrative aspects. As we discussed, I expect you to provide support to the staff in your assigned sections. That will necessarily result in them requesting your assistance directly and expecting your help on a regular basis. If this creates a situation where the load is greater than you can handle, you are expected to bring that to the attention of the staff, managers or me to help determine priorities. I understand you have had this same point clarified for you by Paul Bettge in the past.

I am also concerned about your recent behavior toward Bonnie Abbott. On July 26, Bonnie left work for you to complete on your desk. As you know, Bonnie has been asked to help train you on the various Financial Accounting Section responsibilities you are expected to assume after a reasonable transition period. As you know, your frequent and unpredictable absences have impeded the efforts of Bonnie and other section members to facilitate a smooth transition. As I understand it, the day after Bonnie left this work for you, you returned it to her, stood over her, pointed a finger a few inches from her face and stated, "Don't ever give me work again." You also, reportedly informed Bonnie that she would be caught up short if she did not stop leaving you work.

Your behavior toward Bonnie was unacceptable in the first instance because Bonnie is expected to forward documents to you for handling as part of the transition. Thus, it was unacceptable for you to return work that Bonnie provided to you. Your behavior was also unacceptable because it was threatening. As noted above, the Board does not tolerate threatening behavior and such behavior must not be repeated.

I am also concerned with your performance during the period in which I have been supervising your work. Because I have only recently begun supervising your work, I am not necessarily familiar with all the work you do for the division. Given your concerns that your new workload may be too great, I asked you to track your daily activities for a few weeks to give me a sample of the types of work you are currently doing and who is assigning it. I made this request on June 13 and again on June 27. On June 27th you responded with very general information regarding two days of your work rather than with the list of daily activities I had

- 3 -

asked you to provide. You also asked that Jo Chang, Brenda Richards, and I give you a specific list of work-related objectives. As you know, I responded in a way to assure you that there wasn't a hidden motive behind my request and suggested that you and I start out just clarifying my expectations and then adding Jo's and Brenda's objectives after Brenda's return. Finally, during our wide ranging conversation on July 27 you explained your reluctance to provide information on your responsibilities as you believe that division management has, in the past, used such a list to reassign your work to analysts in order to avoid reclassifying your job. As you know, I clarified that that was not my intent at all and I handed you a list of duties that I had prepared without the benefit of your list of daily activities. This was not the most efficient way of accomplishing the task and resulted in more work for me.

As noted above, if you do not improve your performance you could be subject to disciplinary action, up to and including termination of your employment with the Board, and, if your employment continues, your performance at this point could be rated at the marginal or unsatisfactory level.

Finally, you may continue to use leave without pay for any absences related to the medical condition for which you were approved for leave under the Family and Medical Leave Act (FMLA). However, I will not authorize leave without pay for absences not related to your FMLA condition. Thus, please inform me if your need for leave is due to your FMLA condition.

In addition, the Rehabilitation Act of 1973 (Rehabilitation Act), the Federal Government's equivalent of the Americans with Disabilities Act, requires, under certain circumstances, that the Board provide disabled employees with reasonable accommodations if such accommodations will assist them in performing the essential functions of their jobs. As you were informed by Keisha Hargo, if you believe you suffer from a disability covered under the Rehabilitation Act, you may wish to request a reasonable accommodation if you believe a reasonable accommodation would assist you in performing the essential functions of your job. You may request a reasonable accommodation from: (1) me; (2) Paul Bettge; (3) Louise Roseman, (4) the EEO Office, or (5) Employee Relations.

If you request a reasonable accommodation, you will need to submit sufficient medical documentation to show that you are disabled, as defined by the Rehabilitation Act, and that the requested accommodation would assist you in performing the essential functions of your job. You should be aware that the medical documentation you have provided to date in connection with your request for FMLA leave is insufficient for the Board to determine whether you are disabled under the Rehabilitation Act. To determine whether you are disabled under the Rehabilitation Act the Board would need medical documentation that includes the following information: (1) the nature of the medical problem at issue; (2) how the medical problem substantially limits one or more of your major life activities; (3) whether the medical problem is permanent or long-term; and (4) how the requested accommodation will assist you in performing the essential functions of your job. Major life activities refers to those activities that are of central importance to daily life. General information concerning an impairment is insufficient if the impairment's symptoms vary widely from person to person. In such a case the medical documentation must offer evidence of how the impairment limits your particular daily life activities and the extent of those limitations. Only impairments that are permanent or long-term,

- 4 -

and that prevent or severely restrict you from performing activities that are of central importance to most people's daily lives, require accommodation under the Rehabilitation Act.

If you have any questions about this information please feel free to contact me or Keisha Hargo on 202-728-5877.

Attachment – Preventing Violence in the Workplace



**BOARD OF GOVERNORS**   MANAGEMENT
**OF THE**                POLICY
**FEDERAL RESERVE SYSTEM** STATEMENT

**effective date**
**2/12/01**

# PREVENTING VIOLENCE IN THE WORKPLACE

## POLICY STATEMENT

The Board strives to provide all employees with a healthy, safe, and productive workplace.
The Board's policy is that acts of violence in the workplace or affecting the work
environment are unacceptable and will not be tolerated. This policy applies equally to all
employees, temporary personnel, contractors, and visitors.

At all times, employees are expected to adhere to a standard of conduct that is respectful and
courteous to other employees in the work environment. An employee who has engaged in
violent behavior may be subject to disciplinary action, up to and including termination,
criminal penalties, or both.

## GUIDELINES

Examples of violent behavior prohibited under this policy, include, but are not limited to,
threatening language or behavior, verbal or physical intimidation, intentional destruction or
threat of destruction of property, use or possession of a weapon, fighting, assault, and
battery.

Employees should report incidents of violence to Employee Relations or Security. All such
reports will be taken seriously and will be addressed by the responsible officer and manager.
An employee should promptly notify his or her supervisor of any threats that he or she has
witnessed, received, or been told that another person has witnessed or received. Managers
will promptly take appropriate action when they become aware of violent situations or
complaints from any source. When workplace violence is substantiated, the employee will
be subject to disciplinary action under the Board's Disciplinary Actions policy or Adverse
Action Policy and Procedures. Such action may include termination of employment. With
respect to weapons, District of Columbia law prohibits the carrying, either openly or
concealed, of guns or other dangerous weapons (D.C. Code 22-3204). Similarly, federal law
prohibits possession or use of firearms or other dangerous weapons on the property of a
federal facility (18 USC 930a, b). The Board will not tolerate weapons in the workplace, and
any apparent violations of the law will be referred to the appropriate authorities for
investigation.

Return to top

Contents | Previous | Next

DEFENDANT'S MOTION TO DISMISS AND FOR
SUMMARY JUDGMENT

EXHIBIT K

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TINA M. CHANDLER,                    )
      Plaintiff,                   )    Civil Action No. 1:06-2082 (EGS)
v.                                   )
                                   )
BEN S. BERNANKE,                     )
CHAIRMAN OF THE BOARD                )
OF GOVERNORS OF THE                  )
FEDERAL RESERVE SYSTEM,              )
      Defendant.                   )

**DECLARATION OF LISA HOSKINS**

I, LISA HOSKINS, declare that the following is true and correct:

1.  I am an Assistant Director of the Division of Reserve Bank Operations and Payment

    Systems ("RBOPS") of the Board of Governors of the Federal Reserve System (the

    "Board"). I oversee the Administration Section of RBOPS.

2.  In my capacity as Assistant Director, I have oversight responsibility for the

    administration of RBOPS, including the procedures for promoting employees.

3.  As part of these responsibilities, I, through my staff, maintain records related to

    RBOPS employees, including recommendations for promotions.

4.  Nichole Addison-Waters was a RBOPS employee in 2003.

5.  Attached to this Declaration as <u>Attachment 1</u> is a copy of a memorandum dated

    March 12, 2003 to Louise Roseman, RBOPS director, from Jeff Stehm, who was Ms.

    Addison-Waters's supervisor at that time, recommending Ms. Addison-Waters for a

    promotion to Senior Staff Assistant, grade FR-36.

6.  Ms. Addison-Waters was promoted to Senior Staff Assistant, grade FR-36, effective

March 23, 2003.

7. LaKisha Tapscott was a RBOPS employee in 2005.

8. Attached to this Declaration as <u>Attachment 2</u> is a memorandum dated October 24, 2005 to Ms. Roseman from Mr. Stehm, who was Ms. Tapscott's supervisor at that time, recommending Ms. Tapscott for a promotion to Senior Staff Assistant, grade FR-36.

9. Ms. Tapscott was promoted to Senior Staff Assistant, grade FR-36, effective November 13, 2005.

10. Tina Chandler was a RBOPS Staff Assistant, grade FR-35, from 1998 to November 6, 2006.

11. On November 6, 2006, Ms. Chandler came to my office and gave me a memorandum dated November 6, 2006, from her to Gregory Evans, Ms. Chandler's supervisor, with the subject line "Resignation as of November 6, 2006." A copy of the memorandum is attached to this Declaration as <u>Attachment 3</u>.

12. As stated in <u>Attachment 3</u>, Ms. Chandler resigned from the Board effective November 6, 2006.

    I declare under penalty of perjury that the foregoing is true and correct.

Executed on this __7__ day of May, 2007.

_____

Lisa Hoskins

2

DECLARATION OF LISA HOSKINS

ATTACHMENT 1

# BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
DIVISION OF RESERVE BANK OPERATIONS AND PAYMENT SYSTEMS

| | |
|---|---|
| **Date:** | March 12, 2003 |
| **To:** | Louise Roseman |
| **From:** | Jeff Stehm (via Jeff Marquardt) |
| **Subject:** | Career Ladder Progression for Nichole Addison-Waters |

I recommend that Nichole Addison-Waters be promoted to a FR-36 Senior Staff Assistant. An Redacted percent salary increase of Redacted would result in a new salary of Redacted and a new grade compa ratio of Redacted This increase would place Nikki at the Redacted of the salary range Redacted for current FR-36 senior staff assistants in the division. Nikki has been a FR-35 staff assistant since December 24, 2000. Her last PMP rating was extraordinary and her previous PMP rating was outstanding.

My recommendation for promotion is based on Nikki's excellent performance during the past several years. She has demonstrated very strong administrative and organizational skills and outstanding initiative. Her abilities in this area have resulted in excellent support to all section staff members and the division. She is well respected by the staff and is very proactive and constructive in working with both the staff and her peers throughout the division. Beyond her excellent administrative abilities, Nikki also has been very proactive in developing more advanced skills and taking on greater responsibilities in support of the CSS and PSR programs. She has increased her technical computer skills in a variety of areas and now tracks CEBA overdraft reports from the Reserve Banks for the PSR section, maintains an Access database for project tracking, acts as primary SOL editor for both programs, tracks settlement data for CCIL, and manages the Public-Web feedback box for the division. She is currently working on gaining a better understanding of the sections' payment databases and data needs in order to support more routine data requests. She manages her responsibilities in a very professional manner, has great interpersonal skills in dealing with others, and is continually seeking opportunities to expand her skills and contribute. A prime example of this initiative is her pursuit of an Associate's degree in business at Strayer University, where she has consistently maintained her standing on the dean's list.

Approved: _____   3/14/03
Louise Roseman                         Date

Reviewed: _____   3-13-03
Lisa K. Hoskins                        Date

DECLARATION OF LISA HOSKINS

ATTACHMENT 2

# BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
### DIVISION OF RESERVE BANK OPERATIONS AND PAYMENT SYSTEMS

| | |
|---|---|
| **Date:** | October 24, 2005 |
| **To:** | Louise Roseman |
| **From:** | Jeff Stehm |
| **Subject:** | Career Ladder Progression for LaKisha Tapscott |

I recommend that LaKisha Tapscott be promoted to a FR-36 staff assistant. A salary increase of ~Redacted~ percent[1]) would result in a new salary of ~Redacted~ and a new grade compa ratio of ~Redacted~ Kisha has been a FR-35 staff assistant since September 2004 and her current compa ratio is ~Redacted~ at a FR-35 salary of ~Redacted~. This increase would place Kisha in the ~Redacted~ of the salaries ~Redacted~ for current FR-36 staff in the division. Her last PMP rating (October 2005) was extraordinary.

My recommendation for promotion is based on Kisha's strong performance as the staff assistant for the CSS and PSR functions over the last year. She has effectively managed a broad scope of responsibilities. In the administrative arena, she has effectively managed a wide range of routine and special duties including FOIA requests, Pubweb issues, SOL editor, meeting arrangements, and arranging all staff travel/processing travel reimbursements. In particular, she has provided exceptional support for many senior level meetings at the Board, including PSPAC, PSDC, System groups, interagency and industry meetings, CPSS Work Groups, and bilateral meetings with other central banks. In each case, her professionalism and attention to detail has been excellent.

She also has provided substantial technical support to the PSR and CSS programs in the areas of database maintenance, report generation, and reviews. For example, she maintains databases of daily, weekly, and monthly CLS, GSD, and MBSD statistics on FAME (through the Unix platform); regularly runs reports used by staff for monitoring and trend analysis of settlement flows; serves as the SOL editor for both sections (CSS is one of the heaviest users of SOL); runs reports for on-site and off-site PSR reviews and occasional DI issues from RMIS, DORPS, and section oversight databases; and records and files CEBA data.

Finally, she readily takes on additional responsibilities at the division level. For example, she serves as a committee member for the division's mentoring program, participated on the FedTraveler Focus Group, served as a division climate survey ambassador, and assisted the IS manager with special projects and monitoring the quarterly IS budget.

---

[1] The Management Division's guideline for non-exempt employees is ~Redacted~ percent.

Across all these responsibilities, Kisha has performed very effectively, exercising initiative, sound judgment, professionalism, and maturity. She has strong technical and administrative skills, seeks to enhance her skills and experience at every opportunity, and is always willing to take on additional, more complex responsibilities.

Concur:  _____        _10/28/05_
         Jeffrey Marquardt                    Date

Reviewed: _____        _10/28/05_
         Lisa K. Hoskins                      Date

DECLARATION OF LISA HOSKINS

ATTACHMENT 3

# BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

DIVISION OF RESERVE BANK OPERATIONS AND PAYMENT SYSTEMS

| | |
|---|---|
| **Date:** | November 6, 2006 |
| **To:** | Gregory L. Evan |
| **From:** | Tina Chandler |
| **Subject:** | Resignation as of November 6, 2006 |

I, Tina Chandler, am submitting this formal resignation letter to Greg Evans, stating that I am resigning due to an escalating, stressful and adverse work environment, and I feel the need to resign effective immediately.

cc: Louise Roseman
    Paul Beggte
    Lisa Hoskins
    Human Recourses

DEFENDANT'S MOTION TO DISMISS AND FOR
SUMMARY JUDGMENT

EXHIBIT L

**Job Description**

Board of Governors
of the Federal Reserve System

| | |
|---|---|
| Job Title: Staff Assistant | Grade Level: 35 |
| Division: Reserve Bank Operations and Payment Systems | FLSA Status: E ☐  NE ☒ |
| Reports To (Title): Division Official(s) | Career Ladder: 7528 |

Summary:

The Staff Assistant performs a variety of administrative, research, and technical duties in support of officers and staff in one or more sections within the Division. Maintains, administers, and/or accesses databases of information relating to Reserve Bank operations and payment systems, prepares reports, and assists in coordinating periodic meetings and conferences sponsored by the Division.

Principal Duties and Responsibilities

1. Responds to routine internal and external requests for data. Retrieves Reserve Bank expense and other statistical data from the Board's mainframe computer using FedMIS and prepares routine reports designed by Division staff using spreadsheet, word processing, database, and/or graphics software programs. Uses discretion in handling confidential information.

2. Writes correspondence using accepted Board format and style. Routine correspondence may be written for staff or management signature. Reviews outgoing documentation for format, typographical accuracy, and conformance with procedures. Assists staff in the preparation of briefing memoranda to Division officers and Board Members, including the assembly of other related materials.

3. Provides assistance in preparing for and concluding examinations and operations reviews, such as making logistical arrangements, preparing announcement letters and thank-you letters for borrowed assistants, distributing advance materials, etc.

4. Retrieves and accesses information from Division files and other sources, including the Research Library and on-line computer databases, at the request of Division staff.

5. Makes arrangements for meetings and conferences, informs participants of topics to be discussed, and distributes background information. May be required to take notes at meetings or conferences, prepare minutes, and handle follow-up activities, where necessary.

6. May be required to schedule agenda items for Board review and ensure that all necessary forms and related materials are processed before the designated deadline.

7. Maintains the Correspondence and review Tracking System (CARTS) and other Division data files.

8. Prepares annual program budget documents with staff and management input. Coordinates budget tasks with the Administrative Assistant. Monitors program budget and expenses.

9. Assists other staff assistants in the Division and provides training and support to secretarial staff and message center operators, when necessary. Provides back-up to secretarial staff when necessary.

This description is intended to indicate the general level and function of this job. It is not intended to be all-inclusive and employees may be assigned duties not listed.

Exhibit 13.4

Knowledge/Skill Requirements:

Requires high school diploma or equivalent experience. Requires excellent oral and written communications skills and organizational ability typically acquired by a minimum of four years of administrative/secretarial experience. Must be computer literate with demonstrated proficiency in: spreadsheet or database applications (e.g., LOTUS 1-2-3 for Windows, Paradox) and word processing applications (WordPerfect for Windows). Familiarity with graphics and desktop publishing applications (e.g., Harvard Graphics and Pagemaker) highly desirable.

Problem Solving:

Guidelines include established Board, System, and section policies and procedures. Must be thoroughly familiar with the guidelines that exist in order to apply them appropriately according to the situation. Suggests or recommends new procedures, automation techniques, or data collection methods to improve efficiency. Consults with appropriate supervisor or staff before changing section procedures.

Complexity:

The work involves complex technical administrative duties such as retrieving expense and statistical data from various sources, developing data formats, and preparing and reviewing reports. The incumbent may support one or more functional areas and must use analytical processes to identify what needs to be done. Incumbent may seek advice of supervisor or staff or unusual situations.

Impact of Actions:

The work affects the efficient and accurate processing of information on Federal Reserve Bank operations and payment systems, the accuracy of information provided to senior Board and System officials concerning FRB operations and payment systems, and the efficient operation of the section(s) to which the staff assistant is assigned.

Communications:

Maintains contact with Division, Board, and Reserve Bank officials and staff in responding to inquiries and requests for data, preparing routine correspondence, and coordinating meetings and conferences. Has contacts with individuals at other government agencies, in private industry as well as from the general public.

Supervisory Level:

Ongoing assignments are performed independently in order to meet established objectives and deadlines. Completed work receives technical review from appropriate staff for accuracy. Unusual problems or situations without clear precedents are referred to the appropriate supervisor or staff for guidance.

I certify that the above fully and accurately describes the principal job elements for this position.

Division Approval  _____  Date  _____
                   Signature

HR Approval        _____  Date  _____
                   Signature

Exhibit 13A
Page 2 of 2

DEFENDANT'S MOTION TO DISMISS AND FOR
SUMMARY JUDGMENT

EXHIBIT M

Nonsupervisory                  Board of Governors
Job Description                 of the Federal Reserve System

Job Title:  Senior Staff Assistant          Grade Level:  36

Division:   RBOPS                            FLSA Status:  E____  NE_x_

Reports To (Title):  Division official(s)

**Summary:**
The Senior Staff Assistant performs a variety of administrative, research, and technical duties in support of officers and staff in one or more sections within the Division. Maintains, administers, and/or accesses databases of information on Reserve Bank operations and payment systems, prepares reports, assists in preparation of examinations and operations reviews, and coordinates periodic meetings and conferences sponsored by the Division.

**Principal Duties and Responsibilities:**

1. Responds to internal and external requests for data, using judgement and initiative to respond appropriately. Retrieves Reserve Bank expense and other statistical data from the Board's mainframe computer using FedMIS and provides data to Division or Board staff upon request. Uses spreadsheet software to develop and maintain databases, develop data formats, and design and prepare reports. Assembles data and information and uses graphics programs to prepare exhibits for staff's presentations to the Board, Board committees, Federal Reserve Banks, Congress, international banking groups, and private sector groups. Uses discretion in handling confidential information.

2. Writes correspondence in draft or final form using accepted Board format and style. Routine correspondence may be written for own signature; more technical correspondence may be prepared for signature of manager or analyst, as appropriate. Reviews outgoing documentation for format, typographical accuracy, and conformance with procedures. Prepares briefing memoranda to Division officers and Board Members and assembles briefing books as needed.

3. Assists in preparation of examinations and operations reviews, which includes contacting senior Reserve Bank management and arranging on-site interviews, collecting preliminary information from the Reserve Bank, distributing information to examination/review team participants, making logistical arrangements for team, and coordinating the agenda for the team to follow.

4. Facilitates staff research based on request or own initiative by retrieving and accessing information from Division files and other sources, including the Research Library and on-line computer databases.

5. Prepares and compiles periodic section status reports for use by Division management and staff.

6. Makes arrangements for meetings and conferences, informs participants of topics to be discussed, and distributes background information. Takes notes at meetings or conferences, prepares minutes, and handles follow-up activities where necessary.

7. Schedules agenda items for Board review and ensures that all necessary forms and related materials are processed before the designated deadline.

8. Maintains the Correspondence and Review Tracking System (CARTS) and other Division data files.

9. Prepares annual program budget documents with staff and management input. Coordinates budget tasks with the Administrative Assistant. Monitors program budget and expenses.

Exhibit 13B
Page 1 of 3

FR 1461a (8/91)



10. Assists other staff assistants in the Division and provides backup to secretarial staff when necessary. Provides assistance and/or training to staff assistants, secretaries and message center operators on policy and procedural matters.

========================================================================

This description is intended to indicate the general level and function of this job. It is not intended to be all inclusive and employees may be assigned duties not listed.

**Knowledge/Skill Requirements:**
Requires excellent organizational and automation skills, an understanding of basic accounting, and the ability to research information from a variety of sources. Requires excellent oral and written communication skills and interpersonal skills. Requires a high school diploma, or equivalent, with additional college coursework highly preferred and five years of related administrative work experience. Must demonstrate advanced proficiency in the following types of software capabilities: spreadsheet or database (e.g., Lotus 1-2-3, Paradox); word processing (WordPerfect); and/or graphics or desktop publishing (e.g., Harvard Graphics, Pagemaker).

**Supervision Received:**
Expected to set priorities and perform ongoing assignments independently using initiative to handle any problems or unusual situations that may occur. New assignments are discussed with the supervisor to establish approach to be taken and work product is reviewed for conformance with objectives.

**Guidelines and Judgment:**
Guidelines include established Board, System, and section policies and procedures. Must be thoroughly familiar with the guidelines that exist in order to apply them appropriately according to situation. Suggests or recommends new procedures, automation techniques, or data collection methods to improve efficiency. Consults with appropriate supervisor or staff before changing section procedures.

**Complexity:**
Responsible for maintaining the assigned section's (may be one or more sections) databases, preparing routine and special-request reports, training section staff on new automation procedures, coordinating conferences, researching and reporting on information in connection with the section's responsibilities, and performing a variety of ad hoc assignments in support of the section's work. Must use analytical processes to identify what needs to be done.

**Scope and Effect:**
The work affects the efficient and accurate processing of information on Federal Reserve Bank operations and payment systems, the accuracy of information provided to senior Board and System officials, individuals at other government agencies, in private industry as well as from the general public, concerning FRB operations and payments systems, and the efficient operation of the section(s) to which the staff assistant is assigned.

**Level and Purpose of Contacts:**
Maintains contact with Division, Board, and Reserve Bank officials and staff in responding to inquiries and requests for data, preparing routine correspondence, and coordinating meetings and conferences. Has contacts with individuals at other government agencies, in private industry as well as from the general public. Has contacts with senior Board officials and Board members to provide information in response to requests.

Exhibit _13 B_
Page _2_ of _3_

**Physical Demands/Work Environment:**
There are no unusual physical demands or discomforts.

I certify that the above fully and accurately describes the principal job elements for this position.

Division Approval _____    Date _8/10/94_
                        (Signature)

HRM Approval _____    Date _8/10/94_
                        (Signature)

Exhibit _13 B_
Page _3_ of _3_

TC - ROI -00241

DEFENDANT'S MOTION TO DISMISS AND FOR
SUMMARY JUDGMENT

EXHIBIT N

**AFFADAVIT**

DISTRICT OF COLUMBIA

**WASHINGTON**

I, Jo Chang, (53 years of age, Chinese-American, no prior EEO activity), Manager of the Audit Review Section of the Division of Reserve Bank Operations and Payment Systems (RBOPS), Board of Governors of the Federal Reserve System (the Board), current business address Constitution Ave between 20th & 21st Sts, N.W., Washington, D. C. 20551, do solemnly swear or affirm that:

I am submitting this affidavit to answer the complaint of discrimination and retaliation (FRB-EEO-06-01-001) filed by Tina M. Chandler against the Board. For the record, I am a Chinese American female, over forty. I have never filed an EEO complaint. I am responding to the following allegations made by the complainant:

Issue 1. Because of Tina Chandler's age (48 years of age), she has been evaluated at a level lower than her actual level of performance and thereby she was prevented from obtaining a promotion to the FR-36 grade level although younger women, who she trained, have been promoted.

Exhibit /0
Page / of 8

Page 1 of 8

Affiant's Initials

Issue 2. Because of Tina Chandler's race (African-American) and color (Black), she has been denied rewards for work performed and she has received lesser awards than employees of other races and she has been denied a promotion for the past five years.

Issue 3. Tina Chandler has been subjected to a pattern of harassment, abuse, and hostility in the workplace and denied promotion in retaliation for having previously filed an EEO complaint with the Board's EEO Program Office.

I, Jo Chang, am employed by the Board as the Manager of Audit Review in the RBOPS. I have been in my current position since December 1999 and with the Board since 1988. The Assistant Director's position is empty so I report directly to Paul Bettge, Senior Associate Director of RBOPS. Paul has overall responsibility so we just go to him. I don't know of any plans to fill the Assistant Director's position. I have a staff of seven professionals. I am responsible for the Oversight of the Reserve Banks internal audit departments.

I have known Tina Chandler because she is the administrative assistant for this area, which is sort of murky. She used to work for Jack Dennis, the former Assistant Director. But Tina

Affiant's Initials

TC - ROI -00214

does not report to me.  Sections have staff assistants.  We also
have a work group that helps us out administratively.


## Background

  I used to work for the Examination Section.  I was the
examiner-in-charge. I was in charge of a team of 21 examiners.
Because there are twelve reserve banks and each examination
could take thirty days I was on the road nearly 100% of the
time.  The examination unit was abolished and the two current
sections replaced it.  Jack Dennis, who was part of the
examination staff, was the Assistant Director over the Audit
Review Section.  Jack Dennis left the Board and "Bud" Martindale
was appointed to the position. He has also since left the Board.


AGE DISCRIMINATION

## Evaluations

  Paul Bettge is responsible for the performance evaluation (PMP)
of Tina Chandler.  Paul prepares a draft of Tina's PMP and asks
for input.  The PMP is only between the manager and the staff.
Since Tina doesn't report to me I didn't sit down with her
regarding her performance.  I only discuss performance with my
own staff.

Exhibit _10_
Page _3_ of _8_

Affiant's Initials _____

TC - ROI -00215

## Promotion

I am not aware of how the promotional process for non-exempt staff works. Tina did come to me about a recommendation. I told her to write the recommendation and that I would look at it.

If someone wants a promotion to a higher level you would expect a higher quality of work from him or her. Because of the Assistant Director vacancy, we, Jeannine Szostek and I, were instructed to give Tina work. I give her some tasks. I used to give her my travel. She does work on the Joint Meeting every year.

I have told my staff to give Tina administrative work to do, but, her work was never quite right and the staff got tired of giving her work. Now, none of my staff will give her any work, because they don't want to have to redo Tina's work.

Tina does do good work at times. However performance must be sustained and consistent for Tina to be promoted. I kept telling Tina that she had to be here and be off the phone. She would leave her desk without anyone knowing where she was. I overheard people saying that Tina is never around. I suggested to her that she leave a sign, i.e., "Tina's at lunch," so that she could be accounted for. I also advised her about being on

Exhibit _10_
Page _7_ of _8_

Affiant's Initials

TC - ROI -00216

the telephone on personal calls for long periods of time. It seemed that often Tina was on the phone all day.

As far as other individuals getting promoted I am unaware of it. The individuals whom you named do not work in my section. Nichole Addison-Waters once worked for the Administrative Support Group (ASC) but I believe that she has left the division. Lakisha Tabscott works for another section and Robin Jones works for the ASC.


## RACE DISCRIMINATION

### Denied Awards

Tina Chandler says that she was denied rewards and received lesser awards. I can only speak to cash awards. Tina received a cash award every year for helping on the Joint Meeting. I have been pretty honest and pretty fair with Tina. I just gave her a cash award yesterday for this year's Joint Meeting conference.


## RETALIATION

I was here and I was aware of the EEO complaint. Tina came to my office very upset. I took her to lunch to try to calm her

Exhibit 10
Page 5 of 8

Page 5 of 8

Affiant's Initials

TC - ROI -00217

down.  We talked.  I would always talk with Tina and I also listened.

  As far as Tina saying that she was given material to prepare at 12 noon on Friday for the Joint Meeting that was to begin at 8:00 am on Monday, that's not right.  I prepare the agenda and Tina takes it down to graphics and they print it.  She may select the style.  My staff prepares the documents and CDs.  I prepare the presentations and Tina takes them to duplication for printing.


  Communication:

  I treated Tina right.  I tried to teach her and I tried to coach her.   She would talk to me.  I was shocked when I first heard the accusation of my yelling at her.  I tried to help her get promoted: I encouraged her to go back to school; I talked to her about courses to take; and, I encouraged her to write.  I asked her to sign up for the division's mentoring program but she never did.  Each year I would inquire and for two years she gave me some kind of excuse why she couldn't.


HARRASMENT

Yelling Incident:

Exhibit __10__
Page _6_ of _8_

Affiant's Initials

TC - ROI -00218

I know that Tina is saying that I yelled at her.  Any human being when frustrated will talk loudly.  If someone wants to reach a higher level you expect a higher performance.  Tina had to prepare a List of Participants and there were a lot of mistakes on it.  Tina had to prepare Information Notes and again there were mistakes.

I had asked Tina to prepare invitation letters for audit committee chairs and she sent them to the governor for his signature without checking for accuracy .  I was frustrated.  I had to call the Governor's assistant and retrieve the letters. I really didn't yell at Tina, but I might have talked loudly.


**Overworked:**

As far as Tina being given three major projects, I can only say that these conferences occur every year.  Jeannine Szostek is responsible for the Bank Evaluation.  I am responsible for the Joint Meeting of Audit Committee Chairs and General Auditors Conference (Joint meeting), as well as the SCAD class.    Someone who wants to get promoted needs to learn how to multitask, to plan, and to organize.  For the Joint Meeting it is just a matter of Tina pulling things together.  For the Bank Evaluation project it is just a matter of putting information into binders.

Exhibit _10_
Page _7_ of _8_

Affiant's Initials

TC - ROI -00219

I have read the above statement consisting of eight(8) pages, and I declare under a penalty of perjury that it is true and correct. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

_____
                                                    Signature

4/23/2006
_____
                                                    Date Executed

Exhibit /0
Page 8 of 8

Page 8 of 8

Affiant's Initials

TC - ROI -00220