**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
**TINA M. CHANDLER,**                   )
                                        )
              Plaintiff,                )
                                        )          **Civil Action No.: <u>1:06-2082 (EGS)</u>**
                                        )
**v.**                                  )
                                        )
                                        )
**BEN S. BERNANKE,**                    )
**CHAIRMAN OF THE BOARD OF**            )
**GOVERNORS OF THE**                    )
**FEDERAL RESERVE SYSTEM,**             )
                                        )
              Defendant.                )
_____)

<u>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES**</u>
<u>**IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**</u>
<u>**AND FOR SUMMARY JUDGMENT**</u>

**COMES NOW** the Plaintiff, TINA MICHELLE CHANDLER, by and through

her undersigned counsel, and pursuant to Rules 12(b) and 56 of the Federal Rules of Civil

Procedure, and United States District Court for the District of Columbia Local Rule 7(b),

hereby submits the following as her Opposition to Defendant's Motion to Dismiss and for

Summary Judgment:

**STATEMENT OF FACTS AND PROCEDURAL POSTURE**

Plaintiff TINA CHANDLER ("Plaintiff") is an African-American woman, and

was born on December 20, 1957, and is currently 49 years of age.  She was employed by

Defendant in the Washington, D.C. office as a Staff Assistant at grade FR-35, in the

Division of Reserve Bank Operations and Payment Systems ("RBOPS"), from 1998 until

her resignation on November 6, 2006. She initially reported to Jack Dennis, an African-American male, who was Assistant Director of RBOPS. On June 8, 2006, she was detailed to the Accounting Section of RBOPS, to work as Staff Assistant FR-35 for Assistant Director Greg Evans.

Louise Roseman, a Caucasian/white female, was Director of RBOPS. In or about 2000, Ms. Roseman took adverse action against Mr. Dennis and another African-American male Assistant Director of RBOPS, Earl Hamilton. Ms. Roseman took work from Mr. Dennis and Mr. Hamilton and gave the work to Paul Bettge, a Caucasian/white male. Both Mr. Dennis and Mr. Hamilton filed lawsuits against the Board alleging Title VII race discrimination for failure to promote. Mr. Hamilton's suit was settled and Mr. Hamilton subsequently left his employment with Defendant. Mr. Dennis's suit was likewise settled and Mr. Dennis retired. After Mr. Hamilton and Mr. Dennis left the Board, Mr. Bettge was promoted by Ms. Roseman to the position of Associate Director of RBOPS. Bud Martindale was placed in the position previously held by Mr. Dennis, Assistant Director of RBOPS.

In both 1999 and 2000, Plaintiff received "Outstanding" performance evaluations from her supervisor, Mr. Dennis. In 2000, Mr. Dennis recommended that Plaintiff receive a promotion to Staff Assistant grade FR-36. Ms. Roseman subsequently changed Plaintiff's performance evaluation from "Outstanding" to "Commendable," a lower assessment of her performance. Ms. Roseman also, contrary to Mr. Dennis's recommendation, denied Plaintiff's promotion to Staff Assistant grade FR-36. Ms. Roseman also indicated that she wanted to remove Plaintiff from the Division of RBOPS. Plaintiff filed a formal EEO complaint on December 13, 2000, with the EEO Office at the

Board due to the racial discrimination to which she had been subjected by Ms. Roseman; that complaint was resolved by a Settlement Agreement dated April 2, 2001 (reference is made to the Settlement Agreement as appended to the Motion to Dismiss and For Summary Judgment as filed by Defendant).

The Settlement Agreement provided that Plaintiff's 2000 performance evaluation would be changed back from "Commendable" to "Outstanding" (and that the review as written by Mr. Dennis would be placed back into her file, replacing the lower, different review by Ms. Roseman; that she would receive the pay raise for 2001 that was given to employees receiving "Outstanding" evaluations, namely, 5.3 percent, which would be retroactive to December 17, 2000; that she would receive a cash award of $500 (which had been recommended by Mr. Dennis); and that the Board would pay Plaintiff's attorney's fees relative to the complaint in the amount of $1,000. In exchange, Plaintiff agreed to withdraw her formal EEO complaint and waive all issues that were the subject of the complaint and issues that have arisen between the time of filing of the formal EEO complaint and the date of the Settlement Agreement.

Bud Martindale, who had replaced Mr. Dennis as Assistant Director of RBOPS, was responsible for conducting Plaintiff's performance evaluations for the years 2001, 2002, and 2003. For all three of those years, Plaintiff received "Outstanding" performance evaluations from Mr. Martindale. However, despite these evaluations, Plaintiff did not receive her sought-after promotion to grade FR-36. Plaintiff was also subject to continuous and frequent yelling and offensive and harassing conduct directed toward her by Mr. Martindale.

Mr. Martindale left the position of Assistant Director of RBOPS in August of 2004, and that post remained vacant until the middle of 2006. Plaintiff at that time assisted the Oversight Coordination section, managed by Jeannine Szostek (a Caucasian/white female), and the Audit Review section, managed by Jo Chang (a Chinese-American female). Plaintiff reported to Paul Bettge, Associate Director of RBOPS, who was responsible for conducting Plaintiff's performance evaluations, with the input of Ms. Szostek and Ms. Chang.

Ms. Szostek was a friend of Ms. Roseman, had been Plaintiff's manager in 2000, and knew that Plaintiff had filed an EEO complaint in 2000. Ms. Szostek gave every member of a team that had worked on a Bank Evaluation Project a cash award, except Plaintiff, despite Plaintiff having been an active, participating member of that team on equal footing with all other members of the team (and therefore likewise entitled to the cash award that was denied to her).

Ms. Chang repeatedly subjected Plaintiff to harassment and offensive conduct, creating a hostile work environment. Ms. Chang, without just cause, yelled at Plaintiff and humiliated her; repeatedly suggested to Plaintiff that she should apply for other jobs; and repeatedly asked Plaintiff, in a disparaging manner, what Plaintiff wanted to do with her life.

Plaintiff was again denied promotion to grade FR-36 in 2005. She commented about this failure to promote on a climate survey of the Division of RBOPS.[1] Subsequently, she was prohibited from attending the climate survey meeting (which she

---

[1] The Governors of the Board had called in a group to conduct a climate survey of the Division of RBPOS because the Division had a high turnover rate of employees and a high number of complaints both to Employee Relations and the EEO office.

had earlier been told she would be permitted to attend). Plaintiff then notified the EEO Office that she intended to file another formal EEO complaint.

Plaintiff was responsible for training Lakisha Tabscott and Nicole Addison-Waters (both women in their mid-twenties and at grade FR-35) to perform the duties of Staff Assistant. Subsequent to her notifying the EEO Office that she intended to file a formal EEO complaint (and prior to the filing of the complaint), Ms. Tabscott was promoted to Staff Assistant grade FR-36, the very promotion sought by Plaintiff for years. Ms. Addison-Waters was also promoted to Staff Assistant grade FR-36. Plaintiff had remained at grade FR-35, the level at which she had been hired, for her entire tenure at the Board (over seven years), despite "Outstanding" evaluations from her supervisors and a recommendation that she be promoted to FR-36. Ms. Tabscott and Ms. Addison-Waters, both trained by Plaintiff, were promoted quickly from FR-35 to FR-36. Plaintiff was fully qualified for a promotion to FR-36 because of the "Outstanding" evaluations, recommendation from Mr. Dennis that she be promoted, performance of work assignments at the FR-36 level, training of personnel to perform the duties of Staff Assistant, positive comments about her work performance including a letter from Anna M. Wong of the Federal Reserve Bank of Boston (dated July 29, 2002) (Exhibit 2), cash awards for performance in the amounts of $1,000 and $500, respectively, and a letter commending her contributions in organizing the Joint Meeting of Audit Committee Chairs and General Auditors, and subsequent Conference of General Auditors (dated August 1, 2002) (Exhibit 3).

Plaintiff filed her second formal EEO Complaint on January 3, 2006. After filing this complaint, her managers abnormally refrained from communicating with her. Ms.

Chang continued to harass Plaintiff, and Plaintiff experienced a hostile work environment and suffered emotional distress due to her work environment. On June 8, 2006, she was detailed to the Accounting Section of RBOPS, to work as Staff Assistant FR-35 for Assistant Director Greg Evans.

While working for this section, many assignments and tasks were being withheld from her, in order to establish that she had poor work performance.

She subsequently resigned on November 6, 2006, due to "escalating , stressful and adverse work environment" and the discrimination and hostile work environment to which she had been subjected during her entire tenure at the Board (Exhibit 4). Everything in the performance evaluation was directed towards her eventual termination, therefore, Plaintiff was forced to resign. She had been reassigned to an accounting position despite her inexperience with that work, and the performance review contained untrue allegations of poor performance and the requirement that her performance improve by April of 2007. She anticipated a poor review in April of 2007 and eventual termination, and due to this, her declining health as exacerbated by the employment environment, and the continued discrimination and retaliation, she was forced to resign.

Plaintiff was diagnosed with post-traumatic stress syndrome (PTSS) and fibromyalgia, and referred to a psychiatrist for treatment. On June 7, 2006, Dr. Curiel completed, signed, and dated a Certification of Health Care Provider form, stating that Plaintiff "will have to take work only intermittently;" Plaintiff "is presently incapacitated Will require psychiatric care before working full time;" Plaintiff "will have to take time off from work until her condition improves;" and Plaintiff is "unable to perform any of her duties at present time." (Exhibit 5) Plaintiff submitted this Certification to the Board

as part of her application for leave under the Family and Medical Leave Act (FMLA).

The Board granted Plaintiff 12 weeks (480 hours) of unpaid FMLA leave to be used on

an intermittent basis from June 7, 2006, until June 6, 2007.  Despite requiring continuous

time off, she was only granted this intermittent time off.

In Plaintiff's performance evaluation, Greg Evans wrote that from October 2005

to March 2006, Plaintiff had taken off work, had extended absences, and could not keep

up with her work so that her responsibilities were transferred to other employees.  These

statements were untrue.  Plaintiff became ill around March 2006, and had exhausted her

annual and sick leave by May 2006, and was then granted leave under FMLA in June

2006.

Ms. Chang's harassment of Plaintiff culminated in an incident wherein Ms. Chang

approached Plaintiff, and invaded Plaintiff's personal space (was unreasonably close to

Plaintiff) by thrusting a handful of gummy bear candy to Plaintiff's mouth, attempting to

force-feed her the candy.  She commanded Plaintiff to "eat it."  Plaintiff held her mouth

tightly closed so that Ms. Chang would not succeed in forcing the candy into her mouth.

Plaintiff's initial instinct was to push Ms. Chang away in order to protect herself, but

Plaintiff was able to overcome this instinct and refrained from making any type of

physical contact with Ms. Chang.  Plaintiff then reported this incident to the EEO office

and Employee Relations office, and left a voicemail message for Greg Evans detailing the

incident.  Greg Evans did not return Plaintiff's call, but responded with a written

memorandum expressing concern over the safety of the workplace and the issue of

violence in the workplace.  He did not address Plaintiff's complaint (reference is made to

Mr. Evan's memorandum as appended to the Motion to Dismiss and For Summary

Judgment as filed by Defendant).  Plaintiff had mentioned a previous incident where a manager had provoked an employee into violence, so that the employee was removed from the workplace in handcuffs.  Plaintiff believed that Ms. Chang was likewise trying to deliberately provoke Plaintiff into anger and a physical response, so that Plaintiff would lose her job and likewise be removed in handcuffs.  Plaintiff also received a letter from Christine M. Fields, the Assistant Director of the Board, expressing concern over Plaintiff's ability to perform the functions of her job without endangering her safety of that of other employees, and requiring Plaintiff to undergo psychiatric evaluation to determine whether she was fit for duty.  Ms. Fields likewise did not address Plaintiff's complaint (Exhibit 7).

On September 18 and 21, 2006, after being placed on administrative leave, Plaintiff underwent psychiatric evaluation by Dr. Carol Kleinman (a psychiatrist designated by the Board) and was found to be fit for duty.  Dr. Kleinman wrote in her letter that "in my opinion, to a reasonable degree of medical certainty, Ms. Chandler is safe to return to work;" that "[s]he is not a violent person;" that "Ms. Chandler, in my view, very likely does suffer from a psychiatric disorder that prevents her from safely performing her work for the Board at this time;" that Plaintiff should consult a psychiatrist, take medication for her anxiety, undergo therapy, and return to work after some time; and that "[i]t seems that her managers have not responded early enough to the problems in their department, until they got so out of hand that Ms. Chandler exploded and made her complaints known." (Exhibit 8).

Dr. Kleinman's report was given to the Board on October 3, 2006, but was not permitted to return to work until October 19, 2006. This significant delay was another incident of retaliation because of her pending complaint.

Plaintiff, in her Complaint filed in this Court on December 6, 2006, alleges violations of Title VII of the Civil Rights Act of 1964 (42 USC § 2000e, *et seq.*, as amended), violation of the Age Discrimination in Employment Act of 1967 (ADEA) (29 USC § 633a, *et seq.*, as amended), and violation of the Family and Medical Leave Act of 1993 (29 USC § 2601, *et seq.*). Namely, Plaintiff alleges that (1) she was subjected to discrimination and adverse actions by the Defendant, including being repeatedly denied a deserved promotion and resultant higher salary, due to retaliation by Defendant in response to the 2000 EEO complaint; (2) she was discriminated against on the basis of race in being repeatedly denied a deserved promotion and resultant higher salary and being subjected to a hostile work environment; (3) she was discriminated against on the basis of age in being repeatedly denied a deserved promotion and resultant higher salary and being subjected to a hostile work environment, and in other younger women being promoted over her; and (4) she suffered from medical conditions as a result of the hostile work environment and discriminatory conduct, and was denied the right to unpaid leave by being required to return to work in contradiction to the orders of her psychiatrist and by being granted intermittent rather than continuous leave. Defendant filed his Answer on May 8, 2007, and also filed his Motion to Dismiss and for Summary Judgment on May 8, 2007. This Memorandum of Points and Authorities is in opposition to said Motion. No discovery has yet been conducted, as Plaintiff was awaiting the Answer of

Defendant.  Plaintiff intends to undertake extensive discovery in this case in order to obtain additional evidence in support of her allegations.

## ARGUMENT

### I.    PLAINTIFF'S CLAIMS ARE TIMELY AND NOT BARRED BY THE 2001 SETTLEMENT AGREEMENT.

Plaintiff filed this present lawsuit on December 6, 2006.  Plaintiff complains of discriminatory and retaliatory conduct by the Defendant directed at her.  Plaintiff's first EEO complaint was settled by Settlement Agreement dated April 2, 2001.  Plaintiff initiated a second EEO complaint in October 2005, and amended the complaint in January 2006.  Plaintiff in that complaint detailed a pattern of discriminatory behavior, as well as a continuation of the retaliation and discrimination that was supposed to have been resolved by the 2001 Settlement Agreement.

In the 2001 Settlement Agreement, Plaintiff agreed to withdraw her formal EEO complaint and waive all issues that were the subject of the complaint and issues that have arisen between the time of filing of the formal EEO complaint and the date of the Settlement Agreement.  Therefore, it is apparent that all claims and issues that arose subsequent to the date of the Settlement Agreement (namely, after April 2, 2001) would not be waived.

Furthermore, all claims and issues that arose subsequent to the Settlement Agreement are timely.  In *Harrison v. Rubin*, the Court of Appeals reversed the dismissal of the plaintiff's Title VII claims, remanding for a determination of whether her Precomplaint Agreement barred her from pursuing claims made in a subsequent complaint.  The Court held that, if the agreement did not bar the claims, then "Harrison's

allegation of a post-settlement assault can proceed without regard to her failure to exhaust administrative remedies." 174 F.3d 249 (D.C. Cir. 1999), citing *Loe v. Heckle,* 768 F.2d 409, 420 (D.C. Cir. 1985) "(where the ends of administrative exhaustion have been served by pursuing administrative remedies for the underlying complaint, separate exhaustion of administrative remedies for related post-complaint conduct is not required)" and citing *Webb v. District of Columbia,* 864 F. Supp. 175, 184 (D.D.C. 1994) "([t]o force an employee to return to the state agency and the EEOC every time he claims a new instance of discrimination in order to have the courts consider the subsequent incidents along with the original ones would erect a needless procedural barrier.)"

In the present case, Plaintiff pursued and exhausted administrative remedies for the issues raised in her first EEO complaint, resulting in the Settlement Agreement. She subsequently made another formal EEO complaint in October 2005, amended January 2006, regarding subsequent discriminatory conduct and retaliation. Defendant would have Plaintiff file a separate complaint for each and every instance of discriminatory and retaliatory conduct that occurred subsequent to the Settlement Agreement. That would indeed be the "needless procedural barrier" described in *Webb*.

Furthermore, a plaintiff is not required to exhaust administrative remedies for a retaliation claim. In *Jones v. Greenspan*, this Court denied the defendant's motion to dismiss the plaintiff's allegations regarding his 2000 and 2001 performance evaluations as untimely for failure to exhaust administrative remedies. 402 F. Supp. 2d 294, 298 (D.D.C. 2005). This Court cited *Turner v. District of Columbia*: "The proposition that exhaustion is unnecessary for retaliation claims stems, in part, however, from the fear that filing a separate charge will result in more retaliation, and that a retaliation claims is

11

necessarily related to the underlying charge.  383 F. Supp. 2d 157, 178 (D.D.C. 2005).

All such allegations in the present case regarding retaliatory conduct should therefore not

be dismissed as untimely.

Defendant cites *Nat'l Railroad Passenger Corp. v. Morgan*, arguing that

discriminatory acts such as failure to promote and unfavorable performance evaluations

are discrete discriminatory acts and therefore a complaint must be timely filed after each

discrete act, or the claims are waived.  536 U.S. 101 (2002).  That case does not,

however, address the reasoning of this Court that subsequent discriminatory or retaliatory

acts, after the filing of a complaint and exhaustion of administrative remedies relating to

that initial complaint, are not subject to this filing requirement because to require

complaints for every subsequent, discrete act following the initial complaint is a

"needless procedural barrier."  The Supreme Court in *Morgan* does hold that failure to

promote and performance evaluations are discrete acts and cannot be grouped together in

a later complaint.  However, the *Morgan* case involves a plaintiff who endured many

discriminatory acts over time and then filed his first complaint, attempting to group all

prior acts into that one complaint.  The plaintiff in *Morgan* is different from the present

Plaintiff in that he did not file and have resolved an initial complaint, only to have

subsequent acts following the Settlement Agreement.  In the present case, had Plaintiff

not had the initial complaint and resulting Settlement Agreement in April 2001, then

*Morgan* might apply to bar her from grouping together such discrete discriminatory acts

such as failure to promote and the unfavorable performance evaluations.  As such,

however, *Morgan* does not apply and Plaintiff's claims are timely and should not be

dismissed.

II.    **GENUINE ISSUES OF MATERIAL FACT EXIST AND SUMMARY JUDGMENT IS PREMATURE AND INAPPROPRIATE.**

Rule 56(c) of the Federal Rules of Civil Procedure states that "the judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Defendant seeks summary judgment based upon the Complaint filed by Plaintiff; no discovery has yet been conducted in this case. It is therefore premature for the Court to consider granting this Motion. Furthermore, the Complaint on its face raises many genuine issues as to material fact, and therefore Plaintiff is entitled to trial of these issues; Plaintiff is also prepared to present additional evidence to this Court should the Court deem it necessary. Finally, the D.C. Circuit Court of Appeals has directed the district courts to view summary judgment motions in employment discrimination cases with caution, because it is so difficult for a plaintiff to establish proof of discrimination. *Jones v. Greenspan* at 299, citing *Aka v. Wash. Hosp. Ctr.,* 116 F.3d 876, 879-80 (D.C. Cir. 1997), overturned on other grounds, 156 F.3d 1284 (D.C. Cir. 1998) (en banc) and *Johnson v. Digital Equip. Corp.,* 836 F. Supp. 14, 18 (D.D.C. 1993). Plaintiff can establish prima facie cases of discrimination, retaliation, and hostile work environment, therefore summary judgment should not be granted and Plaintiff should be permitted to continue with the litigation process, including undergoing written discovery, taking depositions, and presenting her case to a jury.

A.    Discrimination

Under Title VII, in order to show a prima facie case of discrimination, the plaintiff must establish that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the adverse employment action gives rise to an inference of discrimination. *Carter v. Greenspan,* 304 F.Supp. 2d 13, 27 (D.D.C. 2004).

Reference is made to the aforestated Facts of this present case, including but not limited to:

- Lakisha Tabscott and Nicole Addison-Waters (both women in their mid-twenties and at grade FR-35) were trained by Plaintiff to perform the duties of Staff Assistant, and both younger women were promoted to Staff Assistant grade FR-36, while Plaintiff had remained at grade FR-35, the level at which she had been hired, for her entire tenure at the Board, despite "Outstanding" evaluations from her supervisors and a recommendation that she be promoted to FR-36.  Plaintiff was fully qualified for a promotion to FR-36, for, among other things, her performance of work assignments at the FR-36 level, training of personnel to perform the duties of Staff Assistant, and many positive comments about her work performance.

- Plaintiff was subjected to continuous and frequent yelling and offensive and harassing conduct directed toward her by Mr. Martindale.

- Jeannine Szostek, who was a friend of Ms. Roseman, gave every member of a team that had worked on a Bank Evaluation Project a cash award, except Plaintiff.

14

- Plaintiff was again denied promotion to grade FR-36 in 2005.

- While working for the Accounting Section of RBOPS, many assignments and tasks were being withheld from her, in order to establish falsely that she had poor work performance.

- In Plaintiff's performance evaluation, Greg Evans falsely wrote that from October 2005 to March 2006, Plaintiff had taken off work, had extended absences, and could not keep up with her work so that her responsibilities were transferred to other employees.

B.     Retaliation

"To establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in a statutorily protected activity, (2) the employer took an adverse personnel action, and (3) there existed a causal connection between the two." *Jones v. Greenspan* at 300.  A plaintiff engages in a statutorily protected activity, among others, by filing an EEO complaint.  *Id.,* citing *Forkkio v. Powell,* 306 F.3d 1127, 1131-32 (D.C. Cir. 2002).

A plaintiff must then show that the employer took an adverse personnel action, which is an action "with materially adverse consequences affecting the terms, conditions, or privileges of employment."  *Id.,* citing *Stewart v. Evans,* 275 F.3d 1126, 1134 (D.C. Cir. 2002).

Finally, a plaintiff must establish a causal connection between the protected activity and the adverse personnel action.  The plaintiff must show that the employer "had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity."  *Id.,* citing *Cones v. Shalala*, 199 F.3d 512,

521 (D.C. Cir. 2000).   (*Jones* cites *Clark County Sch. Dist. v. Breeden,* 121 S.Ct. 1508 (2001) "noting that a three- or four-month period between an adverse action and protected activity is insufficient to show a causal connection.")

In the present case, Plaintiff was again denied promotion to grade FR-36 in 2005, and she commented about this failure to promote on a climate survey of the Division of RBOPS.  Subsequently, she was prohibited from attending the climate survey meeting (which she had earlier been told she would be permitted to attend).  Plaintiff then notified the EEO Office that she intended to file another formal EEO complaint.  Subsequent to her notifying the EEO Office that she intended to file a formal EEO complaint (and prior to the filing of the complaint), Ms. Tabscott, whom Plaintiff trained, was promoted to Staff Assistant grade FR-36, rather than Plaintiff.

Plaintiff filed her second formal EEO Complaint on January 3, 2006. Immediately after filing this complaint, her managers abnormally refrained from communicating with her.  Ms. Chang continued to harass Plaintiff, and Plaintiff experienced a hostile work environment and suffered emotional distress due to her work environment.  On June 8, 2006, she was detailed to the Accounting Section of RBOPS, to work as Staff Assistant FR-35 for Assistant Director Greg Evans.  She had been reassigned to an accounting position despite her inexperience with that work, and the performance review contained untrue allegations of poor performance and the requirement that her performance improve by April of 2007.  While working for this section, many assignments and tasks were being withheld from her, in order to establish that she had poor work performance.

The gummy bear incident described in the Statement of Facts was reported to the EEO office and Employee Relations office, and Plaintiff left a voicemail message for her superior Greg Evans detailing the incident. Immediately after this, Plaintiff was placed on administrative leave and ordered to consult with a psychiatrist to determine whether she was fit to return to work. On September 18 and 21, 2006, Plaintiff underwent psychiatric evaluation by Dr. Carol Kleinman (the Defendant's designated psychiatrist). Dr. Kleinman's report was given to the Board on October 3, 2006, but Plaintiff was not permitted to return to work until October 19, 2006.

This series of events clearly establishes a prima facie case of retaliation. Plaintiff filed the EEO complaints, or notified the EEO office of incidents, and within a very short period of time, she was denied promotions, moved to another section, given a poor performance evaluation, placed on administrative leave, and delayed in being allowed to return to work. Defendant's summary judgment motion should thus be denied on the issue of the retaliation claims.

C.    Hostile Work Environment

In order to state a prima facie hostile work environment claim, a plaintiff must establish that (1) she is a member of a protected class and (2) was subjected to unwelcome harassment (3) that was based upon race (4) that had the effect of unreasonably interfering with her work performance and creating an intimidating, hostile, or offensive working environment, and that (5) the employer had liability under the doctrine of *respondeat superior*. *Carter v. Greenspan* at 24, citing *Davis v. Coastal Int'l Sec., Inc.*, 275 F.3d 1119, 1122-23 (D.C. Cir. 2002). An employer has liability under the doctrine of *respondeat superior* when he knew or should have known about the

harassment and failed to take prompt and appropriate corrective action.  *Id.* at 26, citing *Curry v. Dist. of Columbia,* 195 F.3d 654 (D.C. Cir. 1999).  A workplace is "hostile" if the offensive conduct "permeates the workplace with discriminatory intimidation, ridicule, or insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Id.,* citing *Williams v. Verizon Washington, D.C., Inc.,* 266 F.Supp. 2d 107, 124 (D.D.C. 2003).

In the present case, Plaintiff is an African-American woman, and was subjected to harassment by Jo Chang, a Chinese-American woman, as fully described hereinabove. Ms. Chang continually and on numerous occasions yelled at Plaintiff and humiliated her; prompting Plaintiff to complain about this conduct, and notify the EEO office that she intended to file a complaint; even then, the employer did nothing.  Plaintiff did file the EEO complaint, and Ms. Chang's harassment of Plaintiff culminated in the aforementioned gummy bear incident.  This was reported to Greg Evans and Christine Fields, neither of whom took any action to stop the harassment, but rather took action against Plaintiff.  Plaintiff eventually had to resign to escape the hostile work environment, and to deal with her serious health issues as created by the hostile work environment.

Other employees created a hostile work environment, including as described hereinabove, Bud Martindale, Louise Roseman, Greg Evans, Jeannine Szostek, and Paul Bettge.  The Defendant did nothing to remedy any of these situations.

**III.    PLAINTIFF HAS STATED A CLAIM UNDER FMLA, AND DOES NOT LACK SUBJECT MATTER JURISDICTION.**

Defendant, in his Motion to Dismiss and for Summary Judgment, argues that, because Plaintiff is a federal employee with more than 12 months of service, she is covered under Title II of the FMLA. Title II of the FMLA, unlike Title I, does not contain a provision regarding a private right of action to redress a violation of the FMLA by the employer. This has been interpreted by the courts to mean that federal employees who have been employed over 12 months do not have rights under the FMLA. Plaintiff submits that the granting of the entitlements of the FMLA to federal employees under Title II means that failure of the employer to comply is a violation of the FMLA. To exclude all long-tenure federal employees from the protections of this statute would be contrary to the language of the statute and the intent of the statute to protect the jobs of persons who require leave due to family or medical reasons. Plaintiff's FMLA claims should therefore not be dismissed.

**CONCLUSION**

Plaintiff TINA CHANDLER respectfully requests that this Court deny the Motion to Dismiss and for Summary Judgment on the aforestated grounds, and that she be permitted by her undersigned counsel to present oral argument before this Court in support of her positions and to present evidence before this Court as necessary to show that she has established prima facie cases of discrimination, retaliation, and hostile work environment, and that she has genuine issues of material fact sufficient to survive summary judgment and continue with the litigation process (including taking depositions and otherwise engaging in discovery).

**RESPECTFULLY SUBMITTED** on this 21st day of May, 2007.


s/ David W. Buckley
David W. Buckley (D.C. Bar # 210898)
Deso & Buckley, PC
1828 L Street, N.W., Ste. 660
Washington, D.C.
Telephone:    (202) 822-6333
Facsimile:    (202) 822-6665
            Counsel for Plaintiff


s/ B.G. Stephenson
B.G. Stephenson (Virginia Bar # 8098)
B.G. STEPHENSON, LTD.
4157 Chain Bridge Road
Fairfax, Virginia  22030
Telephone:    (703) 591-2470
Facsimile:    (703) 359-0638
            Of Counsel for Plaintiff

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

**TINA M. CHANDLER,**                          )
                                              )
     Plaintiff,                          )
                                              )            **Civil Action No.: <u>1:06-2082 (EGS)</u>**
                                              )
**v.**                                        )
                                              )
                                              )
**BEN S. BERNANKE,**                          )
**CHAIRMAN OF THE BOARD OF**                  )
**GOVERNORS OF THE**                          )
**FEDERAL RESERVE SYSTEM,**                   )
                                              )
     Defendant.                         )
_____)

<u>**STATEMENT OF GENUINE ISSUES OF MATERIAL FACT**</u>

**COMES NOW** the Plaintiff, TINA MICHELLE CHANDLER, by and through her undersigned counsel, and pursuant to United States District Court for the District of Columbia Local Rule 7(h) hereby submits this Statement of Genuine Issues of Material Fact in support of her Opposition to Defendant's Motion to Dismiss and for Summary Judgment as follows:

1.     Plaintiff TINA CHANDLER ("Plaintiff") is an African-American woman, and was born on December 20, 1957, and is currently 49 years of age. She was employed by Defendant in the Washington, D.C. office as a Staff Assistant at grade FR-35, in the Division of Reserve Bank Operations and Payment Systems ("RBOPS"), from her hiring in 1998 until her resignation on November 6, 2006.

2.      She initially reported to Jack Dennis, an African-American male, who was Assistant Director of RBOPS.

3.      Louise Roseman, a Caucasian/white female, was Director of RBOPS.

4.      In or about 2000, Ms. Roseman took adverse action against Mr. Dennis and another African-American male Assistant Director of RBOPS, Earl Hamilton.  Ms. Roseman took work from Mr. Dennis and Mr. Hamilton and gave the work to Paul Bettge, a Caucasian/white male.

5.      Both Mr. Dennis and Mr. Hamilton filed lawsuits against the Board alleging Title VII race discrimination for failure to promote.  Mr. Hamilton's suit was settled and Mr. Hamilton subsequently left his employment with Defendant.  Mr. Dennis's suit was likewise settled and Mr. Dennis retired.

6.      After Mr. Hamilton and Mr. Dennis left the Board, Mr. Bettge was promoted by Ms. Roseman to the position of Associate Director of RBOPS.  Bud Martindale was placed in the position previously held by Mr. Dennis, Assistant Director of RBOPS.

7.      In both 1999 and 2000, Plaintiff received "Outstanding" performance evaluations from her supervisor, Mr. Dennis.  In 2000, Mr. Dennis recommended that Plaintiff receive a promotion to Staff Assistant grade FR-36.

8.      Ms. Roseman subsequently changed Plaintiff's performance evaluation from "Outstanding" to "Commendable," a lower assessment of her performance.  Ms. Roseman also, contrary to Mr. Dennis's recommendation, denied Plaintiff's promotion to Staff Assistant grade FR-36.  Ms. Roseman also indicated that she wanted to remove Plaintiff from the Division of RBOPS.

9.      Plaintiff filed a formal EEO complaint on December 13, 2000, with the EEO Office at the Board due to the racial discrimination to which she had been subjected by Ms. Roseman; that complaint was resolved by a Settlement Agreement dated April 2, 2001.  The Settlement Agreement provided that Plaintiff's 2000 performance evaluation would be changed back from "Commendable" to "Outstanding" (and that the review as written by Mr. Dennis would be placed back into her file, replacing the lower, different review by Ms. Roseman; that she would receive the pay raise for 2001 that was given to employees receiving "Outstanding" evaluations, namely, 5.3 percent, which would be retroactive to December 17, 2000; that she would receive a cash award of $500 (which had been recommended by Mr. Dennis); and that the Board would pay Plaintiff's attorney's fees relative to the complaint in the amount of $1,000.  In exchange, Plaintiff agreed to withdraw her formal EEO complaint and waive all issues that were the subject of the complaint and issues that have arisen between the time of filing of the formal EEO complaint and the date of the Settlement Agreement.

10.     Bud Martindale, who had replaced Mr. Dennis as Assistant Director of RBOPS, was responsible for conducting Plaintiff's performance evaluations for the years 2001, 2002, and 2003.  For all three of those years, Plaintiff received "Outstanding" performance evaluations from Mr. Martindale.

11.     Despite the "Outstanding" evaluations, Plaintiff did not receive her sought-after promotion to grade FR-36.

12.     Plaintiff was subjected to continuous and frequent yelling and offensive and harassing conduct directed toward her by Mr. Martindale.

13.    Mr. Martindale left the position of Assistant Director of RBOPS in August of 2004, and that post remained vacant until the middle of 2006.  Plaintiff at that time assisted the Oversight Coordination section, managed by Jeannine Szostek (a Caucasian/white female), and the Audit Review section, managed by Jo Chang (a Chinese-American female).  Plaintiff reported to Paul Bettge, Associate Director of RBOPS, who was responsible for conducting Plaintiff's performance evaluations, with the input of Ms. Szostek and Ms. Chang.

14.    Ms. Szostek was a friend of Ms. Roseman, had been Plaintiff's manager in 2000, and knew that Plaintiff had filed an EEO complaint in 2000.

15.    Ms. Szostek gave every member of a team that had worked on a Bank Evaluation Project a cash award, except Plaintiff, despite Plaintiff having been an active, participating member of that team on equal footing with all other members of the team (and therefore likewise entitled to the cash award that was denied to her).

16.    Ms. Chang repeatedly subjected Plaintiff to harassment and offensive conduct, creating a hostile work environment.  Ms. Chang, without just cause, yelled at Plaintiff and humiliated her; repeatedly suggested to Plaintiff that she should apply for other jobs; and repeatedly asked Plaintiff, in a disparaging manner, what Plaintiff wanted to do with her life.

17.    Plaintiff was again denied promotion to grade FR-36 in 2005.

18.    The Governors of the Board had called in a group to conduct a climate survey of the Division of RBPOS because the Division had a high turnover rate of employees and a high number of complaints both to Employee Relations and the EEO office.

19.    Plaintiff commented about the failure to promote on a climate survey of the Division of RBOPS.  Subsequently, she was prohibited from attending the climate survey meeting (which she had earlier been told she would be permitted to attend). Plaintiff then notified the EEO Office that she intended to file another formal EEO complaint.

20.    Lakisha Tabscott and Nicole Addison-Waters were both women in their mid-twenties and at grade FR-35.

21.    Plaintiff was responsible for training Ms. Tabscott and Ms. Addison-Waters to perform the duties of Staff Assistant.

22.    Subsequent to her notifying the EEO Office that she intended to file a formal EEO complaint (and prior to the filing of the complaint), Ms. Tabscott was promoted to Staff Assistant grade FR-36.  Ms. Addison-Waters was also promoted to Staff Assistant grade FR-36.

23.    Plaintiff had remained at grade FR-35, the level at which she had been hired, for her entire tenure at the Board, despite "Outstanding" evaluations from her supervisors and a recommendation that she be promoted to FR-36.

24.    Ms. Tabscott and Ms. Addison-Waters, both trained by Plaintiff, were promoted quickly from FR-35 to FR-36.

25.    Plaintiff was fully qualified for a promotion to FR-36 because of the "Outstanding" evalutions, recommendation from Mr. Dennis that she be promoted, performance of work assignments at the FR-36 level, training of personnel to perform the duties of Staff Assistant, positive comments about her work performance including a letter from Anna M. Wong of the Federal Reserve Bank of Boston (dated July 29, 2002),

cash awards for performance in the amounts of $1,000 and $500, respectively, and a letter commending her contributions in organizing the Joint Meeting of Audit Committee Chairs and General Auditors, and subsequent Conference of General Auditors (dated August 1, 2002).

26.    Plaintiff filed her second formal EEO Complaint on January 3, 2006. After filing this complaint, her managers abnormally refrained from communicating with her.  Ms. Chang continued to harass Plaintiff, and Plaintiff experienced a hostile work environment and suffered emotional distress due to her work environment.

27.    Plaintiff was diagnosed with post-traumatic stress syndrome (PTSS) and fibromyalgia, and referred to a psychiatrist for treatment.

28.    On June 7, 2006, Dr. Curiel completed, signed, and dated a Certification of Health Care Provider form, stating that Plaintiff "will have to take work only intermittently;" Plaintiff "is presently incapacitated; will require psychiatric care before working full time;" Plaintiff "will have to take time off from work until her condition improves;" and Plaintiff is "unable to perform any of her duties at present time."

29.    Plaintiff submitted this Certification to the Board as part of her application for leave under the Family and Medical Leave Act (FMLA).

30.    The Board granted Plaintiff 12 weeks (480 hours) of unpaid FMLA leave to be used on an intermittent basis from June 7, 2006, until June 6, 2007.

31.    Despite requiring continuous time off, she was only granted this intermittent time off.

32.    Ms. Chang's harassment of Plaintiff culminated in an incident wherein Ms. Chang approached Plaintiff, invaded Plaintiff's personal space (was unreasonably

close to Plaintiff) and thrust a handful of gummy bear candy directly in front of Plaintiff's face and commanded Plaintiff to "eat it." Plaintiff's initial instinct was to push Ms. Chang away in order to protect herself, but Plaintiff was able to overcome this instinct and refrained from making any type of physical contact with Ms. Chang.

33.    Plaintiff reported this incident to the EEO office and Employee Relations office, and left a voicemail message for Greg Evans detailing the incident.

34.    Greg Evans did not return Plaintiff's call, but responded with a written memorandum expressing concern over the safety of the workplace and the issue of violence in the workplace. He did not address Plaintiff's complaint.

35.    Plaintiff also received a letter from Christine M. Fields, the Assistant Director of the Board, expressing concern over Plaintiff's ability to perform the functions of her job without endangering her safety of that of other employees, and requiring Plaintiff to undergo psychiatric evaluation to determine whether she was fit for duty. Ms. Fields likewise did not address Plaintiff's complaint.

36.    On September 18 and 21, 2006, Plaintiff underwent psychiatric evaluation by Dr. Carol Kleinman (a psychiatrist designated by the Board) and was found to be fit for duty.

37.    Dr. Kleinman wrote in her letter that "in my opinion, to a reasonable degree of medical certainty, Ms. Chandler is safe to return to work;" that "[s]he is not a violent person;" that "Ms. Chandler, in my view, very likely does suffer from a psychiatric disorder that prevents her from safely performing her work for the Board at this time;" that Plaintiff should consult a psychiatrist, take medication for her anxiety, undergo therapy, and return to work after some time; and that "[i]t seems that her

managers have not responded early enough to the problems in their department, until they got so out of hand that Ms. Chandler exploded and made her complaints known."

38. Plaintiff resigned on November 6, 2006, due to "escalating , stressful and adverse work environment" and the discrimination and hostile work environment to which she had been subjected during her entire tenure at the Board.

**RESPECTFULLY SUBMITTED** on this 21st day of May, 2007.

s/ David W. Buckley
David W. Buckley (D.C. Bar # 210898)
Deso & Buckley, PC
1828 L Street, N.W., Ste. 660
Washington, D.C.
Telephone:    (202) 822-6333
Facsimile:    (202) 822-6665
            Counsel for Plaintiff

s/ B.G. Stephenson
B.G. Stephenson (Virginia Bar # 8098)
B.G. STEPHENSON, LTD.
4157 Chain Bridge Road
Fairfax, Virginia  22030
Telephone:    (703) 591-2470
Facsimile:    (703) 359-0638
            Of Counsel for Plaintiff

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____ )
                                        )
**TINA M. CHANDLER,**                   )
                                        )
      Plaintiff,                      )
                                        )    **Civil Action No.: <u>1:06-2082 (EGS)</u>**
                                        )
**v.**                                  )
                                        )
                                        )
**BEN S. BERNANKE,**                    )
**CHAIRMAN OF THE BOARD OF**            )
**GOVERNORS OF THE**                    )
**FEDERAL RESERVE SYSTEM,**             )
                                        )
      Defendant.                      )
_____)

## [PROPOSED] ORDER

      **FOR THE REASONS** stated in the accompanying Memorandum Opinion, it is

hereby

      **ORDERED** that Defendant's Motion to Dismiss and for Summary Judgment be

and hereby is DENIED.


                                  _____
                                  EMMET G. SULLIVAN
                                  United States District Judge

PLAINTIFF'S MEMORANDUM OF POINTS AND
AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS AND FOR
SUMMARY JUDGMENT

EXHIBIT 2

# FEDERAL RESERVE BANK
## OF BOSTON

ANNA M. WONG
ASSISTANT GENERAL AUDITOR
617·973·3471
FAX: 617·973·4256

P. O. BOX 2076
BOSTON, MASSACHUSETTS 02106-2076

Ms. Tina Chandler
Board of Governors
DOPRS
Washington D.C.

July 29,2002

Dear Tina:

I want to thank you for coordinating the arrangements for the Conference of General Auditors' meeting which was held last week at the Board of Governors. Everything went extremely well, including the transportation arrangements. Your pleasant disposition made it easy and a pleasure for me to work with you. In addition, your excellent organization skills and advance preparations allowed the meeting to run smoothly.

If you are ever in the Boston area, please feel free to give me a call and stop by to visit our Bank. Thanks again

Sincerely,

Anna M. Wong

x.c. B. Martindale

PLAINTIFF'S MEMORANDUM OF POINTS AND
AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS AND FOR
SUMMARY JUDGMENT

EXHIBIT 3



**BOARD OF GOVERNORS**
OF THE
**FEDERAL RESERVE SYSTEM**
WASHINGTON, D. C. 20551

LOUISE L. ROSEMAN
DIRECTOR
DIVISION OF
RESERVE BANK OPERATIONS
AND PAYMENT SYSTEMS

August 1, 2002

Ms. Tina Chandler
Division of Reserve Bank Operations
   and Payment Systems
Board of Governors of the
   Federal Reserve System
Washington, D.C. 20551

Dear Tina:

I am pleased to present you with a cash award of $1,000 for your contributions in organizing the Joint Meeting of Audit Committee Chairs and General Auditors, and the subsequent Conference of General Auditors meeting. In particular, you demonstrated a strong commitment to ensuring that the conference was organized in a professional manner. You collaborated effectively with appropriate program staff in the Office of the Secretary and exhibited strong communication skills throughout the entire project. I especially appreciate your dedication to ensuring that transportation arrangements and hotel reservations were handled smoothly and that printed meeting materials were completed in a timely and professional manner. This cash award will be reflected in your August 28 pay statement. We will provide you a copy of the personnel action notice when it is available.

Paul, Bud, Jo, and I thank you for your important contributions. We are pleased to be able to recognize your efforts in this way.

Sincerely,

*Louise*

c:    Paul Bettge
      Bud Martindale
      Jo Chang

PLAINTIFF'S MEMORANDUM OF POINTS AND
AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS AND FOR
SUMMARY JUDGMENT

EXHIBIT 4

# BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

### DIVISION OF RESERVE BANK OPERATIONS AND PAYMENT SYSTEMS

**Date:**      November 6, 2006

**To:**        Gregory L. Evan

**From:**      Tina Chandler

**Subject:**   Resignation as of November 6, 2006

I, Tina Chandler, am submitting this formal resignation letter to Greg Evans, stating that I am resigning due to an escalating, stressful and adverse work environment, and I feel the need to resign effective immediately.

cc: Louise Roseman
    Paul Beggte
    Lisa Hoskins
    Human Recourses

PLAINTIFF'S MEMORANDUM OF POINTS AND
AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS AND FOR
SUMMARY JUDGMENT

EXHIBIT 5

Certification of Health Care Provider
(Family and Medical Leave Act of 1993)

**U.S. Department of Labor**
Employment Standards Administration
Wage and Hour Division



| *(When completed, this form goes to the employee, __Not to the Department of Labor.__)* | OMB No.: 1215-0181<br>Expires: 08-31-2007 |
|---|---|

| 1. Employee's Name | 2. Patient's Name *(If different from employee)* |
|---|---|
| Tina M. Chandler | Tina M. Chandler |

3. Page 4 describes what is meant by a **"serious health condition"** under the Family and Medical Leave Act. Does the patient's condition[1] qualify under any of the categories described? If so, please check the applicable category.

(1) _____ (2) _____ (3) _____ (4) _X_ (5) _____ (6) _____ , or None of the above _____

4. Describe the **medical facts** which support your certification, including a brief statement as to how the medical facts meet the criteria of one of these categories:

GENERALIZED ACHES AND PAINS, FATIGUE
TRIGGER POINTS CONSISTENT C̄
FIBROMYALGIA,
PATIENT ALSO ~~c~~ WITH PTSD,
HAVING FLASHBACKS

5. a. State the approximate **date** the condition commenced, and the probable duration of the condition (and also the probable duration of the patient's present **incapacity**[2] if different):

CHRONIC CONDITION.
PATIENT WILL NEED PSYCHIATRIC AND
RHEUMATOLOGIC CARE

b. Will it be necessary for the employee to take work only **intermittently or to work on a less than full schedule** as a result of the condition (including for treatment described in Item 6 below)?

PATIENT WILL HAVE TO TAKE WORK
ONLY INTERMITTENTLY

If yes, give the probable duration:

CHRONIC CONDITION.

c. If the condition is a **chronic condition** (condition #4) or **pregnancy**, state whether the patient is presently incapacitated[2] and the likely duration and frequency of **episodes of incapacity**[2]:

PATIENT IS PRESENTLY INCAPACITATED.
WILL REQUIRE PSYCHIATRIC CARE
BEFORE WORKING FULL TIME,

[1] Here and elsewhere on this form, the information sought relates only to the condition for which the employee is taking FMLA leave.

[2] "Incapacity," for purposes of FMLA, is defined to mean inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom.

Form WH-380
Revised December 1999

6. a.  If additional **treatments** will be required for the condition, provide an estimate of the probable number of such treatments.

FREQUENT VISITY TO DOCTORS

If the patient will be absent from work or other daily activities because of **treatment** on an **intermittent** or **part-time** basis, also provide an estimate of the probable number of and interval between such treatments, actual or estimated dates of treatment if known, and period required for recovery if any:

HER CONDITION MAYFLARE AT TIMES

b.  If any of these treatments will be provided by **another provider of health services** (e.g., physical therapist), please state the nature of the treatments:

c.  If a regimen of **continuing treatment** by the patient is required under your supervision, provide a general description of such regimen (e.g., prescription drugs, physical therapy requiring special equipment):

PRESCRIPTION DRUGS: FLETERIL + CLNVI

7. a.  If medical leave is required for the employee's **absence from work** because of the employee's own condition (including absences due to pregnancy or a chronic condition), is the employee **unable to perform work** of any kind?

PATIENT WILL HAVE TO TAKE TIME off
FROM WORK UNTIL HER CONDITION
IMPROVES

b.  If able to perform some work, is the employee **unable to perform any one or more of the essential functions of the employee's job** (the employee or the employer should supply you with information about the essential job functions)? If yes, please list the essential functions the employee is unable to perform:

PATIENT UNABLE TO PERFORM ANY
TWO OF HER DUTIES AT PRESENT
TIME

c.  If neither a. nor b. applies, is it necessary for the employee to be **absent from work for treatment**?

8.  a.  If leave is required to **care for a family member** of the employee with a serious health condition, **does the patient require assistance** for basic medical or personal needs or safety, or for transportation?

b.  If *no*, would the employee's presence to provide **psychological comfort** be beneficial to the patient or assist in the patient's recovery?

c.  If the patient will need care only **intermittently** or on a part-time basis, please indicate the probable **duration** of this need:

_____   RHEUMATOLY
Signature of Health Care Provider    RU CURIEL, MD    Type of Practice

2150 PENNSYLVANNIA AVE    202  741 3333
Address    Telephone Number

WASHINGTON, DC    6/7/06
Date

**To be completed by the employee needing family leave to care for a family member:**

State the care you will provide and an estimate of the period during which care will be provided, including a schedule if leave is to be taken intermittently or if it will be necessary for you to work less than a full schedule:

_____    _____
Employee Signature    Date

Page 3 of 4



A "Serious Health Condition" means an illness, injury impairment, or physical or mental condition that involves one of the following:

1. Hospital Care

   **Inpatient care** (*i.e.*, an overnight stay) in a hospital, hospice, or residential medical care facility, including any period of incapacity[2] or subsequent treatment in connection with or consequent to such inpatient care.

2. Absence Plus Treatment

   (a) A period of incapacity[2] of **more than three consecutive calendar days** (including any subsequent treatment or period of incapacity[2] relating to the same condition), that also involves:

      (1) **Treatment[3] two or more times** by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (*e.g.*, physical therapist) under orders of, or on referral by, a health care provider; or

      (2) **Treatment** by a health care provider on **at least one occasion** which results in a **regimen of continuing treatment[4]** under the supervision of the health care provider.

3. Pregnancy

   Any period of incapacity due to **pregnancy**, or for **prenatal care**.

4. Chronic Conditions Requiring Treatments

   A **chronic condition** which:

      (1) Requires **periodic visits** for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider;

      (2) Continues over an **extended period of time** (including recurring episodes of a single underlying condition); and

      (3) May cause **episodic** rather than a continuing period of incapacity[2] (*e.g.*, asthma, diabetes, epilepsy, etc.).

5. Permanent/Long-term Conditions Requiring Supervision

   A period of **Incapacity**[2] which is **permanent or long-term** due to a condition for which treatment may not be effective. The employee or family member must be under the continuing supervision of, but need not be receiving active treatment by, a health care provider. Examples include Alzheimer's, a severe stroke, or the terminal stages of a disease.

6. Multiple Treatments (Non-Chronic Conditions)

   Any period of absence to receive **multiple treatments** (including any period of recovery therefrom) by a health care provider or by a provider of health care services under orders of, or on referral by, a health care provider, either for **restorative surgery** after an accident or other injury, or for a condition that **would likely result in a period of incapacity**[2] **of more than three consecutive calendar days in the absence of medical intervention or treatment**, such as cancer (chemotherapy, radiation, etc.), severe arthritis (physical therapy), and kidney disease (dialysis).

   This optional form may be used by employees to satisfy a mandatory requirement to furnish a medical certification (when requested) from a health care provider, including second or third opinions and recertification (29 CFR 825.306).

   *Note:* Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number.

   ---

   [3] Treatment includes examinations to determine if a serious health condition exists and evaluations of the condition. Treatment does not include routine physical examinations, eye examinations, or dental examinations.

   [4] A regimen of continuing treatment includes, for example, a course of prescription medication (*e.g.*, an antibiotic) or therapy requiring special equipment to resolve or alleviate the health condition. A regimen of treatment does not include the taking of over-the-counter medications such as aspirin, antihistamines, or salves; or bed-rest, drinking fluids, exercise, and other similar activities that can be initiated without a visit to a health care provider.

### Public Burden Statement

We estimate that it will take an average of 20 minutes to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, Department of Labor, Room S-3502, 200 Constitution Avenue, N.W., Washington, D.C. 20210.

*DO NOT SEND THE COMPLETED FORM TO THIS OFFICE; IT GOES TO THE EMPLOYEE.*

*U.S. GPO: 2000-481-954/25505



PLAINTIFF'S MEMORANDUM OF POINTS AND
AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS AND FOR
SUMMARY JUDGMENT

EXHIBIT 7



RESTRICTED – FR

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
MANAGEMENT DIVISION

Christine M. Fields
Associate Director

August 18, 2006

Ms. Tina M. Chandler
1720 East Bancroft Lane
Crofton, Maryland  21114

Dear Ms. Chandler:

Information has come to my attention that creates a concern about your ability to perform the functions of your job without endangering your safety or that of others.  Thus, I am requiring you to provide me with a written medical evaluation from your doctor that explains whether you are mentally fit to perform your job.   Your division agrees with this recommendation.

My concerns with your ability to perform your job safely arise from two recent events that are outlined in the August 18, 2006 memo from your supervisor, Greg Evans.  Concerns have also been expressed by Rena Carlton, Supervisor, Employee Relations, as a result of your conversation with her.

Based on the events detailed by Mr. Evans and the concerns expressed by Ms. Carlton, I am extremely concerned about your behavior.  Your behavior toward your co-workers has becoming increasingly erratic and threatening and I am concerned that a medical problem may be underlying your actions.  As you know, you gave permission for the Board's doctor, Dr. Horan, to speak to a rheumatologist that you were consulting regarding a medical concern you had.   Dr. Horan states that the rheumatologist informed him that your problems were not rheumatological but rather stemmed from a mental health problem.  Because we are concerned that your behavior could stem from mental health problems, employee relations staff discussed your recent behavior with Dr. Horan and he recommended that you be sent for an independent medical evaluation in order to determine whether you can safely perform your work.  In addition, on August 8, 2006 you reported to the Board's Health Unit and were seen by Dr. Kanjarpane.  You informed Dr. Kanjarpane that you felt you could not continue to perform your job.  Dr. Kanjarpane also advised management that you should be examined by a doctor to determine whether you are able to perform your duties.

In light of your recent behavior and the recommendations from Dr. Horan and Dr. Kanjarpane, I am requesting that you provide me with a written medical evaluation from your psychiatrist that explains whether you are mentally fit to perform your job by September 8, 2006.  As you know, you have been granted administrative leave to allow you time to obtain

this medical information and for the Board to reach a decision on this issue. In addition, in order for the Board to receive a full evaluation of your fitness for duty, you must inform me by August 25, 2006 of your psychiatrist's name and telephone number so that I can forward to him or her your job description as well as a copy of this letter so that your doctor understands the reasons why the Board has asked for you to be evaluated. Please be advised that if you do not submit the contact information for your psychiatrist and/or a written evaluation from your psychiatrist by the dates indicated above, you may be disciplined or, if appropriate, your employment may be terminated.

If you do not wish to be seen by your psychiatrist, you may choose to been seen by a Board doctor. If you choose this option, the Board will ask you to be evaluated by a doctor who is a board-certified psychiatrist in private practice. This examination will include psychological testing as well any additional examinations that are necessary to permit the psychiatrist to opine on your mental fitness to perform your job. The Board will pay for the examination and any additional examinations, if any are necessary, to reach a conclusion on this issue. If you prefer to be seen by a Board doctor you must inform me of this choice by August 25, 2006.

Should you wish, you may also submit any other medical documentation about your ability to perform your job from your personal physician, or other medical practitioner, and the Board will consider this documentation in reaching a decision on your fitness for duty.

Since you will be excused from work during the time it takes for the Board to evaluate your fitness for duty, you will not have access to the building until the matter of your ability to safely perform your job has been resolved. As noted above, if you do not comply with the deadlines for submitting the information I have requested above, your administrative leave will be terminated and, as noted above, you may be subject to disciplinary action or termination of your employment. However, if you find that you can not comply with these deadlines, or if you have any questions regarding this matter, please contact Keisha Hargo at 202-728-5877.

Sincerely,

Christine M. Fields
Associate Director

cc:    Keisha Hargo

PLAINTIFF'S MEMORANDUM OF POINTS AND
AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS AND FOR
SUMMARY JUDGMENT

EXHIBIT 8

# CAROL COLE KLEINMAN, MD, JD
### 5480 Wisconsin Avenue Suite 1006
### Chevy Chase, Maryland 20815

### October 16, 2006

Christine M. Fields
Associate Director
Board of Governors of the Federal Reserve
Washington, DC 20551

RE:  <u>Tina M. Chandler</u>

Dear Ms. Fields:

I am writing this letter as an Addendum to my Psychiatric Evaluation dated October 3, 2006.  The question has arisen whether I think that Ms. Chandler is a dangerous person. As I stated in my earlier report, she will have emotional outbursts from time to time.  However, in my opinion, to a reasonable degree of medical certainty, Ms. Chandler is safe to return to work.  She is not a violent person.

If you have any further questions, please do not hesitate to contact me.

Sincerely,


Carol C. Kleinman, MD, JD

**Board-Certified in Psychiatry and Forensic Psychiatry**
**American Board of Psychiatry and Neurology**